**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| APPLIED SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  25-cv-14251 |
| | ) | |
| PBC CONSULTING INC. and ARDENT LABS, INC., d/b/a COMULATE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

Plaintiff Applied Systems, Inc. ("Applied" or "Plaintiff") hereby alleges as follows against Defendants PBC Consulting Inc. ("PBC") and Ardent Labs, Inc., d/b/a Comulate ("Comulate") (PBC and Comulate, collectively, "Defendants").

## <u>INTRODUCTION</u>

1.    This is a case of corporate fraud and theft by a company that tried to bypass research and development investment and cheat its way to competitiveness with a market leader. By standing up a phony business and lying about its purpose, Comulate fraudulently gained access to Applied's systems to steal a trove of Applied's most valuable trade secrets. Comulate then used Applied's trade secrets, developed over decades at great expense, to enhance the features and functionality of Comulate's existing product and to accelerate the development of new products and functionality that would not have been possible without Applied's intellectual property.

2.    Applied is a leading provider of cloud-based software in insurance automation and the world's largest provider of insurance agency and brokerage management systems.

Comulate is an insurance accounting software start-up founded by Jordan Katz and Michael Mattheakis who, by their own admission, "actually, like didn't know anything about insurance or accounting."[1]  Desperate to fill in the gaps in their knowledge and accelerate the research and development necessary to build out their software and integrate fully with established insurance accounting software companies like Applied, Comulate hatched an unlawful and calculated corporate scheme to intentionally misappropriate Applied's most sensitive and valuable trade secrets.  Comulate's theft was not an isolated act—it was a deliberate scheme, perpetrated for **over nineteen months**, designed to misappropriate critical trade secrets and use them to unfairly compete with Applied.  Most shockingly, Comulate even manufactured a fake insurance agency in California—PBC—solely for the purpose of misappropriating Applied's trade secrets and improperly reverse-engineering Applied's software for over nineteen months.  Upon information and belief, Comulate then used Applied's trade secrets, developed over decades at great expense, to enhance the features and functionality of Comulate's direct billing reconciliation product and to accelerate the development of an agency billing product.

3.      This espionage scheme only came to light recently, when PBC's highly unusual activity on Applied's Epic software platform set off internal alarms and Applied commenced an internal investigation.  That investigation uncovered that PBC was not actually an insurance agency, but was in fact **Comulate itself**.  This shocking revelation was contrary to PBC's misrepresentations to Applied in March 2024, that it was a new agency comprising three experienced agents who had worked together in the past and were ready to grow their own

---

[1] *How to Find $10M Ideas in Markets We'd Never Worked In – Comulate (Jordan Katz & Michael Mattheakis)*, EO (podcast), Podscan.fm, https://podscan.fm/podcasts/eo-2/episodes/how-to-find-10m-ideas-in-markets-wed-never-worked-in-comulate-jordan-katz-amp-michael-mattheakis-eo.

business.  PBC further misrepresented that it was looking to integrate a CRM platform, known as HubSpot, with Epic.  This was a lie.  There was no PBC—rather, PBC was a Trojan horse for Comulate's spying scheme.

4.     On March 15, 2024, PBC entered into an Applied Systems Master Agreement ("Master Agreement"), attached hereto as Exhibit A, and Schedule – Applied Epic Integration Service with SDK [Software Development Kit] for Agencies and Brokerages ("Schedule SDK"), attached hereto as Exhibit B.  According to the terms of the Master Agreement and Schedule SDK, among other limitations, in addition to access to Epic, Applied gave PBC a "limited license to use" the Applied Epic Integration Service SDK and the Run-Time SDK (collectively, the "SDK") "solely in connection with managing [PBC's] insurance agency or brokerage."  Ex. B § 5.  PBC's license was limited to the "Authorized Business Purpose(s)," which were specified as "develop[ing] an integration between HubSpot and Applied Epic via the SDK," *id.* § 5.1, and limited to certain "Authorized Integration(s)" involving specified "Epic [] Integration Method[s]," *id.* § 5.2.  The Schedule SDK was clear that PBC shall not use the SDK "to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of the [SDK] to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions."  *Id*. § 5.5.  PBC's license also explicitly prohibited use "for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service."  *Id*. § 5.6.

5.     In Section 4.3 of the Master Agreement, PBC expressly agreed that the software provided or made available by Applied, including Epic and the SDK, "constitutes, embodies, and/or contains valuable trade secrets, proprietary information, and other Confidential

Information owned by Applied" and agreed that "any use or disclosure to third parties not specifically authorized in writing by Applied or its licensors is prohibited." Ex. A § 4.2. PBC made the same agreements explicitly with respect to the SDK in Section 5.7 of the Schedule SDK, also agreeing that the SDK is subject to the restrictions afforded Confidential Information under the Master Agreement:

> Licensee acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK **constitute and/or contain valuable trade secrets and are considered Confidential Information under the terms of the Agreement**. **Unauthorized use or disclosure** of the Applied Epic Integration Service or of the Run-Time SDK **is prohibited and may be illegal**. Licensee further acknowledges and agrees that this Schedule does not authorize Licensee to use or disclose the Applied Epic Integration Service SDK or the Run-Time SDK other than as prescribed in this Schedule without the prior written consent of APPLIED.

Ex. B § 5.7 (emphasis added). In other words, the Schedule SDK clearly—and repeatedly— prohibited PBC's use of the SDK for any purpose other than to develop an integration between HubSpot and Applied Epic and explicitly prohibited PBC's disclosures of the SDK to Comulate.

6.      Nevertheless, in flagrant violation of the Master Agreement and the Schedule SDK, it is now clear that PBC is ***not*** and ***never was*** an actual insurance agency or brokerage and has ***no*** clients. Instead, the "phoenixbenefits" webpage, https://phoenixbenefits.godaddysites.com/, is a fake website that is little more than a Go Daddy template, which goes nowhere when one clicks on it. A printout of the web page on November 20, 2025 is attached hereto as Exhibit C.

7.      Comulate, posing as the fake "agency" PBC, flagrantly violated almost every limitation in the licenses to the Applied Software, including Epic and the SDK, in the Master Agreement and Schedule SDK. Upon information and belief, Comulate/PBC never integrated with HubSpot and never used Epic or the SDK for ***any*** authorized purposes.

4

8.      Comulate—via PBC—contracted with Applied for access to Epic under false pretenses and in an effort to hack Epic and the Extended Solutions that Applied offers within Epic.  Despite misrepresenting itself as a three-person agency (a very small agency), and despite having just two "seats" to access Epic, PBC made *millions* of calls to certain Applied endpoints using Epic—a number of calls that is several thousand deviations larger than the number that even much bigger (and real) agencies typically make using Epic, as detailed herein.

9.      Upon information and belief, Comulate/PBC used Epic to test and improperly reverse-engineer the confidential and trade secret methods, logic, processes and algorithms underlying various features and functionalities within Epic.  To do so, PBC used fake "invoices" and fake "transactions."  Seemingly nothing about PBC was real, other than its fraud, theft and misappropriation of Applied's trade secrets.  The reality was that PBC was Comulate and, upon information and belief, Comulate was running tests in Epic to figure out how to improve its direct billing product and to accelerate development of an agency billing product to compete with Applied by improperly reverse-engineering Applied's trade secrets at a pace outsized to and more cost-effective than Comulate's traditional development cycles.

10.     Most concerning, this improper reverse-engineering of Applied's most prized trade secrets appears to have been orchestrated by Comulate's senior leadership.  For example, the email address provided by Jordan Bates ("Bates"), the PBC contact who interacted with Applied and signed PBC's Master Agreement, is associated with the LinkedIn page of a Comulate engineer named "Riley W."  On information and belief, Bates either is or is connected to Jordan Katz ("Katz"), Comulate's Co-Founder and Chief Executive Officer ("CEO"), and/or acted at the direction of Comulate's senior management.  Numerous emails that Comulate

attached directly in Epic were flagrantly sent to and from senior Comulate employees in the process of testing the Epic system.

11.     Indeed, via "Bates," Katz and other senior leadership of Comulate began using PBC's fraudulently procured Epic seats to reverse-engineer Applied's proprietary technology and steal Applied's trade secrets in violation of the PBC Master Agreement and federal law. In the course of doing so, Katz and other Comulate senior leadership even uploaded invoices belonging to Comulate's customers—legitimate insurance brokerage agencies and done likely without such agencies' permission or knowledge—to Epic to practice using Epic and extract the targeted Applied trade secrets.

12.     Comulate's scheme was designed to, and did, improperly reverse-engineer Applied's valuable Epic trade secrets in violation of the Master Agreement. Indeed, the Epic trade secrets are Applied's "secret sauce" that have helped Epic become a leading tool for stakeholders in the insurance industry. Comulate's use of PBC, a fake agency, to gain access to Epic allowed it to bypass years of research and development, and millions of dollars of investment, to refine its direct billing product and to develop a new agency billing product.

13.     Applied brings this action against Comulate and PBC to stop Comulate's unlawful theft and misappropriation of Applied's trade secrets, to prevent further dissemination and disclosure of Applied's trade secrets, to prevent Comulate from further harming Applied through unfair competition, and to obtain compensation for the significant harm to Applied that Comulate and PBC have intentionally caused. Applied welcomes honest and lawful competition. We cannot tolerate outright theft. Applied brings this action to protect its valuable trade secrets and prevent immediate and ongoing irreparable harm to its business.

## THE PARTIES

14.     Plaintiff Applied Systems, Inc. is a Delaware corporation with its headquarters and principal place of business at 320 N. Sangamon Avenue, Suite 750, Chicago, Illinois 60607. Applied is a well-known and highly-regarded global provider of cloud-based software that powers the business of insurance.

15.     Defendant PBC Consulting Inc. purports to be a California corporation with its headquarters and principal place of business located at 1430 Q St #402, Sacramento, California 95811—upon information and belief, inside a residential apartment.[2]

16.     Defendant Ardent Labs, Inc., d/b/a Comulate, is a California corporation with its headquarters and sole place of business at 785 Market St. Suite 950, San Francisco, California 94103.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States 18 U.S.C. § 1836 et seq.

18.     This Court has supplemental jurisdiction over Applied's state law claims under 28 U.S.C. § 1367(a), because Applied's state law claims derive from a common nucleus of operative facts and are so closely related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has jurisdiction over Applied's state law claims under 28 U.S.C. § 1332, because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

---

[2] In its dealings with Applied, PBC has also used or gone by the names Phoenix Benefits Consulting and BBC Consulting Inc.  However, upon information and belief, references to BBC Consulting Inc. may have been the result of a typographical error.

19.     This Court has personal jurisdiction over PBC under at least 735 Ill. Comp. Stat. Ann. § 5/2-209(7), because this case concerns PBC's breach of a contract with Applied that is substantially connected with Illinois.  Specifically, PBC's Master Agreement contains a "**Choice of Law and Venue**" provision prescribing:  "The Agreement and the relationship between the parties, and all proceedings directly or indirectly related thereto shall be governed by the laws of the Location.  The Location is Will County, Illinois."  Ex. A § 14.6.  Indeed, PBC "**consent[ed] to the sole and exclusive jurisdiction and venue of the courts of the Location for <u>any proceeding or claim</u> between the parties**," *id.* (emphasis in original), including this Court.

