UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| APPLIED SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PBC CONSULTING INC., and ARDENT LABS, INC., d/b/a COMULATE, <br><br> Defendants. | No. 25 CV 14251 <br><br> Judge Manish S. Shah |

### MEMORANDUM OPINION AND ORDER

Plaintiff Applied Systems, Inc. sells Epic, an insurance agency management software. Defendant Ardent Labs, Inc., d/b/a Comulate, developed software that integrates with the Epic software. In order to gain access to Epic and its software development kit to develop its product, Comulate created a fake company, PBC Consulting, that it held out as an insurance agency. PBC and Applied entered into agreements for PBC's use of the Epic software and its software development kit. Applied discovered anomalous use of its software, and tracked the use to PBC and eventually, Comulate. Applied seeks a preliminary injunction enjoining Comulate from using information it obtained through the PBC account.

### I. Legal Standards

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish "that it is likely to succeed on the merits of its claims and that traditional legal remedies would be inadequate, such that it would

suffer irreparable harm without injunctive relief." *Ill. Tamale Co., Inc. v. LC Trademarks, Inc.*, 164 F.4th 648, 654 (7th Cir. 2026). If the movant shows it is likely to succeed on the merits, I then weigh "the harm of denying an injunction to the movant against the harm of granting an injunction to the nonmovant" and consider the public interest. *Id.* The movant bears a "significant burden" and must show more than a "mere possibility of success" on the merits to prevail; it must "demonstrate at a minimum how it proposes to prove the key elements of its case." *Id.* at 654–55.

**II.    Facts**

Plaintiff Applied Systems hosts Epic, an insurance agency management system. [33-22] ¶ 3; [33-23] ¶ 3.[1] Epic is a platform for insurance agencies or brokerages to manage accounting, reconciliation, billing, and customer service. [33-22] ¶ 3. Epic is web-based but also offers a software development kit that allows customers to develop their own software and integrate it with Epic. [33-22] ¶ 6; [33-23] ¶ 3. Users of the software development kit can access some, but not all, of Epic's functions. [33-22] ¶ 6; [33-23] ¶ 3. Applied publishes some documentation on the software development kit, including its interfaces and how software should connect to it, but does not publish the code or algorithms in the code that implement the software development kit. [33-23] ¶ 3. Access to the software development kit is

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed on the top of filings. This opinion cites to some materials filed under seal. Materials that influence or underpin a judicial decision should not be sealed unless protected by statute, rule, or privilege. *See City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697–98 (7th Cir. 2014). The cited evidence does not appear to be eligible for sealing. If a party disagrees, and believes continued sealing is justified, it must file a statement of its position within two weeks of the entry of this order.

2

governed by contract, and Applied issues "keys" for specifically authorized customers to access the Epic software development kit. [33-22] ¶ 6; [33-23] ¶ 4. Each key is specific to that customer and only permits access to that customer's data. [33-23] ¶ 4.

Defendant Comulate is an insurance technology startup that provides artificial-intelligence-driven automation for insurance accounting processes. [33-22] ¶ 7. Comulate has a software program that integrates with Epic, using AI to extract information and reconcile it within a customer's account. [33-22] ¶ 8.

In March 2024, PBC Consulting, Inc. entered into two agreements with Applied for access to Epic and its software development kit for two named users. [33-2] (the master agreement); [33-3] (the software development kit schedule).[2] The master agreement allowed PBC a "limited, non-sublicensable, non-transferable, non-exclusive right … to allow Users to access the Software … solely for the Permitted Use." [33-2] at 2 (§ 3.1). Users were "provisioned on a Named Basis only." [33-2] at 2 (§ 3.2). "Permitted use" meant "use and access solely pursuant to an Order, in connection with Licensee's internal insurance operations, and in accordance with the Agreement and the Documentation." [33-2] at 7 (§ 15). The agreement restricted PBC from disassembling, decompiling, reverse-engineering, modifying, transforming, otherwise translating, or attempting to gain unauthorized access to Epic, including its source code. [33-2] at 2 (§ 3.6(b)). It also restricted creating derivative works or

---

[2] The agreements show the company as "BBC Consulting Inc." [33-2] at 2; [33-3] at 6. After the agreements were signed, the name of the company apparently changed from BBC Consulting Inc. to PBC Consulting Inc. [33-23] ¶ 6. The parties refer to the company as PBC, and I do as well.