20.     This Court also has personal jurisdiction over Comulate because, as set forth herein, Comulate is the alter ego of and exercises substantial control over PBC.  PBC is a sham entity created by Comulate in order to gain unlawful access to the trade secrets under the Master Agreement and then reverse-engineer them in violation of the Master Agreement.  Comulate is therefore subject to and bound by the jurisdiction and venue provisions of the Master Agreement.  Upon information and belief, Katz, a co-founder and the CEO of Comulate, signed the Master Agreement on PBC's behalf while fraudulently posing as an officer or agent of PBC at the direction of Comulate.

21.     Alternatively, this Court has personal jurisdiction over Comulate because, in the unlikely event that PBC is not an alter ego of Comulate, Defendants have engaged in a civil conspiracy to fraudulently obtain, improperly reverse-engineer and misappropriate Applied's confidential information and trade secrets, and to engage in other misconduct as alleged herein.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

Moreover, venue is proper in this district because section 14.6 of the PBC Master Agreement provides that PBC "**consents to the sole and exclusive jurisdiction and venue of the Courts of [Will County, Illinois] for <u>any proceeding or claim</u> between the parties**." Ex. A § 14.6 (emphasis in original). Comulate, PBC's alter ego, is subject to venue here for the same reasons set forth above.

**FACTUAL ALLEGATIONS**

A.     <u>Applied Pioneers The Insurance Technology Industry</u>

    23.     Like many great technology startups, Applied was started in 1983 in the basement of its founder, Robert Eustace, and today has over 2,800 employees worldwide. Applied is a developer of cloud-based software designed specifically for the insurance industry. Applied specializes in insurance automation software for agency and brokerage management systems that facilitate the exchange of information throughout the insurance life cycle between agencies, brokerages, insurance carriers, and their clients. Applied's core mission is premised on the idea of connecting and automating the digital roundtrip of insurance.

    24.     Applied's Epic is the world's most widely used insurance agency management system ("AMS") for insurance agencies and brokers. Epic, a sophisticated software program, provides a centralized platform for a business to manage sales, policies and customer service through many integrated capabilities including prospecting, pipeline management, market access, operational reporting, policy management, and insurance quotes and submissions. Epic is also a powerful accounting software program that enables digital payments, including the management

9

and reconciliation of accounts payable and receivable within the general ledger, which is fully integrated with and natively embedded in Epic itself.[3]

25.     Since its founding, Applied has created and delivered many firsts, including: (i) the first agency AMS and PC-based software application in the property and casualty industry, Applied TAM®, in 1983; (ii) the first cloud-based, fully integrated and automated agency billing software, Epic, in 2008; (iii) the first mobile app designed to give insurance agents and brokers on-the-go access to client and prospect information from their agency management systems in 2012; (iv) the first client portal for 24/7 insured self-service in 2014; and (v) the first natively integrated payments solution built specifically for insurance in 2022.  By simplifying and modernizing the insurance lifecycle, Applied's products—and the hard-working and creative employees who have developed and supported them for over 40 years—enable millions around the world to safeguard and protect their loved ones, homes, and most treasured possessions.

26.     Applied's software has repeatedly been praised for its innovation within the insurance software industry, known as insurtech.  In August 2025, Epic won the 2025 SaaS Awards' category for Best SaaS Product in Business Intelligence, Analytics, and Reporting and received its fourth consecutive Global 5-Star Insurance Technology and Software Provider honor from Insurance Business.  The SaaS awards specifically recognized Epic's embedded analytics, which transform data into workflow-level decision support and enable smarter organizational

---

[3] In Epic, the general ledger ("GL") is the core financial module for managing an agency's accounts.  It allows users to enter receipts, process disbursements, create journal entries, and perform reconciliations for bank accounts and direct bill commissions.  This includes handling client payments, carrier deposits, vendor payments, and commission payables.

decision-making.[4]  Applied has also received multiple American Business Awards (*i.e.*, Stevie Awards) for Epic.[5]

27.    Considering Applied's deep understanding of the insurance industry, its suite of product offerings, and its reputation for innovation, it is not surprising that Applied is also one of the leaders in insurance artificial intelligence ("AI").  Examples of Applied's innovative uses of AI include Applied Book Builder, an AI-powered tool that helps insurance agencies grow their business by analyzing existing customer data and identifying new opportunities and Epic Bridge, which allows users to document emails, access client information, and use templates within their Outlook email inbox.  Applied also established the Applied AI Lab, which provides companies with an opportunity to participate in research, guide use cases, and experiment hands-on with innovative AI-assisted capabilities across Applied's suite of product offerings.

28.    Applied was recently included in Fast Company's seventh annual Best Workplace for Innovators List, which recognizes the top 100 businesses globally that empower employees at all levels to improve processes, create new products, or invent new ways of doing business. Applied ranked 74th for its culture of collaboration.[6]

---

[4] *See* Applied Systems, Press Release, *Applied Earns Dual Honors with SaaS Award and 5-Star Tech Provider Recognition* (Aug. 27, 2025) (https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-earns-dual-honors-with-saas-award-and-5-star-tech-provider-recognition).

[5] *See, e.g.*, Applied Systems, Press Release, *Applied Systems Honored with Three Stevie Awards in 2025 American Business Awards* (Apr. 30, 2025).(https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-systems-honored-with-three-stevie-awards-in-2025-american-business-awards/).

[6] *See* Applied Systems, Press Release, *Applied Systems Recognized as a Fast Company Top Workplace of Innovators* (Sept. 9, 2025) https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-systems-recognized-as-a-fast-company-top-workplace-for-innovators/ (last visited Nov. 18, 2025).

29.     In stark contrast to Applied, Comulate—which by its own admission has no insurance experience—has only been operating since 2022.

**B.      Applied's Innovations Have Built A Thriving Ecosystem Around Epic**

30.     Epic, the preeminent AMS system among insurance agencies, is used more than any other AMS system among the largest agencies in the United States.  In 2025, eight out of the ten largest brokers ranked by Business Insurance, 69 of Insurance Journal's top 100 property and/or casualty agencies, and 57% of Reagan Consulting and IIABA's best practices all used Applied's Epic.[7]

31.     While Epic is Applied's core software program, Applied offers numerous software programs that add additional features and functionalities to Epic, including:  (i) texting; (ii) benefits quoting (Applied Benefits Designer); (iii) CSR24 (a consumer-facing customer service interface); (iv) email marketing; and (v) commercial lines insurance application processing, among many others.

32.     As another addition to Epic, Applied also offers Applied Pay, a full-cycle agency bill accounts receivable application that automates the process of sending invoices to insureds and processing and returning their online payment transaction data to the AMS for reconciliation. Applied Pay is integrated into Epic's general ledger, enabling clients to access and use Applied Pay directly within Epic.  For example, invoices are tagged within the AMS and then sent to payees for payment.  Once payment is complete, the system returns the invoice for reconciliation

---

[7] *See* Applied Systems, Press Release, *Applied Remains the Industry's Leading Provider of Agency Management Systems According to Multiple Industry Lists* (Sept. 18, 2025) https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-remains-the-industrys-leading-provider-of-agency-management-systems-according-to-multiple-industry-lists/.

within the general ledger.  This is a large benefit to users as it eliminates the need to manually enter each payment and journal entry, saving hours of time per day.

33.     Epic allows for integrations with third-party software via tools like Applied's software development kit ("SDK").  Integrations allow Applied's customers to further enhance Epic's capabilities, thereby connecting agencies, carriers, and an ecosystem of insurance technology providers by enabling end-to-end workflows that span marketing, servicing, and accounting, while also enabling firms to extend their functionality through third-party tools.  For example, Applied's website explains that its "commitment to innovation extends to our integration ecosystem strategy, which focuses on identifying and collaborating with best-in-class organizations that add value to the next generation of the digital roundtrip of insurance."[8]  In addition, Applied's SDK supports "customers in integrations to extend the value of their core technology stack."[9]

34.     Applied offers different software licenses depending on its customer's needs.  For example, if a customer only needs access to Epic (and nothing else), Applied will enter into a licensing agreement allowing the customer to access the Epic software via the user interface ("UI") only.

35.     If a customer needs to be able to facilitate integrations using the SDK, Applied also tailors the SDK license provided to each customer depending on the customer's needs.  For instance, Applied provides some customers with a "limited" SDK license that licenses use of only expressly authorized SDK methods, as identified in the underlying agreement.  Other

---

[8] *See* Applied Systems, Inc., *About Us – Ecosystem*, *https://www1.appliedsystems.com/en-us/about-us/ecosystem/.*

[9] *Id.*

customers may license a broader suite of all available SDK methods, which Applied colloquially refers to as an "all you can eat" SDK license.

36.     Applied's SDK license agreements specifically prohibit customers from allowing "a third party to access" Applied's SDK. Ex. B § 5.6.  In addition, if a customer wishes to disclose Applied's licensed SDK to a "third-party consultant providing technical services" to the customer and Applied "in its sole discretion, consents to the disclosure," the customer, Applied, and the third-party consultant must first execute an "Acknowledgement Form for Third-Party Consultants or Programmers . . . whereby [customer's] third-party consultant assumes all of the confidentiality obligations assumed by [customer] hereunder and agrees to use and access Applied . . . SDK solely for [customer's] benefit in the course of [customer] exercising the limited rights granted to it under this Agreement," and "[Customer] shall be strictly liable for any violation of the confidentiality obligations and use restrictions contained within this Agreement by its employees or third-party consultants." *Id.* § 5.7.

**C.     Applied's Epic SDK Methods And Epic Algorithms Are Highly Valuable Trade Secrets**

37.     The development and subsequent deployment of Epic, Applied Pay, and other Applied software required, and continues to require, substantial upfront investments of time, resources, personnel, and financial capital by Applied.  Indeed, since its founding, Applied has invested tens of millions of dollars in research and development in Epic and other software products, as well as significant time and resources in developing a sophisticated understanding of its customers' needs and wants.  Applied's decades-long commitment to innovation has led to the creation of a vast amount of intellectual property.  Like many companies, Applied has chosen to protect its most valuable intellectual property as trade secrets.  Applied's trade secrets include information regarding the methods in Epic's SDK (the "Epic SDK Method Trade Secrets") and,

most importantly, the unique and confidential methods, processes, logic and algorithms underlying Epic's SDK methods and certain additional actions in Epic that may only be initiated through its user interface ("UI") (collectively, the "Epic Algorithm Trade Secrets"). The Epic Algorithm Trade Secrets are Applied's "secret sauce."