3

using Epic for "purposes of benchmarking, competitive analysis, or for developing, using or providing a competing software product, or service." [33-2] at 2 (§ 3.6(e), (f)).

The software development kit schedule provided a "limited use license" and granted PBC a "personal, non-perpetual, non-assignable, non-transferable, non-exclusive, and limited license to use the Applied Epic Integration Service [software development kit] and the Run-Time [software development kit] … only in conformance with the Documentation, to establish the Integration(s) identified below … solely for the internal business purpose(s) also identified below … and solely in connection with managing Licensee's insurance agency or brokerage." [33-3] at 2 (§ 5). The schedule authorized the software Hubspot to be integrated into Epic. [33-3] at 3 (§ 5.2). It also restricted PBC from exporting data, configurations, tools, stored procedures or data views from the Applied software databases to any third party and from using or leveraging "knowledge gained from access and use of the" software development kits "to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder." [33-3] at 4 (§ 5.5). Like the master agreement, it barred PBC from using the software development kit "for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." [33-3] at 4 (§ 5.6(f)). The schedule said, "For the avoidance of doubt, Licensee has no license to use the Applied Epic Integration Service [software development kit] or the Run-Time [software development kit] for the purpose of developing an application, patch, fix,

4

tool, or other program, software, or device marketed, sold, and/or distributed to third parties." [33-3] at 4 (§ 5.6).

In October 2025, Applied learned of anomalous activity from PBC's account. [33-23] ¶ 9. In particular, it learned that there was an abnormally large number of data usage and calls through the software development kit. [33-23] ¶ 9; [33-24] ¶ 10. PBC had nearly eleven million "average general ledger [application programming interface] hits"[3] within the software—ten times the number of hits as companies five hundred times its size. [33-24] ¶ 13. It also had more traffic hits (over twelve million) than the average number of hits for companies at least fifty times its size. [33-24] ¶ 11. According to Applied's investigator, the deviations in PBC's data usage from the average data usage of other accounts of the same size were "statistically very significant." [33-24] ¶ 16.

Based on the irregularities, Applied decided to further investigate PBC's account. [33-24] ¶ 18. Applied's investigator found that the email address associated with PBC's account was also associated with a LinkedIn page for "Riley W." [33-24] ¶¶ 18, 20. "Riley W."'s page said he was an engineer at Comulate. [33-24] ¶ 20. When the investigator reverse-image searched Riley W.'s LinkedIn photograph, he found that the photograph was a stock photo available on multiple stock photo websites. [33-24] ¶ 21. The billing address on the account was not registered to a business and instead was the address of a mixed-use building with apartments and retail shops.

---

[3] The "general ledger" is a function within the Epic software, to which the software development kit "calls." [33-23] ¶ 10.

5

[33-24] ¶¶ 23–24. BBC Consulting was not registered with the California Secretary of State. [33-24] ¶ 25. The company's phone number was a Textnow Voice Over IP number, which are commonly used for anonymity, and the company website was a stock GoDaddy webpage with broken links that did not lead anywhere. [33-24] ¶¶ 26–27.

When the investigator reviewed documents in the PBC account, he found many references to Comulate. [33-24] ¶¶ 29–30. And when he reviewed the IP addresses used to access the PBC account, they were all associated with Comulate's offices and cloud environments. [33-24] ¶ 36. The investigator believed that PBC was not a legitimate organization, and instead was a front created by Comulate to gain access to Applied's software. [33-24] ¶ 38. The investigator opined that the volume of data usage indicated data scraping and reverse engineering of Applied's tools. [33-24] ¶ 38.

Comulate does not dispute that PBC was not a real company. Indeed, its Chief Executive Officer Jordan Katz said it is not a real insurance agency nor a real entity. [36-13] ¶ 5. He called the account a "sandbox" account and says Comulate used the account "to develop and demonstrate Comulate functionality for Epic-integrated customers in a sandbox (test) environment that was isolated from real customer data and real customer environments." [36-13] ¶ 6. Katz claimed that it was obvious that the account was not real, and that at an industry conference, Comulate used the sandbox account to run a product demonstration that was observed by four senior Applied employees. [36-13] ¶¶ 7–8.