38.     As a result, Applied is the sole owner of all right, title, and interest in a wide range of trade secrets referred to herein as the Epic SDK Method Trade Secrets and the Epic Algorithm Trade Secrets, including without limitation the unique methods, logic, processes, and algorithms to perform agency billing,[10] direct billing, billing automation, the month end process, and invoicing and payment reconciliation within Epic. These are the unique methods, logic, processes, and algorithms that Comulate, posing as PBC, appears to have been diligently reverse-engineering through subterfuge, gross disregard for the terms of PBC's Master Agreement and Schedule SDK, and willful and malicious theft of Applied's intellectual property rights.

39.     Thus, based on Applied's current information and belief, this case concerns two primary types of misappropriated trade secrets, both of which concern the very core of its business.

40.     *First*, the Epic SDK Method Trade Secrets are a series of confidential SDK methods that can be used to interact with Epic. Each of the specific SDK methods is kept confidential and not shared by Applied except under confidentiality restrictions. Each Epic SDK Method Trade Secret initiates a unique underlying method, process, procedure or algorithm within Epic, as described in more detail below.

---

[10] In agency billing—unlike traditional "direct billing" in which the insurance carrier is billed directly and then remits a commission to the insurance agency—the insurance agency is billed first, takes its commission, and then remits the remainder of the payment to the carrier.

41.     *Second*, the Epic Algorithm Trade Secrets are the individual methods, processes, procedures and algorithms in Epic that correspond to each Epic SDK Method Trade Secret, as well as certain additional actions and processes which can only be initiated through the Epic UI. Applied takes significant measures to protect the confidentiality of the Epic Algorithm Trade Secrets and does not share them with customers or other third parties under any circumstances. Moreover, there is no way to legitimately reverse-engineer the Epic Algorithm Trade Secrets, either through public information or normal use of Epic, the SDK or other Applied software authorized by Applied's agreements with its customers. Instead, the only conceivable way to reverse-engineer these trade secrets is by engaging in grossly excessive, repetitive system testing and bombardment beyond any remotely "normal" use of Epic or its SDK, and such reverse-engineering and testing is expressly prohibited by the Master Agreement and Schedule SDK license agreements.

42.     Here, as discussed further below, Comulate/PBC made ***millions*** of calls to certain SDK methods in Epic in connection with its illegal scheme to improperly reverse-engineer Applied's Epic Algorithm Trade Secrets.

43.     Upon information and belief, Applied's trade secrets misappropriated by Comulate/PBC include, but may not be limited to, individual Epic SDK Method Trade Secrets, individual Epic Algorithm Trade Secrets, and combinations thereof. In order to avoid revealing the trade secret information that Applied seeks to protect by bringing this action, below Applied provides additional detail regarding the nature and functions of its misappropriated trade secrets by common subject areas, without revealing the unique underlying detailed methods, logic, processes and algorithms, the public disclosure of which would destroy the value of the trade secrets.

### Categories Of Misappropriated Trade Secrets

44.     **Group 1:  General Ledger Algorithms:**  These trade secrets concern a series of internal processing logic, proprietary implementation details and algorithms, as well as the corresponding SDK methods, that provide unique workflows, computational approaches, and analytical formulations for tasks including, by way of non-exhaustive example, retrieving a list of receipts that meet requirements specified in the parameters; retrieving a chart of accounts that meet the criteria provided; retrieving a bank account that matches the specified account identified; inserting and updating a receipt in Epic; populating a receipt detail object with dynamic items necessary to apply debits to credits during an insert receipt workflow; inserting and retrieving a list of journal entries in Epic that meet the requirements specified in the journal entry filter object; and finalizing a specified receipt.  In lay terms, the general ledger SDK methods and their underlying logic use proprietary algorithms to perform tasks like generating and updating receivable and payable entries in the general ledger and reconciling payments and collections to streamline and automate the insurance billing process.

45.     **Group 2:  Reconciliation Algorithms:**  These trade secrets concern unique numerical approaches to performing reconciliation in the general ledger, including retrieving direct bill commission objects; inserting direct bill reconciliation into Epic; updating direct bill reconciliation in Epic; and associating a general ledger item with a reconciliation direct bill commission statement, as well as corresponding SDK methods.

46.     **Group 3:  Broker Algorithms:**  These trade secrets concern unique procedures to automatically determine a list of brokers that meet the requirements specified by the parameters, get default broker commissions, and retrieve a list of broker payable contracts that meet the requirements specified by the parameters, as well as corresponding SDK methods.

47.     **Group 4:  Employee Algorithms:**  These trade secrets concern unique analytical formulations for retrieving a list of employees that meet the requirements specified by the parameters and retrieving a list of employee commissions that meet the requirements specified by the parameters in order to streamline and automate the commission process, as well as corresponding SDK methods.

48.     **Group 5:  Attachment Algorithms:**  These trade secrets concern unique proprietary algorithms used to retrieve a list of attachments that meet the requirements specified, insert the specified attachment, and get, upload, and update attachment details in Epic, as well as corresponding SDK methods.

49.     **Group 6:  Transaction Algorithms:**  These trade secrets concern unique mathematical algorithms and processes for retrieving a list of transactions from Epic that meet the requirements specified, insert the specified transaction in Epic. receive transaction codes, get default installments of the specified type for the specified transaction, and adjust the commission on a transaction and get the default settings needed to adjust a commission action in order to carry out transactions and complete commission processes, as well as corresponding SDK methods.

50.     **Group 7:  Company Algorithms:**  These trade secrets concern unique proprietary processes to retrieve a list of companies that meet the specified parameters and insert the specified company payable contract in Epic, as well as corresponding SDK methods.

51.     **Group 8:  Month-End Closing Algorithms:**  These trade secrets concern unique mathematical algorithms and processing logic used to generate journal entries from aggregated transactions in Epic.  These processes, developed over the course of Applied's entire 40-year history, take Epic transactions and aggregate them based on internal identifiers and proprietary

18

classes into credit and debit entries in the general ledger. The month-end closing algorithms are initiated through Epic's user interface.

52. **Group 9: Reconciliation Algorithms:** These trade secrets concern unique mathematical algorithms and processing logic used to generate new general ledger entries and other data fields, reconcile transactions for user review, and update entries on the general ledger and other data within Epic. The reconciliation algorithms are initiated through Epic's user interface.

53. **Group 10: Invoice Generation Algorithms:** These trade secrets concern unique proprietary processes that identify billing, contact, policy, and other information from within Epic and generate an invoice based on user configurations. The invoice generation algorithms are initiated through Epic's user interface.

54. Applied's Epic SDK Method Trade Secrets are not generally known or readily ascertainable to the public or to individuals in the insurance or accounting industry. The Epic SDK Method Trade Secrets are not readily ascertainable from publicly available information.

55. Applied's Epic Algorithm Trade Secrets are not generally known or readily ascertainable to the public or to individuals in the insurance or accounting industry. The Epic Algorithm Trade Secrets are not readily ascertainable from publicly available information. The Epic Algorithm Trade Secrets go far beyond any existing back-end reconciliation, payment, and collection system in the field, and there is no system comparable to Epic, which integrates insurance-specific functions like policy management, accounting and CRM into a single, automated platform that streamlines operations and reduces the inefficiencies of using separate systems. Simply put, these economically and competitively valuable trade secrets are Applied's "secret sauce."

19

56.     Applied does not make these trade secrets public.  To the contrary, Applied redacts from public copyright filings regarding Epic proprietary source code and software designs any information regarding Epic's SDK Method Trade Secrets and Epic Algorithm Trade Secrets because destroying the secrecy of such methods, logic, processes and algorithms would destroy the competitive advantage they provide Applied's products.

57.     There is no legitimate way to reverse-engineer the Epic Algorithm Trade Secrets. The massive, improper testing and reverse-engineering of Applied's Epic system perpetrated by Comulate/PBC violated the Master Agreement and the Schedule SDK with PBC and would violate similar agreements with any other Applied customer.  As detailed further below, in each customer license agreement, Applied places strict limits on the use of Epic and/or its SDK, including express prohibitions on reverse-engineering, benchmarking, testing and other activities that could potentially be used to design or refine a competing product.  Normal (legitimate) customers make a modest number of SDK calls and actions in the Epic UI in the performance of their day-to-day business, which could not be used for reverse-engineering because normal usage would not uncover the underlying methods, logic, processes and algorithms that correspond to each individual SDK method and certain actions accessible only through Epic's UI, such as the month end closing process, the reconciliation process and generating an invoice.

**D.**     **Comulate Is A Start-Up Launched To Parse PDFs And Emails**

58.     Comulate was founded in 2022 by Michael Mattheakis and Katz.  Prior to his role as CEO of Comulate, Katz was a product manager, and Mattheakis worked predominantly with AI and fintech infrastructure.  Most notably, neither Katz nor Mattheakis had a background in insurance, let alone the insurance software industry.

20

59.     When Comulate launched in 2022, it offered a product that was intended to automate the process of revenue reconciliation via an intelligence tool that extracted and reconciled commissions from carriers or policies within an already established AMS. Comulate's "intelligence" tool consisted of a "revenue graph tool" that provided customers with "unprecedented visibility" and answers to "decade-old business" questions.[11]

**E.      Comulate And Applied Explore A Potential Partnership**

60.     In accordance with Applied's partner program, executives at Applied and Comulate had several high-level discussions regarding Applied's partner program.

61.     On May 23, 2023, Applied and Comulate entered into a Proof-of-Concept (Pilot) Agreement for Potential Partners (the "Pilot Agreement"), attached hereto as Exhibit D, which recited:  "The parties are interested in validating further potential product development opportunities to allow for enhancement of automated revenue management workflows. . . . Applied and [Comulate] desire to explore methods to integrate and connect their respective software products to identify ways to enhance automated revenue management workflows provided to Customers ('Purpose')."  *Id*. § 1.

62.     Pursuant to the Pilot Agreement, Applied gave Comulate a limited license for six months "to use and access certain proprietary software and products that Applied and its affiliates develop, market, license, and distribute ('Applied Software'), specifically as follows: (a) one (1) API and/or SDK key for unlimited calls solely to integrate Applied Epic with Partner [*i.e.*, Comulate] Software; (b) Data Lake and (c) Applied Epic" and "limited [use] solely for

---

[11] *See* Wayback Machine, Comulate, https://web.archive.org/web/20230324005705/https://www.comulate.com/ (archived Mar. 24, 2023) ("Comulate reads and writes ***to your AMS and ERP***" and "Comulate connects to your AMS or CRM, populating itself with always-live policy data for reconciliation and reporting.") (emphasis added).

Non-Production/Testing Use to test the interface and electronic exchange of information between Applied Epic and [Comulate's] computer systems for the Purpose only." *Id.* § 5.