6

Katz said that in May 2023, Comulate and Applied signed an agreement for Applied to provide Comulate with a test environment to facilitate development of Comulate's AI program. [36-13] ¶ 10. Katz said that Applied never delivered on its promise, and so in order to gain direct access to Epic and Epic's software development kit, Comulate obtained the sandbox account. [36-13] ¶¶ 11–12, 17, 24; [60-1] ¶ 37. Katz said that "Comulate paid for the account; used it only for developing and demonstrating features; obtained no information it did not already have access to; did not disclose any Applied information to third parties; and has never used any of Applied's code or intellectual property in any of Comulate's products." [36-13] ¶ 24.

### III. Analysis

#### A. Likelihood of Success on the Merits

Applied seeks a preliminary injunction based solely on its pending claim for breach of contract.[4] Applied first needs to show that it "is likely to succeed on the merits." *Ill. Tamale Co.*, 164 F.4th at 654. Under Illinois law, the elements of a breach-of-contract claim are: (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by defendant; and (4) resulting injury to the plaintiff. *Wolf v. Riverport Ins. Co.*, 132 F.4th 515, 520 (7th Cir. 2025).[5] There is no dispute that the

---

[4] Applied also brings claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. [54]. I have supplemental jurisdiction over the state-law breach-of-contract claims under 28 U.S.C. § 1367(a). [54] ¶¶ 17–18.

[5] Pursuant to the master agreement's choice-of-law provision Illinois law governs. [33-2] at 6 (§ 14.6); *see Beach Forwarders Inc. v. Serv. By Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023).

7

contract was valid and enforceable or that Applied performed under the contract. Comulate argues that Applied has not shown breach or injury.

### 1. Breach

Applied alleges that PBC and Comulate violated the permitted use provision of the contract and reverse engineered its software, used the information gained to develop its own products, and disclosed confidential information to third parties.

As an initial matter, Comulate does not dispute that PBC is not a real company and that it was a front for Comulate to gain access to Epic. I consider PBC and Comulate to be the same.

Comulate did not abide by the master agreement and schedule's "permitted use" provisions and developed its own products by using Epic and the software development kit. Comulate does not argue that it did not breach under these provisions of the agreements. [60] at 9–10. Katz himself said that the PBC was not a real insurance company and that the sandbox account was used for "developing and demonstrating features." [36-13] ¶¶ 5–6, 24; *see also* [60-1] ¶ 37 ("Comulate used the PBC sandbox account for product demos and to improve interoperability between Comulate and Applied Epic."). Neither of these uses are allowed under the "permitted use" section and are explicitly prohibited by the contracts. It is likely that Comulate breached the contracts.

Applied argues that Comulate breached by disclosing confidential information to third parties. It says that PBC violated the nondisclosure provisions by "giving unfettered access to Applied's Confidential Information to Comulate, which as a third party had no right whatsoever" to access the information. [33] at 15. But Applied also

8

argues that PBC and Comulate are one and the same—that PBC was a "mere instrumentality" of Comulate. [33] at 11–12. Comulate concedes that PBC is not an entity separate from Comulate. Because Comulate and PBC are the same, Applied cannot show that PBC breached its obligations by disclosing information to Comulate. But disclosure and access to non-named users (whether or not internal to Comulate) is a breach. The master agreement allows access to Epic only on a "named basis." [33-2] at 2 (§ 3.2). The agreements allowed two users access to the Epic software development kit. [33-23] ¶ 8. Yet there is evidence that at least twelve Comulate employee emails were found in the PBC account documents. [33-24] ¶¶ 29–30. Because Applied has shown that Comulate provided access and confidential information to non-named users, it is likely that Comulate breached the nondisclosure and named-basis-only provisions of the contracts.