63.    In Section 7 of the Pilot Agreement, Comulate expressly agreed "that the Applied Software constitutes, embodies, and/or contains valuable trade secrets, proprietary information, and other Confidential Information owned by Applied or its licensors and that any use or disclosure to third parties not specifically authorized in writing by Applied or its licensors is prohibited." *Id.* § 7.  The Pilot Agreement further stated that Partner shall not "reverse-engineer" the Applied Software, create derivative works, or "use the Applied Software for purposes of benchmarking, competitive analysis, or for developing, using or providing a competing software product, or service." *Id.*  Section 6 provided that, to the extent Comulate violates Section 7, Comulate "automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests, without the necessity for further consideration." *Id.* § 6.

64.    In addition, since 2022, several of Applied's customers became customers of Comulate and sought to integrate Comulate with Epic.  Because Applied thought that Comulate was a good-faith partner working to improve both parties' customer relationships, Applied authorized the customers' integrations with Comulate software.  For example, approximately sixty of Applied's customers were authorized to integrate Comulate's system to Epic using Applied's SDK, pursuant to Applied's standard SDK license agreements with its customers that prohibit any unauthorized use or disclosure of Applied's trade secrets and confidential information to third parties.

65.    The fact that these customers were authorized to integrate Comulate's system to Epic using Applied's SDK does not mean that Comulate was authorized to gain access to

Applied's SDK. To the contrary, for Comulate as an entity to gain authorized access to the SDK and/or any other Applied Software, Applied's license agreements require Comulate as an entity to sign the applicable Third-Party Consultant Agreement. But Comulate repeatedly refused to sign.

66.     In order to assist Applied's customers that wanted to integrate with Comulate, Applied entered into negotiations with Comulate in an effort to reach agreement on a mutually-acceptable confidentiality and license agreement that would enable Comulate to serve as a third-party consultant to Applied's customers. As those negotiations delayed the integration plans of Applied's customers, in order to be a good partner to Applied's partner agencies and in a show of good faith based on the belief that Applied and Comulate would reach an agreement, Applied agreed to allow Comulate to act as a consultant and assist Applied's customers with their requested integrations.

67.     It later came to Applied's attention that unbeknownst to Applied, Comulate had been given a user seat in four of the above customers' Epic accounts. Upon information and belief, such access was based on Comulate's role as a consultant for such agencies and would not provide Comulate carte blanche to conduct tests or other activities in Epic in support of Comulate's overall business as such usage would likely have been in violation of Comulate's consulting agreement with each such agency.

68.     Importantly, none of these arrangements permitted Comulate anything close to the same level of access it obtained by pretending to be PBC. Acting as PBC, Comulate could configure the SDK and test integrations without the keen eyes of its agency customers asking what it was doing. Hiding behind PBC, Comulate had no time constraints on when to run tests or upload documents, expiration of access to the software or limits on the number of calls it

could make.  Comulate could attempt, at its leisure, to reverse-engineer the highly-valuable Epic Algorithm Trade Secrets, in violation of numerous provisions of the Master Agreement and the Schedule SDK, without the need to answer to Comulate's own customers.

**F.**     **Comulate Creates A Fake Insurance Agency To Misappropriate Applied's Valuable Trade Secrets**

69.     Comulate's scheme was born from a lie.  In early March 2024, Jordan Bates of PBC misrepresented to an Applied representative that PBC was a new, three-person start-up insurance agency.  He said he was interested in Epic because he had heard from several IT people in insurance that Epic is the only way to go.

70.     On March 15, 2024, PBC entered into the Master Agreement and Schedule SDK with Applied in order to obtain access to Epic and the SDK.  *See* Exs. A and B.

71.     In the Schedule SDK, PBC claimed falsely that it intended to use Epic to "develop an integration between HubSpot and [Epic] via the SDK" and that "[t]he integration will be part of normal internal business operations which are owned and/or licensed by [PBC]." Ex. B § 5.1.

72.     In March 2024, Applied undertook its standard initial intake interview to collect information from PBC to ensure that it was suitable as a client and to determine how best to optimize PBC's experience with Epic.  During that interview, PBC misrepresented numerous facts—including misrepresenting that it was an insurance agency when it was really operating as a front for Comulate.  For example, Bates and one other representative of PBC misrepresented that PBC was a new, three-person agency with a small number of accounts looking to integrate HubSpot with Epic, and that PBC was in the process of finalizing carrier appointments to help launch the new business.  In fact, PBC never had and still has no clients, and PBC never was and still is not an insurance agency.

24

73.     As with all of Applied's Epic and SDK agreements, the Master Agreement and Schedule SDK strictly limit PBC's use of Epic, the SDK and any other Applied software to specific, authorized business purposes and impose strict confidentiality obligations.  *See id.* §§ 5, 5.1, 5.5, and 5.9.

74.     The Master Agreement, which controls access to all Applied software, requires that "[u]sers are provisioned on a Named Basis only, must be located in the Territory, and must be [PBC's] Employees."  Ex. A § 3.2.  As PBC is a sham entity created to allow Comulate employees to access and use Applied's software, PBC and Comulate repeatedly breached this provision.

75.     Both the Master Agreement and the Schedule SDK restrict PBC's use of Epic, the SDK and any other Applied software to use in connection with PBC's "internal insurance operations" or "solely in connection with managing [PBC's] insurance agency or brokerage."  *See id.* §§ 3.3, 15 ("Permitted Use" is a "[u]se and access solely pursuant to an Order, in connection with Licensee's internal insurance operations, and in accordance with the Agreement and the Documentation."); Ex. B § 5 (regarding SDK limited use license).  Since PBC is not an insurance agency, Comulate/PBC repeatedly breached this term.

76.     With respect to the SDK, Section 5.1 of the Schedule SDK limits the scope of PBC's SDK license to the "Authorized Business Purpose(s)" of "develop[ing] an integration between HubSpot and Applied Epic via the SDK."  *Id.* § 5.1.  PBC also agreed that its integration with HubSpot would "be part of normal internal business operations, which are owned and/or licensed by [PBC]."  *Id.*  In Section 5.2, the SDK license was further limited to "Authorized Integration(s) and no others."  *Id.* § 5.2.  Those Authorized Integrations are specific, identified combinations of an "Epic Integration SDK Method," an "Authorized 'To' Software" and an "Authorized 'From' Software."  *Id.*

77.     Notably, Section 5.2's "Authorized Integrations" do ***not*** include the majority of the most commonly used SDK methods that Comulate called hundreds of thousands or even millions of times during the over nineteen months that it secretly used Epic while pretending to be PBC, as described below.  *See id.*  For example, by far the most calls made by Comulate related to certain general ledger SDK methods that are not included among the "Authorized Integrations" in Section 5.2.  PBC/Comulate's brazen breach of the limitations in Section 5.2 is shocking, to say nothing of the fact that its use was not a part of normal insurance operations and did not involve integration with HubSpot.

78.     Section 5.5 of the Schedule SDK also limits the scope of PBC's SDK license. Section 5.5 states:

> For the avoidance of doubt, Licensee shall use the [SDK] for internal purposes only. . . . Unless expressly agreed otherwise, Licensee shall not use the [SDK] to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and ***shall not utilize or leverage knowledge gained from access and use of the [SDK] to develop, create, link and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business purpose and Authorized Integration***.

*Id.* § 5.5 (emphasis added).  Upon information and belief, the entire purpose of Comulate/PBC's fraudulent scheme was to leverage knowledge gained from their improper access of the Epic SDK to improve and create Comulate features, functionalities and products.

79.     Section 3.6 of the Master Agreement provides certain explicit restrictions on PBC's software license and use rights:

> Except as expressly authorized herein or by Applied in writing, Licensee ***shall NOT***:  … (b) disassemble, decompile, ***reverse-engineer***, modify, transform, otherwise translate, or attempt to gain unauthorized access to the Software, including the source code; (c) except as expressly authorized by Section 3.2, allow a non-

> Employee to access the Software; (d) use the Software as part of a third-party "private labeling" or "white labeling" transaction; (e) create derivative works, license, sublicense, resell, lease, lend, distribute, publish, duplicate, reproduce, assign, transfer or otherwise make available the Software, Work Product, or Documentation to any third party, in whole or in part; (f) ***use the Software for purposes of benchmarking, competitive analysis, or for developing, using, or providing a competing software product, or service***; (g) bypass or breach (or attempt to do so) any security device or protection used by or contained in the Software; or (h) allow another entity or person to do any of the foregoing.

Ex. A § 3.6 (emphasis added). The Schedule SDK includes similar license restrictions, including an explicit prohibition on using the SDK "for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." Ex. B § 5.6. The Schedule SDK adds: "For the avoidance of doubt, Licensee has no license to use the [SDK] for the purpose of developing an application, patch, fix, tool, or other program, software, or device marketed, sold, and/or distributed to third parties." *Id.* Again, Comulate/PBC's fraudulent scheme directly violates these provisions as its primary activities involved benchmarking and competitive analysis for the purpose of creating a competing software product.

80. Section 4.2 of the Master Agreement prohibits the creation of derivative works automatically assigns title in any derivative works to Applied:

> Licensee is not authorized to make any derivative works, modifications of, or implement any program improvements to any Applied intellectual property, including without limitation, the Applied Software. To the extent Licensee violates this Section 4.2, ***Licensee automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests***, without the necessity of further consideration and without any claim that Applied has waived Licensee's breach of this provision.

Ex. A § 4.2 (emphasis added). Section 5.8 of the Schedule SDK similarly prohibits the creation of

modifications of or derivative works from the SDK and automatically assigns title in any such

modification or derivative work to Applied:

> All right, title, and interest, including copyright and other intellectual property rights, in and to the Applied Epic Integration Service SDK and the Run-Time SDK, including any Specific Integration Code, and the media on which the Applied Epic Integration Service SDK and the Run-Time SDK are delivered, shall remain the property of APPLIED or its licensors and shall not be deemed to be, in whole or in part, a work-made-for hire or a work made in the course of employment. To the extent required notwithstanding this provision, Licensee automatically assigns, upon their creation, to APPLIED all right, title, and interest in and to any requested Specific Integration Code, including copyright interests and any other intellectual property interests, without the necessity of further consideration. ***This Agreement does not give Licensee any right to develop derivative works based upon, or to otherwise duplicate, the Applied Epic Integration Service SDK or the Run-Time SDK, in whole or in part***, except as expressly provided herein or to transfer the Applied Epic Integration Service SDK or the Run-Time SDK, in whole or in part, without the prior written consent of APPLIED. Any modifications of Applied Epic Integration Service SDK or the Run-Time SDK (e.g., corrections, patches, Updates, custom programming, or enhancements), as well as ***ideas or suggestions made by Licensee for program improvements, shall be the property of APPLIED*** and be subject to this Agreement. Licensee is not authorized to make any such modifications of or to implement any such program improvements to Applied Epic Integration Service SDK or the Run-Time SDK except as expressly provided hereunder. To the extent it does notwithstanding this prohibition, ***Licensee automatically assigns, upon their creation, to APPLIED the ownership of such unauthorized modifications and/or improvements, including copyright interests and any other intellectual property interests, without the necessity of further consideration*** and without any claim that APPLIED has waived Licensee's breach of this provision.