Applied also has some evidence that Comulate reverse engineered its software and software development kit, though whether it is likely to prove as much is a closer call. Applied's investigator inferred from the data usage on the PBC account that Comulate was "data scraping" and concluded that the data scraping was likely being used to "allow Comulate to reverse engineer Applied's tools." [33-24] ¶ 38. This is the only mention of reverse engineering in his declaration. He does not explain how data scraping indicates reverse engineering. On the other hand, Comulate's software analyst says that Comulate's actions within the software do not indicate reverse engineering or data scraping, but rather, indicates "ordinary synchronization operations." [60-4] ¶ 19. He points to how the calls were almost exclusively made to

9

one kind of function, instead of spread out across many different functions. [60-4] ¶¶ 20–21. He says this "is inconsistent with reverse engineering and consistent with a repetitive sync operation." [60-4] ¶ 21. At this stage, I find Comulate's analyst more convincing. He provides an explanation for why the data does not show there was data scraping or reverse engineering. Applied has not shown a breach of the reverse-engineering clause.

Applied has also not shown that Comulate created a derivative work from its software. Applied does not say how Comulate's products were derivative works of its product. Comulate argues that the term "derivative works" is a term of art, and Comulate's products do not fall under the term. Applied does not respond to Comulate's argument about derivative works. I borrow the definition of derivative work from the Copyright Act: a derivative work is "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Looking outside the Copyright Act, Black's Law Dictionary defines "derivative" as "something that has developed from or been produced from something else." *Derivative, Black's Law Dictionary* (12th ed. 2024). The dictionary then points to "derivative work under WORK (2)." The definition of "derivative work" is "[a] copyrightable creation that is based on a preexisting product." *Work (2), Black's Law Dictionary* (12th ed. 2024). The definition then refers to the Copyright Act. *Id.* Merriam-Webster defines "derivative work" as "a piece of

10

intellectual property that substantially derives from an underlying work." *Derivative Work*, *Merriam-Webster Legal Dictionary*, available at https://www.merriam-webster.com/legal/derivative%20work (last accessed Feb. 4, 2026).

Under the Copyright Act, "by definition, derivative works incorporate the underlying work in some way." *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 522 n.5 (7th Cir 2009). And the definitions in Black's Law Dictionary and Merriam-Webster echo the Copyright Act. Applied has not explained how Comulate's product incorporates Epic, as opposed to merely having enhanced interoperability with Epic. *See Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 996 (9th Cir. 2024) ("Without more, mere interoperability isn't enough to make a work derivative."). Nor does it show how it proposes to prove that Comulate's product was a derivative of the Epic software. *Ill. Tamale Co.*, 164 F.4th at 655. Applied has not shown a likelihood that Comulate breached the agreements by creating a derivative work.

   2. *Injury*

Comulate argues that Applied was not injured by any breach. Applied says it has been damaged because Comulate used Applied's confidential information to develop competing products. It also says it suffered damages in the form of costs incurred investigating Comulate's use of the PBC sandbox account. "Money out of pocket is a standard understanding of actual damages in contract law." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 830 (7th Cir. 2018). Applied spent money to investigate unusual activity in an account, which led to its discovery of Comulate's breach of contract. The costs to investigate Comulate's actions are enough to show that Applied was harmed—Applied spent money because Comulate breached the

11

permitted use and nondisclosure provisions of the agreements. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 149 (2005) (a plaintiff "must establish an actual loss or measurable damages resulting from the breach in order to recover.").[6]

And though Comulate attempts to argue that it does not compete with Applied, its own evidence shows that at least one of its customers chose Comulate's product over Applied's Recon product: an insurance brokerage "conducted a thorough vetting process of available accounting automation and integration solutions for Applied Epic, specifically evaluating Ascend, Simple Pin, and an *early version of Applied Recon*. After considering the features, reliability, and overall fit for our business needs, we selected Comulate as the best solution for our organization in the second quarter of 2025." [60-6] at 1–2 (emphasis added). Comulate had access to Epic through the PBC account from March 2024 to November 2025. [33-23] ¶ 8; [33] at 10. Between January and November 2025, the PBC account made over twelve million calls to Epic. [33-24] ¶ 11. Applied lost at least one customer to Comulate after Comulate gained access to Epic, which may not have been the case had Comulate not had access to information it learned from its impermissible PBC account.