Ex. B § 5.8 (emphasis added). Importantly, these provisions operate to automatically assign title to Applied in all products created by Comulate as a result of its fraudulent scheme to reverse-engineer and misappropriate Applied's trade secrets.

81. In Section 4.3 of the Master Agreement, PBC expressly agreed that Applied's software constitutes, embodies and/or contains valuable trade secrets and its use or disclosure to third parties is prohibited: "*Licensee agrees that the Software constitutes, embodies and/or contains valuable trade secrets, proprietary information, and other Confidential Information* owned by Applied or its licensors and that *any use or disclosure to third parties* not specifically authorized in writing by Applied or its licensors *is prohibited*." Ex. A § 4.3 (emphasis added). In Section 5.7 of the Schedule SDK, as noted earlier, PBC similarly agreed that the SDK constitutes and/or contains valuable trade secrets and its unauthorized use or disclosure is prohibited:

> Licensee acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK *constitute and/or contain valuable trade secrets and are considered Confidential Information under the terms of the Agreement*. *Unauthorized use or disclosure* of the Applied Epic Integration Service or of the Run-Time SDK *is prohibited and may be illegal*. Licensee further acknowledges and agrees that this Schedule does not authorize Licensee to use or disclose the Applied Epic Integration Service SDK or the Run-Time SDK other than as prescribed in this Schedule without the prior written consent of APPLIED.

Ex. B § 5.7 (emphasis added).

82. In the Master Agreement, PBC agreed that it would treat Applied's Confidential Information "in the same manner" as it protects its own confidential information, "but not less than is reasonable under the circumstances (or as required by law) without regard to whether the information received satisfies the statutory definition of a 'trade secret.'" Ex. A § 10.1. PBC further agreed to use Applied's Confidential Information "only for the purpose for which it was disclosed or as otherwise permitted by the Agreement" and to disclose it only to those

Employees or Professional Advisors "with a need to know and who are subject to confidentiality obligations consistent with those set forth in this Master Agreement." *Id.* "Confidential Information" is defined as "[t]he Applied Software, Support Materials, any trade secrets, compilations, components, Licensee Data, data, source/object code, customer/vendor/supplier info, documents, drawings, sketches, financial info, formulae, inventions, lists, manuals, parts, patterns, plans, processes, software, specification, techniques, proposals and all other information protectable by applicable privacy laws and other information of a secret, confidential, or proprietary nature." *Id.* § 15.

83.     The Schedule SDK also notes that "[a]ny use of [Epic] not authorized or beyond the scope of the licenses granted under this Schedule is prohibited" and that "Licensee shall not use [Epic] to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of [Epic] to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business Purpose." Ex. B § 5.5.

84.     When PBC entered into the Master Agreement with Applied, PBC also agreed to comply with the terms of Applied's Acceptable Use Policy ("AUP"), which is incorporated into both the Master Agreement and Schedule SDK.  Ex. A § 5.1.  Applied's Acceptable Use Policy requires that PBC "shall use the Software exclusively for authorized and legal purposes, consistent with all applicable laws and regulations."  Ex. E.

85.     On March 15, 2024, subject to the terms of the Master Agreement, PBC/Comulate placed an order for the Digital Agency Professional package, including the following Applied products:  Applied EpicCloud; Applied Mobile; Applied CSR24; Applied Epic Quotes;

Agency/Insurer Interface Functionality; and Epic Dashboards/Analytics. Ex. F at 3. PBC/Comulate also obtained a license to the Applied EpicCloud Integration Service with SDK subject to the terms in the Schedule SDK. *Id.* In addition, PBC/Comulate obtained a 12 month subscription to Applied's online training platform called Applied University and professional setup of the Digital Agency Package, including a guided implementation of the Digital Agency components and up to four training days. *Id.*

86. On December 20, 2024, Comulate/PBC purchased a subscription to the Applied Data Lake, subject to the Master Agreement and Data Lake Terms of Use. Ex. G at 4. According to the Data Lake Terms of Use, "Applied hereby grants Licensee a non-transferable, non-exclusive, terminable, and limited license to export Licensee Data solely from Applied Epic to a repository which may be hosted in a third-party public cloud (the 'Data Lake') to create custom reports and analytic solutions." *Id.*

87. Sections 4, 5.3, 6.1, 7, 10.5, 12, 14, and 15 survive termination of the Master Agreement. Ex. A § 14.12. Sections 3, 4, 5.7, 5.8, 5.9, 7.3, 9, and 10 survive termination of the Schedule SDK. Ex. B § 11.

**G.  Comulate Uses PBC To Misappropriate Applied's Epic SDK Method Trade Secrets And Epic Algorithm Trade Secrets**

88. Almost immediately upon gaining access to Applied's system under false pretenses, PBC began misappropriating Applied's Epic SDK Method Trade Secrets and the Epic Algorithm Trade Secret—the unique underlying logic, processes and algorithms that could only be reverse-engineered through massive, improper testing of the system in violation of PBC's Master Agreement and Schedule SDK.

89. As explained above, normal, even much larger insurance agency customers of Applied make a relatively modest number of SDK calls in the course of integrating with Epic for

legitimate business purposes.  Comulate/PBC's activities were far outside the norm.  The table below provides the total number of calls made by Comulate/PBC by SDK method on its account since its inception in March 2024.[12]  While the entirety of Comulate/PBC's use was outside the scope of its Master Agreement and Schedule SDK for reasons discussed elsewhere, the table below distinguishes between use of SDK methods within the scope of "Authorized Integrations" in Section 5.2 of PBC's Schedule SDK (listed in black text) and use of SDK methods outside the scope of PBC/Comulate's SDK license (listed in red text).  Thus, as the below table shows, Comulate/PBC made **hundreds of thousands** and in some cases **several millions** of unauthorized SDK calls that could only have one purpose—to improperly reverse-engineer the Epic Algorithm Trade Secrets:

| **Trade Secret Epic SDK Method** | **Total SDK Call Count By PBC/Comulate March 2024-Present** |
|:---:|:---:|
| General Ledger Trade Secret Method #2 | 22,263,037 |
| Line Trade Secret Method #1 | 557,916 |
| Company Trade Secret Method #1 | 372,865 |
| Broker Trade Secret Method #1 | 347,792 |
| Employee Trade Secret Method #1 | 286,456 |
| Policy Trade Secret Method #1 | 241,995 |
| Client Trade Secret Method #1 | 179,187 |
| General Ledger Trade Secret Method #2 | 162,900 |

---

[12] In this table, in order not to destroy the trade secrets at issue, we have replaced the specific Epic SDK method called by PBC/Comulate with the subject matter category that method belongs in and a unique numerical identifier.  In addition, for space reasons, we have included only those methods where the total call count was over 1,000 calls.

| **Trade Secret Epic SDK Method** | **Total SDK Call Count By PBC/Comulate March 2024-Present** |
|---|---|
| Lookup Trade Secret Method #1 | 63,711 |
| General Ledger Trade Secret Method #3 | 48,346 |
| Transaction Trade Secret Method #1 | 38,058 |
| Activity Trade Secret Method #1 | 23,563 |
| Attachment Trade Secret Method #1 | 13,826 |
| Broker Trade Secret Method #1 | 6,775 |
| Attachment Trade Secret Method #2 | 6,104 |
| Transaction Trade Secret Method #2 | 6,039 |
| Contact Trade Secret Method #2 | 4,448 |
| Reconciliation Trade Secret Method #1 | 3,407 |
| Attachment Trade Secret Method #3 | 2,236 |
| Attachment Trade Secret Method #4 | 2,024 |
| Activity Trade Secret Method #2 | 1,300 |
| General Ledger Trade Secret Method #4 | 1,288 |
| Reconciliation Trade Secret Method #2 | 1,222 |
| General Ledger Trade Secret Method #5 | 1,151 |
| Activity Trade Secret Method #3 | 1,131 |

90. The number of calls PBC/Comulate made is so wildly out of the ordinary that it dwarfs any other comparable size agency that works with Applied, even ignoring the fact that the other "comparable size" agencies are real insurance agencies with real customers. For example,

year to date, PBC has already made more than **25 million SDK general ledger calls** alone, a figure that is almost **25 times larger** than any other small agency:

| IP Address | SDK General Ledger Calls (YTD) |
|---|---|
| 34.208.51.110 (Comulate IP address) | 25,739,022 |
| 12.8.248.162 | 1,272,405 |
| 52.167.249.213 | 1,039,386 |
| 52.177.30.21 | 971,920 |
| 8.44.225.10 | 798,755 |
| 20.115.67.44 | 518,374 |
| 66.117.196.233 | 455,456 |
| 52.184.219.242 | 420,667 |
| 74.204.93.42 | 418,343 |
| 4.1.18.146 | 355,163 |
| 172.68.174.142 (Comulate IP address) | 299,944 |
| 172.68.174.143 (Comulate IP address) | 295,696 |
| 10.60.7.164 | 269,790 |
| 72.204.12.98 | 159,165 |

91.     Fraudulently hiding behind the fake agency PBC, Comulate obtained the Epic SDK Method Trade Secrets through improper means, at least because Comulate knew that PBC had obtained access to Applied's Epic SDK Method Trade Secrets by theft, misrepresentation, breach of its obligations under the Master Agreement and Schedule SDK with Applied and fraud. Despite knowingly obtaining Applied's Epic SDK Method Trade Secrets in violation of the Master Agreement and Schedule SDK, Comulate willfully and maliciously committed itself to

unlawfully reverse-engineering the Epic Algorithm Trade Secrets by running millions of tests in extraordinary, concentrated, daily activity that far exceeds the bounds of any normal use of Epic. Comulate and PBC's concerted activity was in express violation of PBC's Master Agreement and Schedule SDK which, as explained above, prohibited this type of reverse-engineering and testing, as well as any benchmarking or other competitive activity to design a competing product. Remarkably, after negotiating the license scope in the Schedule SDK, Comulate/PBC also proceeded to use any Epic SDK methods they wished, ignoring the specified Authorized Methods set forth in Section 5.2 of the Schedule SDK.

92.     The unauthorized use of Epic and the Epic SDK by PBC in this manner was the only way that Comulate/PBC could reverse-engineer Applied's Epic Algorithm Trade Secrets. As explained above, the methods, processes, logic and algorithms underlying the Epic SDK Method Trade Secrets and the actions accessible only through Epic's UI, such as the month end closing process, the reconciliation process and generating an invoice, are not made public, and any ordinary course usage of Epic and/or the Epic SDK would not provide a way to understand what methods, processes, logic and algorithms were being triggered in response to each Epic SDK method or when a user takes any action in the UI. Yet, upon information and belief, Comulate was desperate for this enormously valuable information because Comulate could use it both to refine its existing direct billing product and to accelerate its development of an agency billing product to compete with Applied's Applied Pay product and to jumpstart its development of a product to replace and compete with Applied's Epic platform.