---

[6] Under the "American Rule," expenses for litigation are usually not damages from a breach of contract. *Sarmont v. DeWitt*, 2024 IL App (2d) 230239, ¶ 35. But the costs of investigating and remediating a breach are not governed by the rule, because "they are not incurred in pursuing litigation." *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994) (costs of identifying potentially responsible parties under the Comprehensive Environmental Response, Compensation, and Liability Act not governed by the American Rule); *see also Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 69 (costs of credit monitoring after data breach are actual damages). Applied's investigation into Comulate's breach was not a litigation expense. Rather, it was an investigation into who accessed confidential information and what they may have taken—steps necessary to determine how to respond to a suspected breach. They are damages from the breach of contract.

12

Because Applied has shown it was injured by Comulate's breach, it has shown that it is likely to succeed on the merits of its breach-of-contract claim.

### B. Irreparable Harm

A party seeking a preliminary injunction must show it is likely to suffer irreparable harm. *Ill. Tamale Co.*, 164 F.4th at 654. "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). Where harm would be ongoing without a preliminary injunction, no adequate remedy at law exists. *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005) (ongoing competition is a sufficient basis for relief); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1997) ("No adequate remedy at law exists because the harm without preliminary injunctive relief would be ongoing."). And it is difficult to quantify the loss of competitive position. *Hill v. Names & Addresses, Inc.*, 212 Ill.App.3d 1065, 1082 (1st Dist. 1991); *cf. Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) (characterizing harms from breach of non-compete agreement as a "canonical form of irreparable harm"). "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess*, 415 F.3d at 632.

Applied contends that its injuries are irreparable because it has lost a competitive advantage due to Comulate's actions, and Comulate could continue to profit off the use of ill-gotten information absent an injunction. I agree. Applied has shown—and Comulate does not contest—that Comulate breached the agreement's permitted-use provisions. Applied has also shown—and indeed, Comulate admits— that the information gained through the breach was used to develop Comulate's

13

product. This product directly competes with Applied's upcoming Recon product, and Comulate's evidence shows that at least one customer has already chosen Comulate's product over Applied's Recon. If there were no preliminary injunction, Comulate could continue to seek out and contract with customers using information it is not entitled to exploit. The ongoing competition between Applied and Comulate is a sufficient basis to show irreparable harm. *Hess*, 415 F.3d at 632.

### C. Balance of Equities and Public Interest

In balancing the equities, I must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted. *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 (7th Cir. 2022). This is a "sliding scale"—the more likely Applied is to win, the less the balance of harms must weigh in its favor. *Id.*

Comulate could continue to harm Applied's business if no injunction is granted. On the other hand, Comulate says a preliminary injunction would be devastating to its business. [61] at 14. But Comulate has also argued that it developed its product *before* the agreement with Applied was breached. [60] at 11 ("Applied's 'competing product' theory … is refuted by the chronology. … Comulate's products were on the market years before Recon even existed."). An injunction barring Comulate from using information gained through the PBC sandbox account would simply put it back in the position it was in before it breached the contract. Any harm to Comulate by requiring it to honor its obligations to only use information in a permitted manner

14

would derive entirely from its own breach of contract.[7] Applied has shown a very strong likelihood of success on the merits; Comulate has essentially admitted it breached the permitted-use provision of the agreement. The harm to Comulate is self-inflicted. And the public interest favors the enforcement of contracts. *See Life Spine*, 8 F.4th at 546. The balance favors an injunction against Comulate.

### D. Bond

Rule 65(c) requires the movant to give security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined. If wrongfully enjoined, Comulate will have incurred costs in identifying what information was gained from the PBC account and stopping the incorporation or exploitation of that information in its software. It will take the development of Comulate's product back to March 2024, and Comulate may lose customers, existing and potential, in the meantime. The parties don't offer specifics about the value of the information obtained through the PBC account or the costs of its excision from Comulate's ongoing operations. On the limited record before me, I set the security at $1 million, and the parties can brief whether to raise or lower that amount.

---

[7] If Comulate could have obtained the same information from other channels, but didn't, its failure to use other authorized means of developing its products does not mitigate the harm to Applied from Comulate's breach.

15

## IV. Conclusion

Applied's motion for a preliminary injunction, [32], is granted. Enter Preliminary Injunction.

ENTER:

                                            Manish S. Shah
                                            United States District Judge

Date: February 11, 2026