93.     Indeed, as described above, many of the Epic SDK methods that Comulate/PBC called most frequently concerned subject areas like generating receivable and payable entries in the general ledger, automating payment processes, invoicing, collection, and other areas that

Comulate has not traditionally innovated in. By learning how the inner-workings of Epic—the Epic Algorithm Trade Secrets—performed unique mathematical algorithms to automatically pull and process this information and reconcile it in the general ledger, Comulate effectively bypassed the need to conduct its own research and development to create an Epic replacement—something that would be immensely valuable to Comulate.

94. Upon information and belief, Comulate is, even now, using the trade secret information it misappropriated by pretending to be PBC to refine and/or develop competing products. Under the terms of the Master Agreement and Schedule SDK, any such products or intellectual property developed based on Applied's misappropriated trade secrets belong to Applied. Yet, despite holding title under the Master Agreement and Schedule SDK, the potential for Comulate to imminently release improved or new competing products based on Applied's trade secrets poses an enormous risk of irreparable harm to Applied.

**H.** **Applied Discovers PBC's Fraud And Misappropriation Of Its Trade Secrets**

95. Applied's internal systems recently flagged PBC's use of Epic as suspicious due to the enormous volume of calls PBC was making to Applied endpoints. Given PBC's tiny size and the fact that it supposedly had just a few accounts and was a new agency, the vast number of calls made no sense and raised suspicions that it was not operating in accordance with its contractual obligations.

96. Applied initiated an internal investigation, which revealed that PBC was not a real agency and appeared to be one-and-the-same with Comulate. Notably, Applied discovered that the IP addresses used by PBC were IP addresses typically associated with Comulate.

97. Applied's investigation also revealed that PBC's call volume was so far beyond the norm that it exceeded the activity levels of even some of Applied's largest enterprise clients.

As demonstrated by the below bell curve, PBC's z score of 3.47 indicates extremely strong, uncommon, or rare activity well above typical expectations. PBC's SDK call volume places them in the 99.97% percentile in a standard normal distribution.



## I. Applied Establishes That PBC And Comulate Are One And The Same

98.     In light of the discoveries set forth above, Applied launched a deeper investigation to determine who was behind PBC's activities. That investigation revealed a startling array of facts irrefutably linking PBC to Comulate.

99.     After further investigation of PBC and its registered user information, Applied found that many PBC "user" credentials included the names of Comulate employees.

100.    Some of Comulate's fraudulent tactics were so brazen as to defy belief. For example, Applied discovered that the email address provided by Bates, the PBC contact who signed all of PBC's agreements with Applied, was associated with the LinkedIn page of ***an engineer at Comulate***:



101.   Notably, the picture used in this LinkedIn page is actually a stock photo used on many websites online, indicating a further attempt to hide the identity of the actual Comulate employee who created the LinkedIn page.

102.    Given PBC's obvious close connections to Comulate, Applied looked further into PBC's activities within Epic and found even more blatant evidence of connections to Comulate. For example, Applied found ***numerous emails that Comulate employees*** had actually attached directly in PBC's Epic in the process of testing various aspects of agency and direct billing, Applied Pay, and other trade secret and confidential aspects of Applied's business.  Just a few screenshots of those emails tied to Comulate data scientists, product leads, and other senior employees are set out below:









103.    Remarkably, Comulate/PBC made no efforts to even fake legitimate insurance agency activities in its Epic account.  For example, Comulate tested the system using *fake invoices*, *fake customers*, and *even other actual Applied customers' invoices* to test and learn about the trade secret Epic SDK methods and underlying logic, processes and algorithms described above.  In all, there are *hundreds of Comulate emails within PBC's Epic account* that Applied has collected that explicitly and implicitly show Comulate testing the Epic system.  Upon information and belief, Comulate's subterfuge had one purpose—to refine products and develop new products to compete with Applied using Applied's own misappropriated trade secrets.

104.    Applied has discovered additional facts demonstrating that PBC is nothing more than a front for Comulate.  For example, PBC's website, available at https://phoenixbenefits.godaddysites.com/, is nothing more than a Go Daddy shell.  Clicking on the "Our Solutions" or other links on the page leads to nothing, and there is no indication that it is a real webpage or associated with a legitimate agency.  Upon information and belief, PBC has not obtained any of the licenses or other regulatory approvals necessary to operate as a legitimate insurance agency.  Indeed, upon information and belief, it has not even registered with the Secretary of State in California (where it is purportedly located) or any other state, despite purporting to be a corporation.  Even the address provided by PBC appears to be nothing more than a residential apartment building in Sacramento, California that does not appear to be

affiliated with "PBC" or any insurance agency.

105.    PBC even signed up for Epic and the Epic SDK using a credit card that, upon

information and belief, is associated with the fake PBC name and contact information,

potentially constituting wire fraud.

**J.      Applied Protects The Confidentiality Of The Epic SDK Method Trade Secrets And The Epic Algorithm Trade Secrets**

106.    Given that their value lies in part in their secrecy, Applied has taken reasonable

measures to maintain the confidentiality of the Epic SDK Method Trade Secrets and the Epic

Algorithm Trade Secrets.  These efforts include requiring all of Applied's employees to sign an

Employee Confidentiality, Restrictive Covenant, and Work Product Agreement ("Employee

Confidentiality Agreement") as a condition of, and in consideration for, employment with

Applied.  Among other things, the Employee Confidentiality Agreement provides that, during

and after employment with Applied, Confidential Information—explicitly defined to include

trade secrets[13]—may not be disclosed to any unauthorized person or used for any unauthorized

purpose without the prior written consent of Applied.  In addition, it specifies that employees

may use Confidential Information only as necessary and solely in connection with the

performance of their duties and in compliance with the policies and procedures of Applied.  The

---

[13] The Employee Agreement defines "Confidential Information" as "information obtained by Employee while employed by Company that is not generally known by those with whom Company or any of its Affiliates, would assist in competition against them, including without limitation: (i) proprietary computer code; (ii) the development, research, marketing, and sales activities of Company and its affiliates, (iii) financial information and strategic plans of Company and its Affiliates business relations, (v) the nature and substance of Company's and its Affiliates business relationships, (vi) the information received, or that may be received hereafter, by Company or any of its Affiliates belonging to others with any understanding, express or implied, that the information would not be disclosed, Confidential Information will not include information that is or becomes generally known to and readily available for use by the public other than as a result of Employee's wrongful acts or omissions."

Employee Confidentiality Agreement also requires the immediate return of all Confidential Information to Applied upon termination of employment.

107.    Applied also requires all employees to comply with its Global Employment Handbook for Applied Systems, Inc. and its Affiliates (the "Employee Handbook"). Regarding Confidentiality, the Employee Handbook states:

> We are proud of our culture of innovation. The materials, products, designs, plans, ideas, and data of Applied are our property and should never be given to an outside company or another individual, except through appropriate channels and with appropriate authorization. It is your responsibility to safeguard sensitive and confidential Applied information. The nature of your business and the economic well-being of Applied are dependent upon protecting and maintaining proprietary Applied information. Any improper transfer of material or disclosure of information, even if it is not apparent that an employee has personally gained by such action, constitutes unacceptable conduct. Any employee who participates in such a practice may be subject to disciplinary action, up to and including termination of employment…. Applied's sensitive and confidential information includes, but is not limited to, information that is not generally known to the public or Applied's competitors, which, if disclosed would harm Applied, including without limitation: (i) proprietary computer code, specifications, architecture, processes and/or procedures, trade secrets, and other related information about Applied's products or services; (ii) Applied's development, research, marketing, and sales activities; (iii) Applied's financial information and strategic plans; (iv) information related to Applied's customers and employees; (v) the nature and substance of Applied's business relationships, and (vi) information received with any understanding, express or implied, that the information would not be disclosed.

108.    The Employee Handbook also specifies that each employee is responsible for complying with Applied's Information Security Program and Information Security Policies, as well as Applied's Acceptable Use Policy. Applied's Information Security Program and Policies are designed to strongly reinforce the security and confidentiality of Applied's information and trade secrets, including the Epic SDK Trade Secrets. New employees receive training regarding

information security policies during on-boarding and employees must re-acknowledge policies annually. Applied's annual, mandatory training program includes training regarding compliance with information and data security rules and obligations.

109. In addition to the foregoing, Applied employs security, both physical and electronic, at all of its offices and in all of its electronic systems to restrict access to its confidential information and trade secrets. Access to Applied's systems is password-protected, and the scope of access is defined by the job responsibilities of a particular employee. Applied also requires two-factor authentication.

110. In order to obtain access to Epic, the Epic SDK and/or other Applied software, a customer must enter into a license agreement with Applied. As discussed above, Applied does not disclose the Epic SDK Method Trade Secrets to customers or third parties without confidentiality restrictions. And, Applied does not disclose the Epic Algorithm Trade Secrets to customers or third parties *at all*.

111. Applied's Epic SDK license agreements themselves, which any customer must sign in order to access Applied's Epic SDK Method Trade Secrets, impose strict restrictions on customers' use and disclosure of the Epic SDK Method Trade Secrets. Section 5.7 of Applied's standard SDK license provides in relevant part that the customer "acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK constitute and/or contain *valuable trade secrets and are considered Confidential Information* under the terms of the Agreement" and that "[u]nauthorized use or disclosure of the Applied Epic Integration Service or of the Run-Time SDK *is prohibited and may be illegal*." *See, e.g.*, Ex. B § 5.7 (emphasis added) (PBC's SDK license agreement terms are representative of Applied's standard SDK license terms). The same provision also requires the customer to "acknowledge[] and agree[] that this

44

Schedule *does not authorize [customer] to use or disclose* the Applied Epic Integration Service SDK or the Run-Time SDK *other than as prescribed in this Schedule* without the prior written consent of APPLIED." *Id.* (emphasis added).

112. Moreover, Section 5.7 of the standard Schedule SDK license prohibits Applied's customers from sharing confidential and trade secret information regarding the Epic SDK with any third party, including third-party consultants, absent confidentiality restrictions and Applied's consent. Applied expressly required that "[customer], its third-party consultant, and APPLIED shall first execute an Acknowledgement Form for Third-Party Consultants or Programmers attached hereto, and incorporated herein, as Exhibit 1, whereby [customer's] third-*party consultant assumes all of the confidentiality obligations assumed by [customer] hereunder* and agrees to use and access Applied Epic and Applied Epic Integration Service SDK *solely for [customer's] benefit in the course of [customer] exercising the limited rights granted to it under this Agreement*." *Id.* § 5.7 (emphasis added). In addition, "[customer] *shall be strictly liable for any violation of the confidentiality obligations and use restrictions* contained within this Agreement by its employees or third-party consultants" and "[t]his Section shall survive termination of this Schedule." *Id.* (emphasis added).

113. The referenced "Acknowledgement Form for Third-Party Consultants or Programmers," attached hereto as Exhibit H, provides in Section 2.3 that "Third-Party Consultant agrees to be bound by the terms of the Non-Disclosure Agreement attached hereto as Exhibit 1" and "further agrees that its individual employees are bound to maintain confidentiality with terms as protective as those in Exhibit 1." Ex. H § 2.3. In addition, the "Third-Party Consultant agrees that its use of any Confidential Information (as defined in Exhibit 1), in whole

and in part, ***shall be used solely for [customer's] benefit in the course of exercising the limited rights granted herein***.  *Id.*

**K.**     **Applied Has Incurred Significant Harm Due To Comulate's Misappropriation**

114.    The massive subterfuge by PBC/Comulate was designed to, and did, result in the improper acquisition of Applied's Epic SDK Method Trade Secrets and Epic Algorithm Trade Secrets by Comulate to Applied's detriment.

115.    Years after its founding in 2022, Comulate launched its core product, an AI-driven revenue automation that focuses specifically—and solely—on direct billing automation for insurance brokers (the "Comulate System").  The Comulate System provides end-to-end direct bill automation and reconciliation for direct billing.

116.    Upon information and belief, Comulate has used Applied's trade secrets to refine Comulate's direct billing product in an effort to more effectively compete with Applied and ultimately seeks to use Applied's trade secrets to offer a product to replace Applied's Epic altogether.

117.    Upon information and belief, Comulate is also in the process of introducing, or has already introduced, an agency billing product for the first time and developed its agency billing product using Applied's misappropriated trade secrets.

118.    After discovering, investigating and confirming Comulate's breathtaking fraud, Applied terminated PBC's access to Epic and took other steps to ensure that Comulate had no other direct access to Applied's Epic to continue its misappropriation and reverse-engineering of Applied's Epic Algorithm Trade Secrets.  Applied has already incurred substantial costs investigating and attempting to remediate Comulate's misconduct, including conducting a thorough forensic investigation and incurring legal expenses to protect Applied's trade secrets

and prevent further harm by Comulate.

119.    Upon information and belief, because Comulate also works with many of Applied's customers who integrate Comulate's product with Epic, terminating Comulate's improper access may also complicate or damage Applied's valuable relationships with its customers and prospective business opportunities, or may require Applied to take further steps to protect its customer relationships from harm by Comulate.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE**
**DEFEND TRADE SECRETS ACT ("DTSA")**
**(Against Defendants PBC and Comulate)**

120.    The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

121.    Applied is the owner of the Epic SDK Method Trade Secrets and Epic Algorithm Trade Secrets, including without limitation the unique methods, logic, processes, and algorithms to perform agency billing, direct billing, billing automation, the month end process, the reconciliation process, invoice generation, and invoicing and payment reconciliation within Epic, as described herein.

122.    Applied's trade secrets relate to information and/or products and services used in, and intended for use in, interstate or foreign commerce, including but not limited to technical data, formulas, algorithms, patterns, compilations, ratios, programs, methods, techniques, processes, know-how, and plans that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

123.    The information that Defendants have misappropriated qualifies as and contains trade secrets of Applied. The trade secrets misappropriated by Defendants concern and are

related to products and services provided to customers throughout the United States and used in, and intended for use in, interstate or foreign commerce.

124.    Applied utilizes the trade secrets to provide services that are sold in interstate commerce.

125.    Consequently, the Applied trade secrets misappropriated by Defendants are subject to protection under the DTSA, 18 U.S.C. § 1831, *et seq*.

126.    Applied's trade secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

127.    Applied has spent thousands of hours, and tens of millions of dollars, in investment to develop and maintain the trade secrets, which would be of immense value to any competitor, including Comulate.

128.    Applied takes and, at all relevant times, has taken reasonable measures to maintain the confidential and secret nature of the Epic SDK Method Trade Secrets and the Epic Algorithm Trade Secrets through the Employee Agreement; the Employee Handbook; providing data security training to its employees; prohibiting unauthorized access to trade secret and confidential information, both physically and in its electronic systems; and using security measures such as passwords and two-factor authentication to prevent unauthorized access to the trade secrets.  In addition, Applied protects the confidentiality of the Epic SDK Method Trade Secrets by requiring customers and third parties to agree to the confidentiality and use obligations set forth in the Master Agreement and Schedule SDK before providing access.  *See* Exs. A and B.  Moreover, Applied does not provide the Epic Algorithm Trade Secrets to any customers or third parties under any circumstances.

129.    On information and belief, Defendants' acts of misappropriation of Applied's

trade secrets in violation of the DTSA include, but are not limited to:

      a.   Acquisition of Applied's trade secrets by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering;

      b.   Acquisition of Applied's trade secrets in circumstances where Defendant knew or had reason to know that the trade secrets had been acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering;

      c.   Disclosure, without Applied's consent, of Applied's trade secrets that Defendant acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering; and

      d.   Use, without Applied's consent, of Applied's trade secrets that Defendant acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering;

130.    Upon information and belief, Defendants have improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) Applied's trade secrets in violation of the DTSA.

131.    Upon information and belief, Comulate has gained, or will gain, substantial benefit from its misappropriation of Applied's trade secrets to Applied's substantial detriment.

132.    Defendants engaged in this conduct despite acquiring this information under

circumstances giving rise to a duty to maintain the information's secrecy and to limit its use, including but not limited to the confidentiality provisions in the Master Agreement and the Schedule SDK.

133.     As a direct and proximate result of Defendants' past, current and continued misappropriation of Applied's trade secrets, which Defendants took for their own benefit, Applied has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law, and Defendants must be enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Applied.

134.     PBC and Comulate should therefore be preliminarily and permanently enjoined from any further misappropriation of Applied's trade secrets and ordered to immediately return and/or destroy Applied's trade secrets.

135.     As a direct and proximate result of Defendants' misappropriation, Applied has suffered and continues to suffer actual damages in a sum to be set forth according to proof at trial and irreparable harm and is entitled to all damages, attorneys' fees, costs, and other remedies permitted under the DTSA, including but not limited to actual damages, unjust enrichment, and/or a reasonable royalty based on Comulate's continued use of the trade secrets in, upon information and belief, competing product offerings and the development of competitive products.

136. Applied is further entitled to a constructive trust over any trade secrets, confidential information, products, or other intellectual property developed by Comulate using or based on Applied's trade secrets.

137. Upon information and belief, Defendants' conduct was and is malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Defendants acted with a purpose or willingness to commit the misappropriation, and the misappropriation was not reasonable under the circumstances at the time and was not undertaken in good faith. Applied is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the trade secret misappropriation damages recovered, as well as reasonable attorneys' fees and costs to be proven at trial.

**COUNT II**
**BREACH OF CONTRACT**
**(Against Defendants PBC and Comulate)**

138. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

139. The Master Agreement, including Schedule SDK and the exhibits thereto, is a valid and enforceable written contract, with definite and certain terms.

140. Applied has at all times performed and continues to perform all of its required obligations under the Master Agreement and Schedule SDK.

141. PBC has breached numerous provisions of the Master Agreement and Schedule SDK, including but not limited to those set forth below.

142. PBC breached Section 3.2 of the Master Agreement, which provides in relevant part that "[u]sers are provisioned on a Named Basis only, must be located in the Territory, and must be Licensee's Employees" and that "[i]ncidental access to the Software by Licensee's

Employees or Professional Advisors is permitted where: (a) the Employee is performing tasks principally related to internal network/systems administration and not to Licensee's internal insurance operations; and (b) the Professional Advisor is providing its professional services to Licensee in connection with Licensee's general business operations, such as auditing, and not to Licensee's insurance operations." Ex. A § 3.2. PBC's use of Epic breached Section 3.2 of the Master Agreement because PBC's users were not PBC employees. Rather, PBC was granting Comulate employees unauthorized access to Epic for, upon information and belief, the purpose of misappropriating Applied's valuable trade secrets and confidential information to develop competing products.

143. PBC breached Section 3.3 of the Master Agreement because its use was not a "Permitted Use," defined as "use and access solely pursuant to an Order, in connection with Licensee's internal insurance operations, and in accordance with the Agreement and the Documentation." *Id.* § 3.3. Again, PBC did not use and access Epic solely in connection with its (fake) internal insurance operations, because it was not a real insurance agency and because PBC was operating as a front for Comulate to gain access to Applied's valuable trade secrets and confidential information.

144. PBC breached Section 3.5 of the Master Agreement by using Epic to develop and test competing products. *See id.* § 3.5.

145. PBC breached Section 3.6 of the Master Agreement, by among other things reverse-engineering Applied's trade secrets and software, and attempting to gain unauthorized access to the software, creating derivative works, making Applied's software available to Comulate, using Applied's software "for purposes of benchmarking, competitive analysis, or for

developing, using, or providing a competing software product, or service" and allowing Comulate to do the foregoing. *Id.* § 3.6.

146.    PBC breached Section 10.1 of the Master Agreement because PBC did not maintain the confidentiality of Applied's Confidential Information disclosed under the Agreement. *Id.* § 10.1. As detailed throughout, PBC sought to and did expose Applied's Confidential Information and trade secrets, PBC disclosed Applied's Confidential Information at least to Comulate and used it for purposes not permitted under the Agreement.

147.    PBC breached Section 5 of the SDK because PBC did not use the SDK "solely in connection with managing [PBC's] insurance agency or brokerage." Ex. B § 5. PBC had no insurance agency or brokerage and used the SDK to misappropriate Applied's trade secrets.

148.    PBC breached Section 5.1 of the Schedule SDK, which only permitted PBC to use Epic for the "Authorized Business Purpose[]" of "develop[ing] an integration between HubSpot and [Epic] via the SDK" and provided that "[t]he integration will be part of normal internal business operations which are owned and/or licensed by [PBC]." *Id.* § 5.1. PBC in fact used Epic to gain access to Applied's trade secrets, not to integrate with HubSpot. In addition, the integration was not part of any normal business operations or any business owned by PBC.

149.    PBC breached Section 5.2 of the Schedule SDK by exceeding the "Authorized Integrations" set forth in Section 5.2, including but not limited to making millions of calls to Epic SDK methods outside the scope of the Epic SDK methods authorized by Section 5.2 of the Schedule SDK, such as its millions of SDK general ledger calls. Even as to the SDK methods

within the scope of Section 5.2, PBC's use breached the Master Agreement because its use of those methods was not to integrate with HubSpot. *See id.* § 5.2.

150. PBC breached Section 5.5 of the Schedule SDK, which provides in relevant part that "[a]ny use of Applied Epic Integration Service SDK or of the Run-Time SDK not authorized or beyond the scope of the licenses granted under this Schedule is prohibited. For the avoidance of doubt, Licensee shall use the Applied Epic Integration Service SDK and the Run-Time SDK for internal purposes only . . . . Unless expressly agreed otherwise, Licensee shall not use the Applied Epic Integration Service SDK or the Run-Time SDK to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of the Applied Epic Integration Service SDK or of the Run-Time SDK to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business Purpose and Authorized Integration." *Id.* § 5.5. For the same reasons set forth above, PBC violated this provision by using Epic to gain access to Applied's valuable trade secrets and confidential information and for the purpose of developing competing products.

151. Finally, PBC breached Section 5.6 of the Schedule SDK, which similarly prohibited PBC from "us[ing] the Applied Epic Integration Service SDK or the Run-Time SDK for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." *Id.* § 5.6. PBC engaged in prohibited benchmarking and competitive analyses for the same reasons set forth above.

152. PBC breached Section 5.7 of the Schedule SDK because it did not maintain the confidentiality of the SDK as Confidential Information consistent with its obligations under the

Master Agreement and PBC used and/or disclosed the SDK "other than as prescribed in this Schedule without the prior written consent of Applied. *Id.* § 5.7.

153. All of the above misconduct constitutes a material breach of the Master Agreement and Schedule SDK, including but not limited to the specific provisions set forth above.

154. PBC is the alter ego of Comulate because there is such unity of interest and ownership that they are one and the same and, if the acts of PBC are treated as those of PBC alone, an inequitable result will follow.

155. Upon information and belief, Bates, in entering into the Master Agreement and Schedule SDK on behalf of PBC was acting as an agent and/or officer of Comulate or at Comulate's direction and for its benefit.

156. Upon information and belief, Comulate substantially controlled PBC and PBC had no separate legal existence apart from Comulate. Comulate exerted substantial control over the daily affairs of PBC and Comulate holds PBC as its agent.

157. Comulate materially breached each of the provisions for the same reasons set forth above.

158. As a direct and proximate result of PBC/Comulate's breaches, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate PBC/Comulate's breaches. Such damages are natural, highly probable consequences of PBC/Comulate's breaches.

159. Applied is also entitled to a constructive trust over any trade secrets, confidential information, products, or intellectual property misappropriated by or developed by Comulate

based on Applied's trade secrets and confidential information, including pursuant to Section 4.2 of the Master Agreement, which expressly provides that, "[t]o the extent Licensee violates this Section 4.2, Licensee automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests, without the necessity of further consideration and without any claim that Applied has waived Licensee's breach of this provision." *See* Ex. A § 4.1.

### COUNT III
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendants PBC and Comulate)

160.    The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

161.    The Master Agreement, including the Schedule SDK and the Exhibits thereto, is a valid, enforceable written contract, with definite and certain terms.

162.    Applied has at all times performed and continues to perform all of its requirements and obligations under the Master Agreement and the Schedule SDK.

163.    PBC owed Applied a duty of good faith and fair dealing that is implied in every contract, including but not limited to because the Master Agreement and Schedule SDK granted PBC discretion in accessing Epic solely for the purposes outlined in, and to engage in the activities set forth in, the Master Agreement and Schedule SDK.

164.    PBC violated the covenant of good faith and fair dealing through the intentional, deliberate, and fraudulent conduct described herein, including but not limited to because PBC

used its access to Epic to gain access to Applied's valuable trade secrets and confidential information and to run tests designed to aid Comulate in developing competing products.

165.    PBC's conduct violated the spirit of the Master Agreement and Schedule SDK and deprived Applied of the fruits of those agreements through PBC's use of Epic for unauthorized purposes and for the goal of facilitating Comulate's development of competing products, including but not limited to abusing any discretion afforded by the Master Agreement and Schedule SDK in PBC in its use of Applied's system in bad faith and for the benefit of Comulate.

166.    As the alter ego of and the entity that substantially controls PBC, Comulate is bound by the covenant of good faith and fair dealing with respect to the Master Agreement and Schedule SDK.

167.    Comulate breached the covenant of good faith and fair dealing through the same conduct set forth above.

168.    As a direct and proximate result of PBC/Comulate's breaches, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate PBC/Comulate's breaches.

169.    Applied is also entitled to a constructive trust over any trade secrets, confidential information, products, or intellectual property misappropriated by or developed by Comulate

based on Applied's trade secrets and confidential information, including pursuant to Section 4.2 of the Master Agreement. *See* Ex. A § 4.2.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
**(Against Defendants PBC and Comulate)**

170. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

171. PBC, including Bates, made numerous fraudulent misrepresentations in order to induce Applied to enter into the Master Agreement and Schedule SDK and then continue its relationship with PBC.

172. In connection with the intake interview process in March 2024, PBC, including Bates, misrepresented to Applied salespeople including Jason Shorter and Andy Sahl, among other things, that PBC was a legitimate, new three-person insurance agency, seeking to integrate HubSpot with Epic, and that it was exploring carrier interviews to expand its business.

173. In fact, PBC is a fake agency with no customers or business and entered into the Master Agreement and Schedule SDK for the purpose of gaining access to Applied's valuable trade secrets and confidential information for the purpose of developing competing product offerings, as described above.

174. At the time that PBC made the representations alleged herein, PBC knew the representations were false. Specifically, PBC knew that it was not a legitimate insurance agency, that it would not be using Epic and other Applied software for the authorized business purposes

set forth in the Master Agreement and Schedule SDK, and that PBC was in fact a front for Comulate.

175.    PBC made the fraudulent representations alleged herein as part of a scheme to induce Applied to reply on them and to cause and induce Applied to enter into the Master Agreement and Schedule SDK and to maintain a relationship with PBC thereafter.

176.    PBC's fraudulent misrepresentations were material to Applied's decision to enter into the Master Agreement and Schedule SDK and subsequently to continue its relationship with PBC.

177.    Applied justifiably relied on PBC's fraudulent misrepresentations in entering into the Master Agreement and Schedule SDK.  Specifically, Applied lacked any reason at the time to suspect that PBC was a fake agency, especially in light of the elaborate, brazen steps PBC took to conceal its true identity as a front for Comulate.

178.    PBC's fraudulent misrepresentations were made willfully and wantonly.

179.    Applied's reliance on PBC's fraudulent misrepresentations caused Applied to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred by Applied in investigating and attempting to remediate the fraud perpetrated by PBC, as well as exemplary and punitive damages given PBC's willful, wanton, malicious, fraudulent, and reckless conduct.

180.    As the alter ego of and the entity that substantially controls PBC, Comulate also committed the fraudulent misrepresentations set forth above.

181.    As a direct and proximate result of PBC/Comulate's fraudulent misrepresentations, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to

remediate the fraud perpetrated by Comulate, as well as exemplary and punitive damages given

Comulate's willful, wanton, malicious, fraudulent, and reckless conduct.

### COUNT V
### FRAUDULENT INDUCEMENT
### (Against Defendants PBC and Comulate)

182.    The allegations contained in the foregoing paragraphs are incorporated by

reference as if specifically realleged herein.

183.    PBC, including Bates, made numerous fraudulent misrepresentations under

Illinois law in order to induce Applied to enter into the Master Agreement and Schedule SDK.

184.    In connection with the intake interview process in March 2024, PBC, including

Bates, misrepresented to Applied salespeople including Jason Shorter and Andy Sahl, among

other things, that PBC was a legitimate, new three-person insurance agency, seeking to integrate

HubSpot with Epic, and that PBC was exploring carrier interviews to expand its business.

185.    In fact, PBC is a fake agency with no customers or business and entered into the

Master Agreement and Schedule SDK for the purpose of gaining access to Applied's valuable

trade secrets and confidential information for the purpose of developing competing products, as

set out above.

186.    At the time that PBC made the representations alleged herein, PBC knew the

representations were false.  Specifically, PBC knew that it was not a legitimate insurance agency,

that it would not use Epic and other Applied software for the authorized business purposes set forth in the Master Agreement and Schedule SDK, and that it was in fact a front for Comulate.

187.    PBC made the fraudulent representations alleged herein as part of a scheme to induce Applied to reply on them and to cause and induce Applied to enter into the Master Agreement and Schedule SDK.

188.    PBC's fraudulent misrepresentations were material to Applied's decision to enter into the Master Agreement and Schedule SDK.

189.    Applied justifiably relied on PBC's fraudulent misrepresentations in entering into the Master Agreement and Schedule SDK.  Specifically, Applied lacked any reason at the time to suspect that PBC was a fake agency, especially in light of the elaborate, brazen steps PBC took to conceal its true identity as a front for Comulate.

190.    PBC's fraudulent misrepresentations were made willfully and wantonly.

191.    As the alter ego of and the entity that substantially controls PBC, Comulate also committed the fraudulent inducement set forth above.

192.    As a direct and proximate result of PBC/Comulate's fraudulent inducement, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate the fraud perpetrated by PBC/Comulate, as well as exemplary and punitive damages given PBC/Comulate's willful, wanton, malicious, fraudulent, and reckless conduct.

## COUNT VI
## CIVIL CONSPIRACY
### (Against Defendants PBC and Comulate)

193.    The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

194.    To the extent that PBC and Comulate are distinct entities, PBC and Comulate's actions constitute civil conspiracy.

195.    PBC and Comulate knowingly and voluntarily entered into a scheme (*i.e.*, an agreement) to engage in a combination of unlawful acts of misconduct, including but not limited to the misappropriation and attempted misappropriation and misuse of Applied's trade secrets and confidential information, fraudulent misrepresentation and inducement, and the other misconduct set forth herein.

196.    PBC and Comulate intended that their scheme would undermine Applied and its business operations and both PBC and Comulate committed overt acts in furtherance of the conspiracy, as alleged herein.

197.    The purpose and objective of Defendants' conspiracy was, upon information and belief, for Comulate to compete unfairly with Applied, including but not limited to developing and/or refining products based upon PBC and Comulate's current and continuing misappropriation of Applied's trade secrets.

198.    As a direct and proximate result of PBC and Comulate's conspiracy, Applied has incurred, and will continue to incur, substantial damages, including but not limited to substantial costs incurred to investigate and attempt to remediate PBC and Comulate's conduct.

199.    As a result of Defendants' actions, Applied is entitled to recover compensatory damages in an amount to be proven at trial, as well as punitive damages in light of PBC and Comulate's willful, wanton, malicious, fraudulent, and reckless conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Applied respectfully requests that the Court award the following:

(a)    Preliminary injunctive relief;

(b)    An award of compensatory damages in an amount to be proven at trial;

(c)    Unjust enrichment damages in an amount to be proven at trial;

(d)    A reasonable royalty in an amount to be proven at trial;

(e)    A constructive trust over any Trade Secrets, confidential information, intellectual property, or products or services derived or developed from any of Applied's Trade Secrets and/or confidential information;

(f)    Permanent injunctive relief;

(g)    An award of exemplary and punitive damages to be proven at trial;

(h)      An award of costs and reasonable attorneys' fees; and

(i)      Such other and further relief as is just, equitable and proper.

Respectfully submitted,

*/s/ Amy H. Candido*

Amy H. Candido *(pro hac vice forthcoming)*
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304
T: (650) 251-5000
F: (650) 251-5002
amy.candido@stblaw.com

*/s/ Breana S. Sicley*

Breana S. Sicley
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304
T: (650) 251-5000
F: (650) 251-5002
breana.sicley@stblaw.com

*Attorneys for Plaintiff Applied Systems, Inc.*