**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| APPLIED SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PBC CONSULTING INC. and<br>ARDENT LABS, INC., d/b/a COMULATE,<br><br>Defendants. | Case No. 1:25-cv-14251<br><br>District Judge Manish S. Shah<br>Magistrate Judge Maria Valdez |

**DEFENDANT ARDENT LABS, INC., D/B/A COMULATE'S ANSWER AND AFFIRMATIVE AND OTHER DEFENSES IN RESPONSE TO PLAINTIFF'S SECOND AMENDED COMPLAINT, AND COUNTERCLAIMS**

Defendant / Counterclaim Plaintiff Ardent Labs, Inc. ("Comulate"), by and through its attorneys, hereby submits this Answer and Affirmative and Other Defenses in response to Plaintiff / Counterclaim Defendant Applied Systems, Inc.'s ("Applied") Second Amended Complaint, and Counterclaims as follows:

## **ANSWER**

Each paragraph below corresponds to the same-numbered paragraph in the Complaint. All allegations not expressly admitted are denied. The use of headings herein is only for ease of reference to the Second Amended Complaint and does not constitute admissions as to the accuracy of the headings or subheadings. To the extent the headings or subheadings or other content in the Second Amended Complaint not contained in numbered paragraphs, such as section headings, are considered allegations within the pleading, Comulate denies them.

## **INTRODUCTION**

1. This is a case of corporate fraud and theft by a company that tried to bypass research and development investment and cheat its way to competitiveness with a market leader. By standing up a phony business and lying about its purpose, Comulate fraudulently gained access to Applied's systems to steal a trove of Applied's most valuable trade secrets. Comulate then used Applied's trade secrets, developed over decades at great expense, to enhance the features and functionality of Comulate's existing product and to accelerate the development of new products and functionality that would not have been possible without Applied's intellectual property.

**ANSWER:** Comulate denies the allegations in Paragraph 1.

2. Applied is a leading provider of cloud-based software in insurance automation and the world's largest provider of insurance agency and brokerage management systems. Comulate is an insurance accounting software start-up founded by Jordan Katz and Michael Mattheakis, who, by their own admission, "actually, like didn't know anything about insurance or accounting."[1] Desperate to fill in the gaps in their knowledge and accelerate the research and development necessary to build out their software and integrate fully with established insurance

---

[1] *How to Find $10M Ideas in Markets We'd Never Worked In – Comulate (Jordan Katz & Michael Mattheakis)*, EO (podcast), Podscan.fm, https://podscan.fm/podcasts/eo-2/episodes/how-to-find-10m-ideas-in-markets-wed-never-worked-in-comulate-jordan-katz-amp-michael-mattheakis-eo.

accounting software companies like Applied, Comulate hatched an unlawful and calculated corporate scheme to intentionally misappropriate Applied's most sensitive and valuable trade secrets. Comulate's theft was not an isolated act—it was a deliberate scheme, perpetrated for ***over nineteen months***, designed to misappropriate critical trade secrets and use them to unfairly compete with Applied. Most shockingly, Comulate even manufactured a fake insurance agency in California—PBC—solely for the purpose of misappropriating Applied's trade secrets and improperly reverse-engineering Applied's software for over nineteen months. Upon information and belief, Comulate then used Applied's trade secrets, developed over decades at great expense, to enhance the features and functionality of Comulate's direct billing reconciliation product and to accelerate the development of an agency billing product.

**ANSWER:** Comulate admits that Applied is the dominant provider of insurance agency and brokerage management systems and that Comulate is an insurance accounting software start-up founded by Jordan Katz and Michael Mattheakis. Comulate admits that Mr. Katz stated on a podcast that, at a certain point in time, the two founders "didn't know anything about insurance or accounting," but denies any characterization of that statement. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 2.

3. This espionage scheme only came to light recently, when PBC's highly unusual activity on Applied's Epic software platform set off internal alarms and Applied commenced an internal investigation. That investigation uncovered that PBC was not actually an insurance agency, but was in fact ***Comulate itself***. This shocking revelation was contrary to PBC's misrepresentations to Applied in March 2024 that it was a new agency comprising three experienced agents who had worked together in the past and were ready to grow their own business. PBC further misrepresented that it was looking to integrate a CRM platform, known as HubSpot, with Epic. This was a lie. There was no PBC—rather, PBC was a Trojan horse for Comulate's spying scheme.

**ANSWER:** Comulate admits that Comulate obtained an Epic account under the name PBC Consulting in order to operate a non-customer, non-production sandbox account to develop, test, and demonstrate for customers its Epic integration, i.e., the functionality by which Comulate's products interoperate with Epic, in a test environment that was isolated from real customer data and real customer environments. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 3.

4. On March 15, 2024, PBC entered into an Applied Systems Master Agreement ("Master Agreement"), attached hereto as Exhibit A, and Schedule – Applied Epic Integration Service with SDK [Software Development Kit] for Agencies and Brokerages ("Schedule SDK"), attached hereto as Exhibit B. According to the terms of the Master Agreement and Schedule SDK, among other limitations, in addition to access to Epic, Applied gave PBC a "limited license to use" the Applied Epic Integration Service SDK and the Run-Time SDK (collectively, the "SDK") "solely in connection with managing [PBC's] insurance agency or brokerage." Ex. B § 5. PBC's license was limited to the "Authorized Business Purpose(s)," which were specified as "develop[ing] an integration between HubSpot and Applied Epic via the SDK," *id.* § 5.1, and limited to certain "Authorized Integration(s)" involving specified "Epic [] Integration Method[s]," *id.* § 5.2. The Schedule SDK was clear that PBC shall not use the SDK "to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of the [SDK] to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions." *Id.* § 5.5. PBC's license also explicitly prohibited use "for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." *Id.* § 5.6.

**ANSWER:** Paragraph 4 purports to characterize the Master Agreement and Schedule SDK, and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the allegations in Paragraph 4.

5. In Section 4.3 of the Master Agreement, PBC expressly agreed that the software provided or made available by Applied, including Epic and the SDK, "constitutes, embodies, and/or contains valuable trade secrets, proprietary information, and other Confidential Information owned by Applied" and agreed that "any use or disclosure to third parties not specifically authorized in writing by Applied or its licensors is prohibited." Ex. A § 4.3. PBC made the same agreements explicitly with respect to the SDK in Section 5.7 of the Schedule SDK, also agreeing that the SDK is subject to the restrictions afforded Confidential Information under the Master Agreement:

> Licensee acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK ***constitute and/or contain valuable trade secrets and are considered Confidential Information under the terms of the Agreement***. ***Unauthorized use or disclosure*** of the Applied Epic Integration Service or of the Run-Time SDK ***is prohibited and may be illegal***. Licensee further acknowledges and agrees that this Schedule does not authorize Licensee to use or disclose the Applied Epic Integration Service SDK or the Run-Time SDK other than as prescribed in this Schedule without the prior written consent of APPLIED.

Ex. B § 5.7 (emphasis added). In other words, the Schedule SDK clearly—and repeatedly—prohibited PBC's use of the SDK for any purpose other than to develop an integration between HubSpot and Applied Epic and explicitly prohibited PBC's disclosures of the SDK to Comulate.

**ANSWER:** Paragraph 5 purports to characterize the Master Agreement and Schedule SDK, and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. Comulate denies the remaining allegations in Paragraph 5.

6. Nevertheless, in flagrant violation of the Master Agreement and the Schedule SDK, it is now clear that PBC is ***not*** and ***never was*** an actual insurance agency or brokerage and has ***no*** clients. Instead, the "phoenixbenefits" webpage, https://phoenixbenefits.godaddysites.com/, is a fake website that is little more than a GoDaddy template, which goes nowhere when one clicks on it. A printout of the webpage on November 20, 2025 is attached hereto as Exhibit C. Comulate now admits that PBC Consulting is not a real insurance agency. Dkt. 47-5 ¶ 5.

**ANSWER:** The allegations in Paragraph 6 contain legal conclusions to which no response is required. To the extent Paragraph 6 purports to characterize documents (the Master Agreement, Schedule SDK, or Exhibit C), Comulate denies any characterization of the documents, which speak for themselves. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 6.

7. Comulate, posing as the fake "agency" PBC, flagrantly violated almost every limitation in the licenses to the Applied Software, including Epic and the SDK, in the Master Agreement and Schedule SDK. Upon information and belief, Comulate/PBC never integrated with HubSpot and never used Epic or the SDK for ***any*** authorized purposes.

**ANSWER:** The allegations in Paragraph 7 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 7.

8. Comulate—via PBC—contracted with Applied for access to Epic under false pretenses and in an effort to hack Epic and the trade secret methods, logic, processes, and algorithms underlying various features and functionalities within Epic. Despite misrepresenting itself as a three-person agency (a very small agency), and despite having just two "seats" to access Epic, PBC made ***millions*** of SDK calls to certain Applied endpoints using Epic—a number of calls that is much larger than the number that even much bigger (and real) agencies typically make using Epic, as detailed herein.

**ANSWER:** Comulate denies the allegations in Paragraph 8.

9. Upon information and belief, Comulate/PBC used Epic to test and improperly reverse-engineer the confidential and trade secret methods, logic, processes, and algorithms underlying various features and functionalities within Epic. To do so, PBC used fake "invoices" and fake "transactions." Seemingly nothing about PBC was real, other than its fraud, theft and misappropriation of Applied's trade secrets. The reality was that PBC was Comulate and, upon information and belief, Comulate was running tests in Epic to figure out how to improve its direct billing product and to accelerate development of an agency billing product to compete with Applied by improperly reverse-engineering Applied's trade secrets at a pace outsized to and more cost-effective than Comulate's traditional development cycles.

**ANSWER:** Comulate admits that Comulate obtained an Epic account under the name PBC Consulting in order to operate a non-customer, non-production sandbox account to develop, test, and demonstrate for customers its Epic integration, i.e., the functionality by which Comulate's products interoperate with Epic, in a test environment that was isolated from real customer data and real customer environments. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 9.

10. Most concerning, this improper reverse-engineering of Applied's most prized trade secrets appears to have been orchestrated by Comulate's senior leadership. For example, the email address provided by Jordan Bates ("Bates"), the PBC contact who interacted with Applied and signed PBC's Master Agreement, is associated with the LinkedIn page of a Comulate engineer named "Riley W." On information and belief, Bates is Jordan Katz ("Katz"), Comulate's Co-Founder and Chief Executive Officer ("CEO"), and/or acted at the direction of Comulate's senior management. Numerous emails that Comulate attached directly in Epic were flagrantly sent to and from senior Comulate employees in the process of testing and hacking the Epic system.

**ANSWER:** Comulate admits that Comulate obtained an Epic account under the name PBC Consulting in order to operate a non-customer, non-production sandbox account to develop, test, and demonstrate for customers its Epic integration, i.e., the functionality by which Comulate's products interoperate with Epic, in a test environment that was isolated from real customer data and real customer environments. Comulate admits that PBC Consulting is not a functioning

entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 10.

11. Indeed, via "Bates," Katz and other senior leadership of Comulate began using PBC's fraudulently procured Epic seats to improperly reverse-engineer Applied's proprietary technology and steal Applied's trade secrets in violation of the PBC Master Agreement and federal law. In the course of doing so, Katz and other Comulate senior leadership even uploaded invoices belonging to Comulate's customers—legitimate insurance brokerage agencies and done likely without such agencies' permission or knowledge—to Epic to practice using Epic and extract the targeted Applied trade secrets.

**ANSWER:** Comulate denies the allegations in Paragraph 11.

12. Comulate's scheme was designed to, and did, improperly reverse-engineer Applied's valuable Epic trade secrets in violation of the Master Agreement. Indeed, the Epic trade secrets are Applied's "secret sauce" that have helped Epic become a leading tool for stakeholders in the insurance industry. Comulate's use of PBC, a fake agency, to gain access to Epic allowed it to bypass years of research and development, and millions of dollars of investment, to refine its direct billing product and to develop a new agency billing product.

**ANSWER:** Comulate denies the allegations in Paragraph 12.

13. Applied brings this action against Comulate and PBC to stop Comulate's unlawful theft and misappropriation of Applied's trade secrets, to prevent further dissemination and disclosure of Applied's trade secrets, to prevent Comulate from further harming Applied through unfair competition, and to obtain compensation for the significant harm to Applied that Comulate and PBC have intentionally caused. Applied welcomes honest and lawful competition. We cannot tolerate outright theft. Applied brings this action to protect its valuable trade secrets and prevent immediate and ongoing irreparable harm to its business.

**ANSWER:** The allegations in Paragraph 13 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 13.

## THE PARTIES

14. Plaintiff Applied Systems, Inc. is a Delaware corporation with its headquarters and principal place of business at 320 N. Sangamon Avenue, Suite 750, Chicago, Illinois 60607. Applied is a well-known and highly regarded global provider of cloud-based software that powers the business of insurance.

**ANSWER:** Comulate admits that Applied Systems, Inc. is a Delaware corporation with its headquarters in Chicago, Illinois. Comulate admits that Applied is the dominant player in the

enterprise-level insurance agency management system market. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 14.

15. Defendant PBC Consulting Inc. purports to be a California corporation with its headquarters and principal place of business located at 1430 Q St #402, Sacramento, California 95811—upon information and belief, inside a residential apartment.[2] Upon information and belief, PBC is not now and never has been a California corporation. PBC is a sham entity created by Comulate to defraud Applied and misappropriate Applied's trade secrets.

**ANSWER:** Comulate admits that the address for "BBC Consulting Inc" is listed on the Applied Systems Master Agreement as 1430 Q St #402, Sacramento, California 95811. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 15.

16. Defendant Ardent Labs, Inc., d/b/a Comulate, is a Delaware corporation with its headquarters and sole place of business at 785 Market St. Suite 950, San Francisco, California 94103.

**ANSWER:** Comulate admits that Comulate is a Delaware corporation with its headquarters and place of business at 785 Market St., San Francisco, California.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States 18 U.S.C. § 1836 *et seq.*, and the computer fraud and abuse laws of 18 U.S.C. § 1030.

**ANSWER:** The allegations in Paragraph 17 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 17.

18. This Court has supplemental jurisdiction over Applied's state law claims under 28 U.S.C. § 1367(a), because Applied's state law claims derive from a common nucleus of operative facts and are so closely related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution. This Court has jurisdiction over Applied's declaratory judgment claim under 28 U.S.C. §§ 2201 and 2202 because an actual

[2] In its dealings with Applied, PBC has also used or gone by the names Phoenix Benefits Consulting and BBC Consulting Inc. However, upon information and belief, references to BBC Consulting Inc. may have been the result of a typographical error.

controversy exists between the parties regarding their respective rights under the Master Agreement and Schedule SDK.

**ANSWER:** The allegations in Paragraph 18 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 18.

19. This Court has personal jurisdiction over PBC under at least 735 Ill. Comp. Stat. Ann. § 5/2-209(7), because this case concerns PBC's breach of a contract with Applied that is substantially connected with Illinois. Specifically, PBC's Master Agreement contains a "**Choice of Law and Venue**" provision prescribing: "The Agreement and the relationship between the parties, and all proceedings directly or indirectly related thereto shall be governed by the laws of the Location. The Location is Will County, Illinois." Ex. A § 14.6. Indeed, PBC "**consent[ed] to the sole and exclusive jurisdiction and venue of the courts of the Location for any proceeding or claim between the parties**," *id.* (emphasis in original), including this Court.

**ANSWER:** The allegations in Paragraph 19 contain legal conclusions to which no response is required. Paragraph 19 purports to characterize the Master Agreement, and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 19.

20. This Court also has personal jurisdiction over Comulate because, as set forth herein, Comulate is the alter ego of and exercises substantial control over PBC. PBC is a sham entity created by Comulate in order to gain unlawful access to the trade secrets under the Master Agreement and then reverse-engineer them in violation of the Master Agreement. Comulate is therefore subject to and bound by the jurisdiction and venue provisions of the Master Agreement. Upon information and belief, Katz, a co-founder and the CEO of Comulate, signed the Master Agreement on PBC's behalf while fraudulently posing as an officer or agent of PBC at the direction of Comulate.

**ANSWER:** The allegations in Paragraph 20 contain legal conclusions to which no response is required. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted, Comulate denies the allegations in Paragraph 20.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district. Moreover, venue is proper in this district because section 14.6 of the PBC Master Agreement provides that PBC "**consents to the sole and exclusive jurisdiction and venue of the Courts of**

**[Will County, Illinois] for any proceeding or claim between the parties**." Ex. A § 14.6 (emphasis in original). Comulate, PBC's alter ego, is subject to venue here for the same reasons set forth above.

**ANSWER:** Comulate admits that venue is proper in this Court. The remaining allegations in Paragraph 21 contain legal conclusions to which no response is required. Paragraph 21 purports to characterize the Master Agreement, and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 21.

## FACTUAL ALLEGATIONS

### A. Applied Pioneers The Insurance Technology Industry

22. Like many great technology start-ups, Applied was started in 1983 in the basement of its founder, Robert Eustace, and today has over 2,800 employees worldwide. Applied is a developer of cloud-based software designed specifically for the insurance industry. Applied specializes in insurance automation software for agency and brokerage management systems that facilitate the exchange of information throughout the insurance life cycle between agencies, brokerages, insurance carriers, and their clients. Applied's core mission is premised on the idea of connecting and automating the digital roundtrip of insurance.

**ANSWER:** Comulate admits that Applied is a developer of cloud-based software designed for insurance agencies using agency and brokerage management systems. Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22 and on that basis denies them.

23. Applied's Epic is the world's most widely used insurance agency management system ("AMS") for insurance agencies and brokers. Epic, a sophisticated software program, provides a centralized platform for a business to manage sales, policies, and customer service through many integrated capabilities including prospecting, pipeline management, market access, operational reporting, policy management, and insurance quotes and submissions. Epic is also a powerful accounting software program that enables digital payments, including the management and reconciliation of accounts payable and receivable within the general ledger, which is fully integrated with and natively embedded in Epic itself.[3]

---

[3] In Epic, the general ledger ("GL") is the core financial module for managing an agency's accounts. It allows users to enter receipts, process disbursements, create journal entries, and

**ANSWER:** Comulate admits that Applied's Epic is the world's most widely used insurance agency management system for insurance agencies and brokers, and that Epic includes accounting functionality, including a general ledger, that is integrated with Epic. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 23.

24. Since its founding, Applied has created and delivered many firsts, including: (i) the first agency AMS and PC-based software application in the property and casualty industry, Applied TAM®, in 1983; (ii) the first cloud-based, fully integrated and automated agency billing software, Epic, in 2008; (iii) the first mobile app designed to give insurance agents and brokers on-the-go access to client and prospect information from their agency management systems in 2012; (iv) the first client portal for 24/7 insured self-service in 2014; and (v) the first natively integrated payments solution built specifically for insurance in 2022. By simplifying and modernizing the insurance life cycle, Applied's products—and the hard-working and creative employees who have developed and supported them for over 40 years—enable millions around the world to safeguard and protect their loved ones, homes, and most treasured possessions.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and on that basis denies them.

25. Applied's software has repeatedly been praised for its innovation within the insurance software industry, known as insurtech. In August 2025, Epic won the 2025 SaaS Awards' category for Best SaaS Product in Business Intelligence, Analytics, and Reporting and received its fourth consecutive Global 5-Star Insurance Technology and Software Provider honor from Insurance Business. The SaaS awards specifically recognized Epic's embedded analytics, which transform data into workflow-level decision support and enable smarter organizational decision-making.[4] Applied has also received multiple American Business Awards (*i.e.*, Stevie Awards) for Epic.[5]

---

perform reconciliations for bank accounts and direct bill commissions. This includes handling client payments, carrier deposits, vendor payments, and commission payables.

[4] *See* Applied Systems, Press Release, *Applied Earns Dual Honors with SaaS Award and 5-Star Tech Provider Recognition* (Aug. 27, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-earns-dual-honors-with-saas-award-and-5-star-tech-provider-recognition.

[5] *See, e.g.*, Applied Systems, Press Release, *Applied Systems Honored with Three Stevie Awards in 2025 American Business Awards* (Apr. 30, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-systems-honored-with-three-stevie-awards-in-2025-american-business-awards/.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and on that basis denies them.

26. Considering Applied's deep understanding of the insurance industry, its suite of product offerings, and its reputation for innovation, it is not surprising that Applied is also one of the leaders in insurance artificial intelligence ("AI"). Examples of Applied's innovative uses of AI include Applied Book Builder, an AI-powered tool that helps insurance agencies grow their business by analyzing existing customer data and identifying new opportunities, and Epic Bridge, which allows users to document emails, access client information, and use templates within their Outlook email inbox. Applied also established the Applied AI Lab, which provides companies with an opportunity to participate in research, guide use cases, and experiment hands-on with innovative AI-assisted capabilities across Applied's suite of product offerings.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and on that basis denies them.

27. Applied was recently included in Fast Company's seventh annual Best Workplace for Innovators List, which recognizes the top 100 businesses globally that empower employees at all levels to improve processes, create new products, or invent new ways of doing business. Applied ranked 74th for its culture of collaboration.[6]

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and on that basis denies them.

28. In stark contrast to Applied, Comulate—which by its own admission has no insurance experience—has only been operating since 2022.

**ANSWER:** Comulate admits that Comulate was founded in 2022. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 28.

## B. Applied's Innovations Have Built A Thriving Ecosystem Around Epic

29. Epic, the preeminent AMS system among insurance agencies, is used more than any other AMS system among the largest agencies in the United States. In 2025, eight out of the ten largest brokers ranked by Business Insurance, 69 of Insurance Journal's top 100 property

[6] *See* Applied Systems, Press Release, *Applied Systems Recognized as a Fast Company Top Workplace of Innovators* (Sept. 9, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-systems-recognized-as-a-fast-company-top-workplace-for-innovators/ (last visited Nov. 18, 2025).

and/or casualty agencies, and 57% of Reagan Consulting and IIABA's best practices all used Applied's Epic.[7]

**ANSWER:** Comulate admits that Epic is the dominant software platform used by enterprise insurance agencies and brokerages in the United States and is used by more large agencies than any other AMS system. Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29 and on that basis denies them.

30. While Epic is Applied's core software program, Applied offers numerous software programs that add additional features and functionalities to Epic, including: (i) texting; (ii) benefits quoting (Applied Benefits Designer); (iii) CSR24 (a consumer-facing customer service interface); (iv) email marketing; and (v) commercial lines insurance application processing, among many others.

**ANSWER:** Comulate admits that Applied offers additional software programs in addition to Epic. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 30.

31. As another addition to Epic, Applied also offers Applied Pay, a full-cycle agency bill accounts receivable application that automates the process of sending invoices to insureds and processing and returning their online payment transaction data to the AMS for reconciliation. Applied Pay is integrated into Epic's general ledger, enabling clients to access and use Applied Pay directly within Epic. For example, invoices are tagged within the AMS and then sent to payees for payment. Once payment is complete, the system returns the invoice for reconciliation within the general ledger. This is a large benefit to users as it eliminates the need to manually enter each payment and journal entry, saving hours of time per day.

**ANSWER:** Comulate admits that Applied offers Applied Pay, a payment processing product integrated with Epic. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 31.

---

[7] *See* Applied Systems, Press Release, *Applied Remains the Industry's Leading Provider of Agency Management Systems According to Multiple Industry Lists* (Sept. 18, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-remains-the-industrys-leading-provider-of-agency-management-systems-according-to-multiple-industry-lists/.

32. Epic allows for integrations with third-party software via tools like Applied's software development kit ("SDK"). Integrations allow Applied's customers to further enhance Epic's capabilities, thereby connecting agencies, carriers, and an ecosystem of insurance technology providers by enabling end-to-end workflows that span marketing, servicing, and accounting, while also enabling firms to extend their functionality through third-party tools. For example, Applied's website explains that its "commitment to innovation extends to our integration ecosystem strategy, which focuses on identifying and collaborating with best-in-class organizations that add value to the next generation of the digital roundtrip of insurance."[8] In addition, Applied's SDK supports "customers in integrations to extend the value of their core technology stack."[9]

**ANSWER:** Comulate admits that Epic allows integrations with third-party software through the SDK, which customers use to extend Epic's capabilities, and respectfully refers the Court to the quoted webpage for a full and accurate statement of its contents. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 32.

33. Applied offers different software licenses depending on its customers' needs. For example, if a customer only needs access to Epic (and nothing else), Applied will enter into a licensing agreement allowing the customer to access the Epic software via the user interface ("UI") only. Applied only provides such access to entities that execute appropriate contracts with Applied.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and on that basis denies them.

34. If a customer needs to be able to facilitate integrations using the SDK, Applied also offers its customers access to its SDK through an SDK key obtained through an SDK license agreement. The scope of Applied's SDK licenses are tailored depending on the customer's needs. For instance, some customers only take a "limited" SDK license that licenses use of only expressly authorized SDK methods, as identified in the underlying agreement. Other customers may license a broader suite of all available SDK methods, which Applied colloquially refers to as an "all you can eat" SDK license.

**ANSWER:** Comulate admits that Applied typically provides access to the SDK through an SDK key obtained after signing an SDK license agreement. Comulate lacks knowledge or

---

[8] *See* Applied Systems, Inc., *About Us – Ecosystem*, https://www1.appliedsystems.com/en-us/about-us/ecosystem/.

[9] *Id.*

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34 and on that basis denies them.

35. Applied's SDK license agreements specifically prohibit customers from allowing "a third party to access" Applied's SDK. Ex. B § 5.6. In addition, if a customer wishes to disclose Applied's licensed SDK to a "third-party consultant providing technical services" to the customer and Applied "in its sole discretion, consents to the disclosure," the SDK license agreements require that Applied and the third-party consultant must first execute an "Acknowledgement Form for Third-Party Consultants or Programmers . . . whereby [customer's] third-party consultant assumes all of the confidentiality obligations assumed by [customer] hereunder and agrees to use and access Applied . . . SDK solely for [customer's] benefit in the course of [customer] exercising the limited rights granted to it under this Agreement." The SDK license agreements further specify that the "[Customer] shall be strictly liable for any violation of the confidentiality obligations and use restrictions contained within this Agreement by its employees or third-party consultants." *Id.* § 5.7.

**ANSWER:** The allegations in Paragraph 35 contain legal conclusions to which no response is required. Paragraph 35 purports to quote from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 35.

**C. Accessing Applied's Epic Software**

36. As relevant here, Applied provides two mechanisms for accessing its software. The first mechanism is a web-based graphical user interface. This interface permits a user to interact with Epic in a web-based user interface in a conventional manner by clicking on buttons, selecting items from menus, entering data into forms, and other similar behaviors. The second mechanism is the SDK. This permits customer software to issue programmatic requests to Epic through the SDK. The web-based graphical user interface offers actions and functionality that are not exposed through the SDK. Thus, for an entity to be able to obtain access to the full scope of Epic functionality, an SDK license would not be sufficient.

**ANSWER:** Comulate admits that Applied offers both graphical user interface and SDK access to Epic. Comulate lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 36 and on that basis denies them. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 36.

**D. Applied's Epic Algorithms Are Highly Valuable Trade Secrets**

37. The development and subsequent deployment of Epic, Applied Pay, and other Applied software required, and continues to require, substantial upfront investments of time, resources, personnel, and financial capital by Applied. Indeed, since its founding, Applied has invested tens of millions of dollars in research and development in Epic and other software products, as well as significant time and resources in developing a sophisticated understanding of its customers' needs and wants. Applied's decades-long commitment to innovation has led to the creation of a vast amount of intellectual property. Like many companies, Applied has chosen to protect its most valuable intellectual property as trade secrets. Applied's trade secrets include the unique and confidential methods, processes, logic, and algorithms underlying Epic's SDK methods and certain additional actions in Epic that may only be initiated through its user interface ("UI") (collectively, the "Epic Algorithm Trade Secrets"). The Epic Algorithm Trade Secrets are Applied's "secret sauce."

**ANSWER:** The allegations in Paragraph 37 contain legal conclusions to which no response is required. Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 and on that basis denies them.

38. As a result, Applied is the sole owner of all right, title, and interest in a wide range of trade secrets referred to herein as the Epic Algorithm Trade Secrets, including without limitation the unique methods, logic, processes, and algorithms to perform agency billing,[10] direct billing, billing automation, the month-end process, and invoicing and payment reconciliation within Epic. These are the unique methods, logic, processes, and algorithms that Comulate, posing as PBC, appears to have been diligently reverse-engineering through subterfuge, gross disregard for the terms of PBC's Master Agreement and Schedule SDK, and willful and malicious theft of Applied's intellectual property rights.

**ANSWER:** The allegations in Paragraph 38 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 38.

39. The SDK methods are a series of SDK methods that can be used to interact with Epic. Each SDK method initiates a unique underlying method, process, procedure or algorithm within Epic, as described in more detail below. The disclosure of the name, description, input, and output of an SDK method does not expose the underlying method, process, procedure or algorithm that the software performs to execute the method in Applied's back-end system. The underlying method, process, procedure or algorithm that the software performs to execute the method in Applied's back-end system is maintained as confidential by Applied.

---

[10] In agency billing—unlike traditional "direct billing" in which the insurance carrier is billed directly and then remits a commission to the insurance agency—the insurance agency is billed first, takes its commission, and then remits the remainder of the payment to the carrier.

**ANSWER:** Comulate admits that the SDK methods can be used to interact with Epic. Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39 and on that basis denies them.

40. The Epic Algorithm Trade Secrets are the individual methods, processes, procedures, and algorithms in Epic that correspond to each SDK method (the "SDK-Initiated Algorithms"), as well as certain additional actions and processes which can only be initiated through the Epic UI (the "Epic UI-Initiated Algorithms"). Applied takes significant measures to protect the confidentiality of the Epic Algorithm Trade Secrets and does not share them with customers or other third parties under any circumstances. Moreover, there is no way to legitimately reverse-engineer the Epic Algorithm Trade Secrets, either through public information or normal use of Epic through SDK and/or Epic UI, or other Applied software authorized by Applied's agreements with its customers. Instead, the only conceivable way to reverse-engineer these trade secrets is by engaging in grossly excessive, repetitive system testing and bombardment beyond any remotely "normal" use of Epic or its SDK, and such reverse-engineering and testing is expressly prohibited by the Master Agreement and Schedule SDK license agreements.

**ANSWER:** The allegations in Paragraph 40 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 40.

41. Here, as discussed further below, Comulate/PBC made ***millions*** of calls to certain SDK methods in Epic in connection with its illegal scheme to improperly reverse-engineer Applied's Epic Algorithm Trade Secrets.

**ANSWER:** Comulate denies the allegations in Paragraph 41.

42. Further, although Comulate disabled client-side logging when using the Epic UI in an apparent attempt to conceal its activities, evidence shows that Comulate similarly engaged in at least automated and manual crawling and scraping of the Epic UI, including in particular focusing on Epic's agency billing functionality. This activity was, on information and belief, in support of Comulate's development of an agency billing product. In order for Comulate to integrate its agency billing product with Epic, Comulate would have to duplicate functionality performed by Epic in response to user interface actions, thus requiring reverse-engineering of Epic by Comulate in order to understand the impact agency billing-related user interface actions have on the internal state of Epic, including the general ledger.

**ANSWER:** Comulate denies the allegations in Paragraph 42.

43. Upon information and belief, Applied's trade secrets misappropriated by Comulate/PBC include, but may not be limited to, individual Epic Algorithm Trade Secrets and combinations thereof. In order to avoid revealing the trade secret information that Applied seeks to protect by bringing this action, below Applied provides additional detail regarding the nature

and functions of its misappropriated trade secrets by common subject areas, without revealing the unique underlying detailed methods, logic, processes, and algorithms, the public disclosure of which would destroy the value of the trade secrets.

**ANSWER:** The allegations in Paragraph 43 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 43.

**Categories Of Misappropriated Trade Secrets**

44. **Group 1: General Ledger Algorithms:** These trade secrets concern a series of internal processing logic, proprietary implementation details and algorithms that provide unique workflows, computational approaches, and analytical formulations for tasks including, by way of non-exhaustive example, retrieving a list of receipts that meet requirements specified in the parameters; retrieving a chart of accounts that meet the criteria provided; retrieving a bank account that matches the specified account identified; inserting and updating a receipt in Epic; populating a receipt detail object with dynamic items necessary to apply debits to credits during an insert receipt workflow; inserting and retrieving a list of journal entries in Epic that meet the requirements specified in the journal entry filter object; and finalizing a specified receipt. In lay terms, the logic underlying the general ledger SDK methods use proprietary algorithms to perform tasks like generating and updating receivable and payable entries in the general ledger and reconciling payments and collections to streamline and automate the insurance billing process.

**ANSWER:** The allegations in Paragraph 44 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 44.

45. **Group 2: SDK-Initiated Reconciliation Algorithms:** These trade secrets concern unique numerical approaches to performing reconciliation in the general ledger, including retrieving direct bill commission objects; inserting direct bill reconciliation into Epic; updating direct bill reconciliation in Epic; and associating a general ledger item with a reconciliation direct bill commission statement, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 45 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 45.

46. **Group 3: Broker Algorithms:** These trade secrets concern unique procedures to automatically determine a list of brokers that meet the requirements specified by the parameters, get default broker commissions, and retrieve a list of broker payable contracts that meet the requirements specified by the parameters, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 46 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 46.

47. **Group 4: Employee Algorithms:** These trade secrets concern unique analytical formulations for retrieving a list of employees that meet the requirements specified by the parameters and retrieving a list of employee commissions that meet the requirements specified by the parameters in order to streamline and automate the commission process, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 47 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 47.

48. **Group 5: Attachment Algorithms:** These trade secrets concern unique proprietary algorithms used to retrieve a list of attachments that meet the requirements specified, insert the specified attachment, and get, upload, and update attachment details in Epic, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 48 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 48.

49. **Group 6: Transaction Algorithms:** These trade secrets concern unique mathematical algorithms and processes for retrieving a list of transactions from Epic that meet the requirements specified, insert the specified transaction in Epic, receive transaction codes, get default installments of the specified type for the specified transaction, and adjust the commission on a transaction and get the default settings needed to adjust a commission action in order to carry out transactions and complete commission processes, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 49 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 49.

50. **Group 7: Company Algorithms:** These trade secrets concern unique proprietary processes to retrieve a list of companies that meet the specified parameters and insert the specified company payable contract in Epic, including when invoked by various SDK methods or through UI interactions.

**ANSWER:** The allegations in Paragraph 50 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 50.

51. **<u>Group 8: Month-End Closing Algorithms:</u>** These trade secrets concern unique mathematical algorithms and processing logic used to generate journal entries from aggregated transactions in Epic. These processes, developed over the course of Applied's entire 40-year history, take Epic transactions and aggregate them based on internal identifiers and proprietary classes into credit and debit entries in the general ledger. The month-end closing algorithms are initiated through Epic's user interface.

**<u>ANSWER:</u>** The allegations in Paragraph 51 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 51.

52. **<u>Group 9: UI-Initiated Reconciliation Algorithms:</u>** These trade secrets concern unique mathematical algorithms and processing logic used to generate new general ledger entries and other data fields, reconcile transactions for user review, and update entries on the general ledger and other data within Epic, including with respect to Epic's agency billing functionality. The reconciliation algorithms are initiated through Epic's user interface.

**<u>ANSWER:</u>** The allegations in Paragraph 52 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 52.

53. **<u>Group 10: Invoice Generation Algorithms:</u>** These trade secrets concern unique proprietary processes that identify billing, contact, policy, and other information from within Epic and generate an invoice based on user configurations. The invoice generation algorithms are initiated through Epic's user interface.

**<u>ANSWER:</u>** The allegations in Paragraph 53 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 53.

54. Applied's Epic Algorithm Trade Secrets are not generally known or readily ascertainable to the public or to individuals in the insurance or accounting industry. The Epic Algorithm Trade Secrets are not readily ascertainable from publicly available information. The Epic Algorithm Trade Secrets go far beyond any existing back-end reconciliation, payment, and collection system in the field, and there is no system comparable to Epic, which integrates insurance-specific functions like policy management, accounting and CRM into a single, automated platform that streamlines operations and reduces the inefficiencies of using separate systems. Simply put, these economically and competitively valuable trade secrets are Applied's "secret sauce."

**<u>ANSWER:</u>** The allegations in Paragraph 54 contain legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 54.

55. Applied does not make these trade secrets public. To the contrary, Applied redacts from public copyright filings regarding Epic proprietary source code and software designs any

information regarding the Epic Algorithm Trade Secrets because destroying the secrecy of such methods, logic, processes, and algorithms would destroy the competitive advantage they provide Applied's products.

**ANSWER:** The allegations in Paragraph 55 contain legal conclusions to which no response is required. To the extent a response is required, Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 55 and on that basis denies them.

56. There is no legitimate way to reverse-engineer the Epic Algorithm Trade Secrets. Any reverse-engineering of Applied's Epic system perpetrated by Comulate/PBC violated the Master Agreement and the Schedule SDK with PBC and would violate similar agreements with any other Applied customer. As detailed further below, in each customer license agreement, Applied places strict limits on the use of Epic and/or its SDK, including express prohibitions on reverse-engineering, benchmarking, testing and other activities that could potentially be used to design or refine a competing product. Normal (legitimate) customers make a modest number of SDK calls and actions in the Epic UI in the performance of their day-to-day business, which could not be used for reverse-engineering because normal usage would not uncover the underlying methods, logic, processes, and algorithms that correspond to each individual SDK method and certain actions accessible only through Epic's UI, such as the month-end closing process, the reconciliation process and generating an invoice.

**ANSWER:** The allegations in Paragraph 56 contain legal conclusions to which no response is required. To the extent Paragraph 56 purports to characterize the terms of the Master Agreement or Schedule SDK, Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the allegations in Paragraph 56.

## E. Comulate Is A Start-Up Launched To Parse PDFs And Emails

57. Comulate was founded in 2022 by Michael Mattheakis and Katz. Prior to his role as CEO of Comulate, Katz was a product manager, and Mattheakis worked predominantly with AI and fintech infrastructure. Most notably, neither Katz nor Mattheakis had a background in insurance, let alone the insurance software industry.

**ANSWER:** Comulate admits that Jordan Katz and Michael Mattheakis founded Comulate in 2022. Comulate admits that before his role as CEO of Comulate, Katz was a product manager,

and Mattheakis worked with AI and fintech infrastructure. Comulate admits that Katz and Mattheakis did not work in the insurance software industry before founding Comulate. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 57.

58. When Comulate launched in 2022, it offered a product that was intended to automate the process of revenue reconciliation via an intelligence tool that extracted and reconciled commissions from carriers or policies within an already established AMS. Comulate's "intelligence" tool consisted of a "revenue graph tool" that provided customers with "unprecedented visibility" and answers to "decade-old business" questions.[11]

**ANSWER:** Comulate admits that Comulate was the first mover in agency and brokerage accounting automation, rolling out a direct billing automation product in September 2022 that eliminated much of the manual work involved in reconciling carrier commission statements. Comulate admits that Comulate's product integrates with and complements the AMSs that its customers use, primarily Epic. Paragraph 58 purports to quote from a webpage, and Comulate respectfully refers the Court to the quoted webpage for a full and accurate statement of its contents. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 58.

## F. Comulate And Applied Explore A Potential Partnership

59. In accordance with Applied's partner program, executives at Applied and Comulate had several high-level discussions regarding Applied's partner program.

**ANSWER:** Comulate denies the allegations in Paragraph 59.

60. On May 23, 2023, Applied and Comulate entered into a Proof-of-Concept (Pilot) Agreement for Potential Partners (the "Pilot Agreement"), attached hereto as Exhibit D, which recited: "The parties are interested in validating further potential product development opportunities to allow for enhancement of automated revenue management workflows. . . . Applied and [Comulate] desire to explore methods to integrate and connect their respective

[11] *See* Wayback Machine, Comulate, https://web.archive.org/web/20230324005705/https://www.comulate.com/ (archived Mar. 24, 2023) ("Comulate reads and writes ***to your AMS and ERP***" and "Comulate connects to your AMS or CRM, populating itself with always-live policy data for reconciliation and reporting.") (emphasis added).

software products to identify ways to enhance automated revenue management workflows provided to Customers ('Purpose')." Ex. D § 1.

**ANSWER:** Comulate admits that Applied and Comulate entered into the Proof-of-Concept (Pilot) Agreement for Potential Partners. Comulate denies that this agreement was entered into on May 23, 2023. Paragraph 60 purports to quote from a document (Exhibit D), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 60.

61. Pursuant to the Pilot Agreement, Applied gave Comulate a limited license for six months "to use and access certain proprietary software and products that Applied and its affiliates develop, market, license, and distribute ('Applied Software'), specifically as follows: (a) one (1) API and/or SDK key for unlimited calls solely to integrate Applied Epic with Partner [*i.e.*, Comulate] Software; (b) Data Lake and (c) Applied Epic" and "limited [use] solely for Non-Production/Testing Use to test the interface and electronic exchange of information between Applied Epic and [Comulate's] computer systems for the Purpose." *Id.* § 5.

**ANSWER:** The allegations in Paragraph 61 contain legal conclusions to which no response is required. Paragraph 61 purports to quote from a document (Exhibit D), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 61.

62. In Section 7 of the Pilot Agreement, Comulate expressly agreed "that the Applied Software constitutes, embodies, and/or contains valuable trade secrets, proprietary information, and other Confidential Information owned by Applied or its licensors and that any use or disclosure to third parties not specifically authorized in writing by Applied or its licensors is prohibited." *Id.* § 7. The Pilot Agreement further stated that Partner shall not "reverse-engineer" the Applied Software, create derivative works, or "use the Applied Software for purposes of benchmarking, competitive analysis, or for developing, using or providing a competing software product, or service." *Id.* Section 6 provided that, to the extent Comulate violates Section 7, Comulate "automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests, without the necessity of further consideration." *Id.* § 6.

**ANSWER:** The allegations in Paragraph 62 contain legal conclusions to which no response is required. Paragraph 62 purports to quote from a document (Exhibit D), and Comulate

respectfully refers the Court to the document for a full and accurate statement of its contents. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 62.

63. In addition, since 2022, several of Applied's customers became customers of Comulate and sought to integrate Comulate with Epic. Because Applied thought that Comulate was a good-faith partner working to improve both parties' customer relationships, Applied authorized the customers' integrations with Comulate software. For example, approximately sixty of Applied's customers were authorized to integrate Comulate's system to Epic using Applied's SDK, pursuant to Applied's standard SDK license agreements with its customers that prohibit any unauthorized use or disclosure of Applied's trade secrets and confidential information to third parties. Applied later learned that dozens of additional Applied customers integrated Comulate's system to Epic using Applied's SDK without authorization.

**ANSWER:** Comulate admits that Applied customers began using Comulate's products in 2022. Comulate admits that Comulate and Applied worked together to integrate Comulate's technology through the SDK, and that Applied did not identify any of Comulate's methods as unauthorized, objectionable, or inconsistent with Applied's policy. Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 and on that basis denies them.

64. The fact that some of these customers were authorized to integrate Comulate's system to Epic using Applied's SDK does not mean that Comulate was authorized to gain access to Applied's SDK. To the contrary, for Comulate as an entity to gain authorized access to the SDK and/or any other Applied Software, Applied's license agreements require Comulate as an entity to sign the applicable Third-Party Consultant Agreement. But Comulate repeatedly refused to sign.

**ANSWER:** Comulate denies the allegations in Paragraph 64.

65. In order to assist Applied's customers that wanted to integrate with Comulate, Applied entered into negotiations with Comulate in an effort to reach agreement on a mutually acceptable confidentiality and license agreement that would enable Comulate to serve as a third-party consultant to Applied's customers. As those negotiations delayed the integration plans of Applied's customers, in order to be a good partner to Applied's partner agencies and in a show of good faith based on the belief that Applied and Comulate would reach an agreement, Applied agreed to allow Comulate to act as a consultant and assist Applied's customers with their requested integrations.

**ANSWER:** Comulate admits that, after years of Applied not asking for any such agreement, Comulate and Applied negotiated a proposal for a blanket consulting agreement and that the agreement was never finalized after Applied failed to respond to Comulate's May 27, 2025 follow-up to discuss Applied's revisions. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 65.

66. It later came to Applied's attention that unbeknownst to Applied, Comulate had been given a user seat in four of the above customers' Epic accounts. Such access was based on Comulate's role as a consultant for such agencies and would not provide Comulate carte blanche to conduct tests or other activities in Epic in support of Comulate's overall business as such usage would likely have been in violation of Comulate's consulting agreement with each such agency. For example, Comulate complained that this arrangement placed Comulate's customers "in the middle of every integration, test, or demonstration." Dkt. 47-5 ¶ 13. Moreover, using such UI access for Comulate's internal product development purposes, and not for the purpose of managing the Applied customer's insurance business, would not be authorized by Applied's agreements with those customers.

**ANSWER:** The allegations in Paragraph 66 contain legal conclusions to which no response is required. To the extent a response is required, Comulate admits that some Epic customers provided Comulate a user seat in their Epic accounts, generally with transparent usernames such as "Comulate@[customer].com." Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 66.

67. Importantly, none of these arrangements permitted Comulate anything close to the same level of access it obtained by pretending to be PBC. Acting as PBC, Comulate could configure the SDK and test integrations without the keen eyes of its agency customers asking what it was doing. Similarly, Comulate could explore the Epic user interface, and extensively investigate at its leisure the impact that any UI action has on the internal state of Epic, including the general ledger. Hiding behind PBC, Comulate had no time constraints on when to run tests or upload documents, expiration of access to the software or limits on the number of calls it could make. Comulate could attempt, at its leisure, to reverse-engineer the highly valuable Epic Algorithm Trade Secrets, in violation of numerous provisions of the Master Agreement and the Schedule SDK, without the need to answer to Comulate's own customers.

**ANSWER:** Comulate denies the allegations in Paragraph 67.

## G. Comulate Creates A Fake Insurance Agency To Misappropriate Applied's Valuable Trade Secrets

68. Comulate's scheme was born from a lie. In January 2023, someone purporting to be "Jordan Bates" of PBC reached out to Applied about potentially licensing Epic. On a Zoom call with Applied around January 2023, he misrepresented to an Applied representative that PBC was a start-up insurance agency. He falsely claimed familiarity with Epic from prior work at a different, larger insurance agency he (falsely) claimed to have worked at. He falsely said he was interested in Epic for his agency because he had heard from several IT people in insurance that Epic is the only way to go. In February 2024, after a hiatus in communications, "Jordan Bates" of PBC reached out to Applied again expressing that he wished to license Epic as soon as possible. He also falsely claimed that the contract he would enter needed to include SDK access because someone at his agency was creating a "HubSpot" connector for him. He falsely claimed to have a partner at his new insurance agency named "Keith," but "Jordan Bates" did not provide further information on who that was.

**ANSWER:** Comulate admits that Comulate obtained an Epic account under the name PBC Consulting in order to operate a non-customer, non-production sandbox account to develop, test, and demonstrate for customers its Epic integration, i.e., the functionality by which Comulate's products interoperate with Epic, in a test environment that was isolated from real customer data and real customer environments. Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 68.

69. On March 15, 2024, PBC entered into the Master Agreement and Schedule SDK with Applied in order to obtain access to Epic and the SDK. *See* Exs. A and B. Applied relied on PBC's representations that, *inter alia*, it was a real insurance agency with a genuine need for the software for its business, and with a genuine intent to integrate with HubSpot, in entering these agreements.

**ANSWER:** The allegations in Paragraph 69 contain legal conclusions to which no response is required. Paragraph 69 purports to characterize the Master Agreement and Schedule SDK, and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves.

Comulate lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69 and on that basis denies them.

70. In the Schedule SDK, PBC claimed falsely that it intended to use Epic to "develop an integration between HubSpot and [Epic] via the SDK" and that "[t]he integration will be part of normal internal business operations which are owned and/or licensed by [PBC]." Ex. B § 5.1.

**ANSWER:** The allegations in Paragraph 70 contain legal conclusions to which no response is required. Paragraph 70 purports to quote from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 70.

71. As with all of Applied's Epic and SDK agreements, the Master Agreement and Schedule SDK strictly limit PBC's use of Epic, the SDK and any other Applied software to specific, authorized business purposes and impose strict confidentiality obligations. *See id.* §§ 5, 5.1, 5.5, and 5.9.

**ANSWER:** The allegations in Paragraph 71 contain legal conclusions to which no response is required. To the extent Paragraph 71 purports to characterize the Master Agreement or Schedule SDK, Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 71.

72. The Master Agreement, which controls access to all Applied software, requires that "[u]sers are provisioned on a Named Basis only, must be located in the Territory, and must be [PBC's] Employees." Ex. A § 3.2. As PBC is a sham entity created to allow Comulate employees to access and use Applied's software, PBC and Comulate repeatedly breached this provision.

**ANSWER:** The allegations in Paragraph 72 contain legal conclusions to which no response is required. Paragraph 72 purports to quote from a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents.

Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 72.

73. Both the Master Agreement and the Schedule SDK restrict PBC's use of Epic, the SDK and any other Applied software to use in connection with PBC's "internal insurance operations" or "solely in connection with managing [PBC's] insurance agency or brokerage." *See id.* §§ 3.3, 15 ("Permitted Use" is a "[u]se and access solely pursuant to an Order, in connection with Licensee's internal insurance operations, and in accordance with the Agreement and the Documentation."); Ex. B § 5 (regarding SDK limited use license). Since PBC is not an insurance agency, Comulate/PBC repeatedly breached this term.

**ANSWER:** The allegations in Paragraph 73 contain legal conclusions to which no response is required. Paragraph 73 purports to quote from documents (Exhibits A and B), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 73.

74. With respect to the SDK, Section 5.1 of the Schedule SDK limits the scope of PBC's SDK license to the "Authorized Business Purpose(s)" of "develop[ing] an integration between HubSpot and Applied Epic via the SDK." *Id.* § 5.1. PBC also agreed that its integration with HubSpot would "be part of normal internal business operations, which are owned and/or licensed by [PBC]." *Id.* In Section 5.2, the SDK license was further limited to "Authorized Integration(s) and no others." *Id.* § 5.2. Those Authorized Integrations are specific, identified combinations of an "Epic Integration SDK Method," an "Authorized 'To' Software" and an "Authorized 'From' Software." *Id.*

**ANSWER:** The allegations in Paragraph 74 contain legal conclusions to which no response is required. Paragraph 74 purports to quote from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 74.

75. Notably, Section 5.2's "Authorized Integrations" do ***not*** include the majority of the most commonly used SDK methods that Comulate called hundreds of thousands or even millions of times during the over nineteen months that it secretly used Epic while pretending to be PBC, as described below. *See id.* For example, by far the most calls made by Comulate related to certain general ledger SDK methods that are not included among the "Authorized

Integrations" in Section 5.2. PBC/Comulate's brazen breach of the limitations in Section 5.2 is shocking, to say nothing of the fact that its use was not a part of normal insurance operations and did not involve integration with HubSpot.

**ANSWER:** The allegations in Paragraph 75 contain legal conclusions to which no response is required. Paragraph 75 purports to quote from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 75.

76. Section 5.5 of the Schedule SDK also limits the scope of PBC's SDK license. Section 5.5 states:

> For the avoidance of doubt, Licensee shall use the [SDK] for internal purposes only. . . . Unless expressly agreed otherwise, Licensee shall not use the [SDK] to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and ***shall not utilize or leverage knowledge gained from access and use of the [SDK] to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business Purpose and Authorized Integration***.

*Id.* § 5.5 (emphasis added). Upon information and belief, the entire purpose of Comulate/PBC's fraudulent scheme was to leverage knowledge gained from their improper access of the Epic SDK to improve and create Comulate features, functionalities and products.

**ANSWER:** The allegations in Paragraph 76 contain legal conclusions to which no response is required. Paragraph 76 purports to quote from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 76.

77. Section 3.6 of the Master Agreement provides certain explicit restrictions on PBC's software license and use rights:

> Except as expressly authorized herein or by Applied in writing, Licensee ***shall NOT***: … (b) disassemble, decompile, ***reverse-engineer***, modify, transform, otherwise translate, or attempt to gain unauthorized access to the Software, including the source code; (c) except as expressly authorized by Section 3.2, allow a non-Employee to access the Software; (d) use the Software as part of a third-party "private labeling" or "white labeling" transaction; (e) create derivative works, license, sublicense, resell, lease, lend, distribute, publish, duplicate, reproduce, assign, transfer or otherwise make available the Software, Work Product, or Documentation to any third party, in whole or in part; (f) ***use the Software for purposes of benchmarking, competitive analysis, or for developing, using, or providing a competing software product, or service***; (g) bypass or breach (or attempt to do so) any security device or protection used by or contained in the Software; or (h) allow another entity or person to do any of the foregoing.

Ex. A § 3.6 (emphasis added). The Schedule SDK includes similar license restrictions, including an explicit prohibition on using the SDK "for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." Ex. B § 5.6. The Schedule SDK adds: "For the avoidance of doubt, Licensee has no license to use the [SDK] for the purpose of developing an application, patch, fix, tool, or other program, software, or device marketed, sold, and/or distributed to third parties." *Id.* Again, Comulate/PBC's fraudulent scheme directly violates these provisions as its primary activities involved benchmarking and competitive analysis for the purpose of creating a competing software product.

**ANSWER:** The allegations in Paragraph 77 contain legal conclusions to which no response is required. Paragraph 77 purports to quote from documents (Exhibits A and B), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 77.

78. Section 4.2 of the Master Agreement prohibits the creation of derivative works and automatically assigns title in any derivative works to Applied:

> Licensee is not authorized to make any derivative works, modifications of, or implement any program improvements to any Applied intellectual property, including without limitation, the

> Applied Software. To the extent Licensee violates this Section 4.2, ***Licensee automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests***, without the necessity of further consideration and without any claim that Applied has waived Licensee's breach of this provision.

Ex. A § 4.2 (emphasis added). Section 5.8 of the Schedule SDK similarly prohibits the creation of modifications of or derivative works from the SDK and automatically assigns title in any such modification or derivative work to Applied:

> All right, title, and interest, including copyright and other intellectual property rights, in and to the Applied Epic Integration Service SDK and the Run-Time SDK, including any Specific Integration Code, and the media on which the Applied Epic Integration Service SDK and the Run-Time SDK are delivered, shall remain the property of APPLIED or its licensors and shall not be deemed to be, in whole or in part, a work-made-for hire or a work made in the course of employment. To the extent required notwithstanding this provision, Licensee automatically assigns, upon their creation, to APPLIED all right, title, and interest in and to any requested Specific Integration Code, including copyright interests and any other intellectual property interests, without the necessity of further consideration. ***This Agreement does not give Licensee any right to develop derivative works based upon, or to otherwise duplicate, the Applied Epic Integration Service SDK or the Run-Time SDK, in whole or in part***, except as expressly provided herein or to transfer the Applied Epic Integration SDK or the Run-Time SDK, in whole or in part, without the prior written consent of APPLIED. Any modifications of Applied Epic Integration Service SDK or the Run-Time SDK (e.g., corrections, patches, Updates, custom programming, or enhancements), as well as ***ideas or suggestions made by Licensee for program improvements, shall be the property of APPLIED*** and be subject to this Agreement. Licensee is not authorized to make any such modifications of or to implement any such program improvements to Applied Epic Integration Service SDK or the Run-Time SDK except as expressly provided hereunder. To the extent it does notwithstanding this prohibition, ***Licensee automatically assigns, upon their creation, to APPLIED the ownership of such unauthorized modifications and/or improvements, including copyright interests and any other intellectual property interests, without the necessity of further consideration*** and without any claim that APPLIED has waived Licensee's breach of this provision.

Ex. B § 5.8 (emphasis added). Importantly, these provisions operate to automatically assign to Applied ownership of derivative works, modifications, and improvements to Applied's intellectual property, including Comulate's agency billing product.

**ANSWER:** The allegations in Paragraph 78 contain legal conclusions to which no response is required. Paragraph 78 purports to quote from documents (Exhibits A and B), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 78.

79. In Section 4.3 of the Master Agreement, PBC expressly agreed that Applied's software constitutes, embodies, and/or contains valuable trade secrets and its use or disclosure to third parties is prohibited: "***Licensee agrees that the Software constitutes, embodies and/or contains valuable trade secrets, proprietary information, and other Confidential Information*** owned by Applied or its licensors and that ***any use or disclosure to third parties*** not specifically authorized in writing by Applied or its licensors ***is prohibited***." Ex. A § 4.3 (emphasis added). In Section 5.7 of the Schedule SDK, as noted earlier, PBC similarly agreed that the SDK constitutes and/or contains valuable trade secrets and its unauthorized use or disclosure is prohibited:

> Licensee acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK ***constitute and/or contain valuable trade secrets and are considered Confidential Information under the terms of the Agreement***. ***Unauthorized use or disclosure*** of the Applied Epic Integration Service or of the Run-Time SDK ***is prohibited and may be illegal***. Licensee further acknowledges and agrees that this Schedule does not authorize Licensee to use or disclose the Applied Epic Integration Service SDK or the Run-Time SDK other than as prescribed in this Schedule without the prior written consent of APPLIED.

Ex. B § 5.7 (emphasis added).

**ANSWER:** The allegations in Paragraph 79 contain legal conclusions to which no response is required. Paragraph 79 purports to quote from documents (Exhibits A and B), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 79.

80. In the Master Agreement, PBC agreed that it would treat Applied's Confidential Information "in the same manner" as it protects its own confidential information, "but not less than is reasonable under the circumstances (or as required by law) without regard to whether the information received satisfies the statutory definition of a 'trade secret.'" Ex. A § 10.1. PBC further agreed to use Applied's Confidential Information "only for the purpose for which it was disclosed or as otherwise permitted by the Agreement" and to disclose it only to those Employees or Professional Advisors "with a need to know and who are subject to confidentiality obligations consistent with those set forth in this Master Agreement." *Id.* "Confidential Information" is defined as "[t]he Applied Software, Support Materials, any trade secrets, compilations, components, Licensee Data, data, source/object code, customer/vendor/supplier info, documents, drawings, sketches, financial info, formulae, inventions, lists, manuals, parts, patterns, plans, processes, software, specification, techniques, proposals and all other information protectable by applicable privacy laws and other information of a secret, confidential, or proprietary nature." *Id.* § 15.

**ANSWER:** The allegations in Paragraph 80 contain legal conclusions to which no response is required. Paragraph 80 purports to quote from a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 80.

81. The Schedule SDK also notes that "[a]ny use of [Epic] not authorized or beyond the scope of the licenses granted under this Schedule is prohibited" and that "Licensee shall not use [Epic] to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of [Epic] to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business Purpose." Ex. B § 5.5.

**ANSWER:** The allegations in Paragraph 81 contain legal conclusions to which no response is required. Paragraph 81 quotes from a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 81.

82. When PBC entered into the Master Agreement with Applied, PBC also agreed to comply with the terms of Applied's Acceptable Use Policy ("AUP"), which is incorporated into

both the Master Agreement and Schedule SDK. Ex. A § 5.1. Applied's Acceptable Use Policy requires that PBC "shall use the Software exclusively for authorized and legal purposes, consistent with all applicable laws and regulations." Ex. E.

**ANSWER:** The allegations in Paragraph 82 contain legal conclusions to which no response is required. Paragraph 82 purports to quote from a document (Exhibit E), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. To the extent Paragraph 82 purports to characterize the Master Agreement, Schedule SDK, or Acceptable Use Policy, Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 82.

83. On March 15, 2024, subject to the terms of the Master Agreement, PBC/Comulate placed an order for the Digital Agency Professional package, including the following Applied products: Applied EpicCloud; Applied Mobile; Applied CSR24; Applied Epic Quotes; Agency/Insurer Interface Functionality; and Epic Dashboards/Analytics. Ex. F at 3. PBC/Comulate also obtained a license to the Applied EpicCloud Integration Service with SDK subject to the terms in the Schedule SDK. *Id.* In addition, PBC/Comulate obtained a 12-month subscription to Applied's online training platform called Applied University and professional setup of the Digital Agency Package, including a guided implementation of the Digital Agency components and up to four training days. *Id.*

**ANSWER:** The allegations in Paragraph 83 contain legal conclusions to which no response is required. Paragraph 83 purports to characterize a document (Exhibit F), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 83.

84. On December 20, 2024, Comulate/PBC purchased a subscription to the Applied Data Lake, subject to the Master Agreement and Data Lake Terms of Use. Ex. G at 4. According to the Data Lake Terms of Use, "Applied hereby grants Licensee a non-transferable, non-exclusive, terminable, and limited license to export Licensee Data solely from Applied Epic to a repository which may be hosted in a third-party public cloud (the 'Data Lake') to create custom reports and analytic solutions." *Id.*

**ANSWER:** The allegations in Paragraph 84 contain legal conclusions to which no response is required. Paragraph 84 purports to characterize and quote a document (Exhibit G), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 84.

85. Sections 4, 5.3, 6.1, 7, 10.5, 12, 14, and 15 survive termination of the Master Agreement. Ex. A § 14.12. Sections 3, 4, 5.7, 5.8, 5.9, 7.3, 9, and 10 survive termination of the Schedule SDK. Ex. B § 11.

**ANSWER:** The allegations in Paragraph 85 contain legal conclusions to which no response is required. Paragraph 85 purports to characterize documents (Exhibits A and B), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 85.

## H. Comulate Uses PBC To Misappropriate Applied's Epic Algorithm Trade Secrets

86. Almost immediately upon gaining access to Applied's system under false pretenses, PBC began misappropriating Applied's Epic Algorithm Trade Secrets—the unique underlying logic, processes and algorithms that could only be reverse-engineered through massive, improper testing of the system in violation of PBC's Master Agreement and Schedule SDK. For example, one could run Applied SDK commands or UI interactions to delete, upload, update, or insert different types or values of records into Applied's system, and then use repeated SDK calls to "get" data from Applied's system to investigate the logic Applied employed to change its system state to reflect the deletions, updates, uploads, or inserts, thereby deriving the internal logic employed by Applied.

**ANSWER:** Comulate denies the allegations in Paragraph 86.

87. As explained above, normal, even much larger insurance agency customers of Applied make a relatively modest number of SDK calls in the course of integrating with Epic for legitimate business purposes. Comulate/PBC's activities were far outside the norm. The table below provides the total number of calls made by Comulate/PBC by SDK methods since its inception in March 2024.[12] While the entirety of Comulate/PBC's use was outside the scope of

[12] In this table, we have replaced the specific Epic SDK method called by PBC/Comulate with the subject matter category that method belongs in and a unique numerical identifier. In

its Master Agreement and Schedule SDK for reasons discussed elsewhere, the table below distinguishes between use of SDK methods within the scope of "Authorized Integrations" in Section 5.2 of PBC's Schedule SDK (listed in black text) and use of SDK methods outside the scope of PBC/Comulate's SDK license (listed in red text). As the below table shows, Comulate/PBC made ***hundreds of thousands*** and in some cases ***several millions*** of unauthorized SDK calls that could only have one purpose—to improperly reverse-engineer the Epic Algorithm Trade Secrets:

| **Epic SDK Method** | **Total SDK Call Count By PBC/Comulate March 2024-Filing of Complaint** |
|---|---|
| General Ledger SDK Method #2 | 22,263,037 |
| Line Trade Secret Method #1 | 557,916 |
| Company SDK Method #1 | 372,865 |
| Broker SDK Method #1 | 347,792 |
| Employee SDK Method #1 | 286,456 |
| Policy SDK Method #1 | 241,995 |
| Client SDK Method #1 | 179,187 |
| General Ledger SDK Method #2 | 162,900 |
| Lookup SDK Method #1 | 63,711 |
| General Ledger SDK Method #3 | 48,346 |
| Transaction SDK Method #1 | 38,058 |
| Activity SDK Method #1 | 23,563 |
| Attachment SDK Method #1 | 13,826 |
| Broker SDK Method #1 | 6,775 |
| Attachment SDK Method #2 | 6,104 |
| Transaction SDK Method #2 | 6,039 |

addition, for space reasons, we have included only those methods where the total call count was over 1,000 calls.

| | |
|---|---|
| Contact SDK Method #2 | 4,448 |
| Reconciliation SDK Method #1 | 3,407 |
| Attachment SDK Method #3 | 2,236 |
| **Epic SDK Method** | **Total SDK Call Count By PBC/Comulate March 2024-Filing of Complaint** |
| Attachment SDK Method #4 | 2,024 |
| Activity SDK Method #2 | 1,300 |
| General Ledger SDK Method #4 | 1,288 |
| Reconciliation SDK Method #2 | 1,222 |
| General Ledger SDK Method #5 | 1,151 |
| Activity SDK Method #3 | 1,131 |

**ANSWER:** The allegations in Paragraph 87 contain legal conclusions to which no response is required. Paragraph 87 purports to characterize the Master Agreement and Schedule SDK, and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 87.

88. The number of calls PBC/Comulate made is so wildly out of the ordinary that it dwarfs any other comparable size agency that works with Applied, even ignoring the fact that the other "comparable size" agencies are real insurance agencies with real customers. For example, year to date, Comulate has already made more than ***25 million SDK general ledger calls*** alone, a figure that is almost ***25 times larger*** than any other small agency:

| **IP Address** | **SDK General Ledger Calls (YTD as of filing of the Complaint)** |
|---|---|
| 34.208.51.110 (Comulate IP address) | 25,739,022 |
| 12.8.248.162 | 1,272,405 |
| 52.167.249.213 | 1,039,386 |

| | |
|---|---|
| 52.177.30.21 | 971,920 |
| 8.44.225.10 | 798,755 |
| 20.115.67.44 | 518,374 |
| 66.117.196.233 | 455,456 |
| 52.184.219.242 | 420,667 |

| **IP Address** | **SDK General Ledger Calls (YTD as of filing of the Complaint)** |
|---|---|
| 74.204.93.42 | 418,343 |
| 4.1.18.146 | 355,163 |
| 172.68.174.142 (Comulate IP address) | 299,944 |
| 172.68.174.143 (Comulate IP address) | 295,696 |
| 10.60.7.164 | 269,790 |
| 72.204.12.98 | 159,165 |

**ANSWER:** Comulate denies the allegations in Paragraph 88.

89. Fraudulently hiding behind the fake agency PBC, Comulate obtained access to Epic and the SDK through improper means, at least because Comulate knew that PBC had obtained access to Epic and the SDK by fraud, theft, misrepresentation, and breach of its obligations under the Master Agreement and Schedule SDK with Applied. Despite knowingly obtaining access to Applied's Epic and the SDK in violation of the Master Agreement and Schedule SDK, Comulate willfully and maliciously committed itself to unlawfully reverse-engineering the Epic Algorithm Trade Secrets by running millions of tests in extraordinary, concentrated, daily activity that far exceeds the bounds of any normal use of Epic. Comulate and PBC's concerted activity was in express violation of PBC's Master Agreement and Schedule SDK which, as explained above, prohibited this type of reverse-engineering and testing, as well as any benchmarking or other competitive activity to design a competing product. Remarkably, after negotiating the license scope in the Schedule SDK, Comulate/PBC also proceeded to use any Epic SDK methods they wished, ignoring the specified Authorized Methods set forth in Section 5.2 of the Schedule SDK.

**ANSWER:** The allegations in Paragraph 89 contain legal conclusions to which no response is required. Paragraph 89 purports to characterize documents (the Master Agreement Schedule

SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 89.

90. The unauthorized use of Epic and the Epic SDK by PBC in this manner was the only way that Comulate/PBC could reverse-engineer Applied's Epic Algorithm Trade Secrets. As explained above, the methods, processes, logic, and algorithms comprising the Epic Algorithm Trade Secrets are not made public, and any ordinary course usage of Epic and/or the SDK would not provide a way to understand what methods, processes, logic, and algorithms were being triggered in response to each SDK method or when a user takes any action in the UI. Yet, upon information and belief, Comulate was desperate for this enormously valuable information because Comulate could use it both to refine its existing direct billing product and to accelerate its development of an agency billing product to compete with Applied's Applied Pay product and to jumpstart its development of a product to replace and compete with Applied's Epic platform.

**ANSWER:** Comulate denies the allegations in Paragraph 90.

91. The UI access that PBC/Comulate obtained through the PBC/Comulate agreement was particularly important for Comulate's agency billing product. Epic agency billing functionality is primarily UI-initiated, not SDK-initiated. PBC/Comulate's agency billing product includes a "bot," a piece of software that automatically interacts with the Epic UI to perform agency billing operations. Without the UI access provided through the PBC/Comulate agreement, Comulate would not have had access sufficient to build and test its agency billing product, which cannot operate without UI access. In fact, Comulate admits that it "needed" the PBC account to obtain UI access to Epic, as well as the ability to access the SDK without going through a customer account. Dkt. 47-5 at 3; *id.* ¶ 13. UI access was therefore critical for PBC/Comulate to develop its agency billing product. PBC/Comulate disabled Applied's client-side logging and thus discovery is necessary to determine the full scope of PBC/Comulate's use of the agency billing UI, but Comulate on information and belief would have had to, at least, use the UI to reverse-engineer the effect of various agency billing operations on, for example, the general ledger so as to permit it to attempt to duplicate Epic's functionality in its agency billing product while maintaining its Epic integration.

**ANSWER:** Comulate denies the allegations in Paragraph 91.

92. Indeed, as described above, many of the Epic SDK methods that Comulate/PBC called most frequently concerned subject areas like generating receivable and payable entries in the general ledger, automating payment processes, invoicing, collection, and other areas that Comulate has not traditionally innovated in. By learning how the inner workings of Epic—the Epic Algorithm Trade Secrets—performed unique mathematical algorithms to automatically pull and process this information and reconcile it in the general ledger, Comulate effectively

bypassed the need to conduct its own research and development to create an Epic replacement—something that would be immensely valuable to Comulate.

**ANSWER:** Comulate denies the allegations in Paragraph 92.

93. Upon information and belief, Comulate is, even now, using the trade secret information it misappropriated by pretending to be PBC to refine and develop competing products. Under the terms of the Master Agreement and Schedule SDK, any such products or intellectual property developed based on Applied's misappropriated trade secrets belong to Applied. Yet, despite holding title under the Master Agreement and Schedule SDK, the potential for Comulate to imminently release improved or new competing products based on Applied's trade secrets poses an enormous risk of irreparable harm to Applied.

**ANSWER:** The allegations in Paragraph 93 contain legal conclusions to which no response is required. Paragraph 93 purports to characterize documents (the Master Agreement or Schedule SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 93.

### I. Applied Discovers PBC's Fraud And Misappropriation Of Its Trade Secrets

94. Applied's internal systems recently flagged PBC's use of Epic as suspicious due to the enormous volume of calls PBC was making to Applied endpoints. Given PBC's tiny size and the fact that it supposedly had just a few accounts and was a new agency, the vast number of calls made no sense and raised suspicions that it was not operating in accordance with its contractual obligations.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and on that basis denies them.

95. Applied initiated an internal investigation, which revealed that PBC was not a real agency and appeared to be one-and-the-same with Comulate. Notably, Applied discovered that the IP addresses used by PBC were IP addresses typically associated with Comulate.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 and on that basis denies them.

96. Applied's investigation also revealed that PBC's call volume was so far beyond the norm that it exceeded the activity levels of even some of Applied's largest enterprise clients. As demonstrated by the below bell curve, PBC's z-score of 3.47 indicates extremely strong, uncommon, or rare activity well above typical expectations. PBC's SDK call volume places them in the 99.97th percentile in a standard normal distribution.




**<u>ANSWER:</u>** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and on that basis denies them.

**J. <u>Applied Establishes That PBC And Comulate Are One And The Same</u>**

97. In light of the discoveries set forth above, Applied launched a deeper investigation to determine who was behind PBC's activities. That investigation revealed a startling array of facts irrefutably linking PBC to Comulate.

**<u>ANSWER:</u>** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and on that basis denies them.

98. After further investigation of PBC and its registered user information, Applied found that many PBC "user" credentials included the names of Comulate employees.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and on that basis denies them.

99. Some of Comulate's fraudulent tactics were so brazen as to defy belief. For example, Applied discovered that the email address provided by Bates, the PBC contact who signed all of PBC's agreements with Applied, was associated with the LinkedIn page of ***an engineer at Comulate***:




**ANSWER:** Comulate denies the allegations in Paragraph 99.

100. Notably, the picture used in this LinkedIn page is actually a stock photo used on many websites online, indicating a further attempt to hide the identity of the actual Comulate employee who created the LinkedIn page.

**ANSWER:** Comulate denies the allegations in Paragraph 100.

101. Given PBC's obvious close connections to Comulate, Applied looked further into PBC's activities within Epic and found even more blatant evidence of connections to Comulate. For example, Applied found ***numerous emails that Comulate employees*** had actually attached directly in PBC's Epic in the process of testing various aspects of agency and direct billing, Applied Pay, and other trade secret and confidential aspects of Applied's business. Just a few screenshots of those emails tied to Comulate data scientists, product leads, and other senior employees are set out below:

**Nationwide interested in new business?**

GM Graham McCallister
To: Graham McAlister
Sun 10/26/2025 8:52 PM

25-26 Market Response Sum...
21 KB

Hi Nationwide Team,

I'm trying to find a new home for my client Richard Ricardo's auto/gl/wc policy. Richard employs 10 folks and is a wonderful force in our community. We think Nationwide could be a great fit. Please see the attached request.

Thanks,
Graham

Reply Forward

Data Scientist at Comulate

SS Saline Jiang <saline@comulate.com><saline@comulate.com>
To: Aryaman Parekh <aryaman@comulate.com>
Thu 9/18/2025 5:44 PM

0 - INSURANCE REQUEST (ST...
415 KB

COI - Contract 091525KM1-V...
103 KB

Show all 4 attachments (1 MB) Save all to OneDrive - Applied Systems, Inc Save All Attachments

Let's do this one last test to try to reproduce. This is the email that she sent us, and I'm adding an addiitonal attachment.

**From:** Saline Jiang <saline@comulate.com>
**Sent:** Thursday, September 18, 2025 3:43 PM
**To:** Saline Jiang <saline@comulate.com>
**Subject:** Fwd: Issue with Emails attached through Comulate

testing

--
Saline Jiang
Product Lead | Comulate
saline@comulate.com



And another one!

Michael Mattheakis
To: michael@jordancomulate.onmicrosoft.com
Tue 8/19/2025 10:16 PM

Let's go!

Michael Mattheakis
CTO | Comulate
e: michael@comulate.com
p: 408-832-8700

Reply Forward



I'm using this to test our email client
Sent: Wed 8/13/2025 4:58:39 PM (UTC-04:00)
From: Shrey Pandya
To: hiring@agentmail.to

Hello from Comulate

**<u>ANSWER:</u>** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and on that basis denies them.

102. Remarkably, Comulate/PBC made no efforts to even fake legitimate insurance agency activities in its Epic account. For example, Comulate tested the system using ***fake invoices***, ***fake customers***, and ***even other actual Applied customers' invoices*** to test and learn about the Epic Algorithm Trade Secrets described above. In all, there are ***hundreds of Comulate emails within PBC's Epic account*** that Applied has collected that explicitly and implicitly show Comulate testing the Epic system. Upon information and belief, Comulate's subterfuge had one purpose—to refine products and develop new products to compete with Applied using Applied's own misappropriated trade secrets.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief about the truth of the number of Comulate emails within Epic that Applied has collected and on that basis denies the allegation. Comulate denies the remaining allegations in Paragraph 102.

103. Applied has discovered additional facts demonstrating that PBC is nothing more than a front for Comulate. For example, PBC's website, available at https://phoenixbenefits.godaddysites.com/, is nothing more than a GoDaddy shell. Clicking on the "Our Solutions" or other links on the page leads to nothing, and there is no indication that it is a real webpage or associated with a legitimate agency. Upon information and belief, PBC has not obtained any of the licenses or other regulatory approvals necessary to operate as a legitimate insurance agency. Indeed, upon information and belief, it has not even registered with the Secretary of State in California (where it is purportedly located) or any other state, despite purporting to be a corporation. Even the address provided by PBC appears to be nothing more than a residential apartment building in Sacramento, California, that does not appear to be affiliated with "PBC" or any insurance agency.

**ANSWER:** Comulate admits that PBC Consulting is not a functioning entity. Except as expressly admitted herein, Comulate denies the remaining allegations in Paragraph 103.

104. PBC even signed up for Epic and the Epic SDK using a credit card that, upon information and belief, is associated with the fake PBC name and contact information, potentially constituting wire fraud.

**ANSWER:** Paragraph 104 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 104.

## K. Applied Protects The Confidentiality Of The Epic Algorithm Trade Secrets

105. Given that their value lies in part in their secrecy, Applied has taken reasonable measures to maintain the confidentiality of the Epic Algorithm Trade Secrets. These efforts include requiring all of Applied's employees to sign an Employee Confidentiality, Restrictive Covenant, and Work Product Agreement ("Employee Confidentiality Agreement") as a condition of, and in consideration for, employment with Applied. Among other things, the Employee Confidentiality Agreement provides that, during and after employment with Applied, Confidential Information—explicitly defined to include trade secrets[13]—may not be disclosed to

[13] The Employee Agreement defines "Confidential Information" as "information obtained by Employee while employed by Company that is not generally known by those with whom Company or any of its Affiliates, would assist in competition against them, including without limitation: (i) proprietary computer code; (ii) the development, research, marketing, and sales activities of Company and its affiliates, (iii) financial information and strategic plans of Company and its Affiliates business relations, (v) the nature and substance of Company's and its

any unauthorized person or used for any unauthorized purpose without the prior written consent of Applied. In addition, it specifies that employees may use Confidential Information only as necessary and solely in connection with the performance of their duties and in compliance with the policies and procedures of Applied. The Employee Confidentiality Agreement also requires the immediate return of all Confidential Information to Applied upon termination of employment.

**ANSWER:** The allegations in Paragraph 105 contain legal conclusions to which no response is required. Paragraph 105 purports to characterize documents, and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 105.

106. Applied also requires all employees to comply with its Global Employment Handbook for Applied Systems, Inc. and its Affiliates (the "Employee Handbook"). Regarding Confidentiality, the Employee Handbook states:

> We are proud of our culture of innovation. The materials, products, designs, plans, ideas, and data of Applied are our property and should never be given to an outside company or another individual, except through appropriate channels and with appropriate authorization. It is your responsibility to safeguard sensitive and confidential Applied information. The nature of your business and the economic well-being of Applied are dependent upon protecting and maintaining proprietary Applied information. Any improper transfer of material or disclosure of information, even if it is not apparent that an employee has personally gained by such action, constitutes unacceptable conduct. Any employee who participates in such a practice may be subject to disciplinary action, up to and including termination of employment….
>
> Applied's sensitive and confidential information includes, but is not limited to, information that is not generally known to the public or Applied's competitors, which, if disclosed would harm Applied, including without limitation: (i) proprietary computer code, specifications, architecture, processes and/or procedures, trade secrets, and other related information about Applied's products or

---

Affiliates business relationships, (vi) the information received, or that may be received hereafter, by Company or any of its Affiliates belonging to others with any understanding, express or implied, that the information would not be disclosed, Confidential Information will not include information that is or becomes generally known to and readily available for use by the public other than as a result of Employee's wrongful acts or omissions."

> services; (ii) Applied's development, research, marketing, and sales activities; (iii) Applied's financial information and strategic plans; (iv) information related to Applied's customers and employees; (v) the nature and substance of Applied's business relationships, and (vi) information received with any understanding, express or implied, that the information would not be disclosed.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 and on that basis denies them.

107. The Employee Handbook also specifies that each employee is responsible for complying with Applied's Information Security Program and Information Security Policies, as well as Applied's Acceptable Use Policy. Applied's Information Security Program and Policies are designed to strongly reinforce the security and confidentiality of Applied's information and trade secrets, including the Epic Algorithm Trade Secrets. New employees receive training regarding information security policies during onboarding and employees must re-acknowledge policies annually. Applied's annual, mandatory training program includes training regarding compliance with information and data security rules and obligations.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 and on that basis denies them.

108. In addition to the foregoing, Applied employs security, both physical and electronic, at all of its offices and in all of its electronic systems to restrict access to its confidential information and trade secrets. Access to Applied's systems is password-protected, and the scope of access is defined by the job responsibilities of a particular employee. Applied also requires two-factor authentication.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and on that basis denies them.

109. In order to obtain access to Epic, the Epic SDK and/or other Applied software, a customer must enter into a license agreement with Applied. As discussed above, Applied does not provide customers or third parties with access to the SDK without confidentiality restrictions. And, Applied does not disclose the Epic Algorithm Trade Secrets to customers or third parties ***at all***.

**ANSWER:** Comulate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 and on that basis denies them.

110. Applied's Epic SDK license agreements themselves, which any customer must sign in order to access Applied's SDK, impose strict restrictions on customers' use of the SDK and any trade secrets embodied therein. Section 5.7 of Applied's standard SDK license provides in relevant part that the customer "acknowledges and agrees that the Applied Epic Integration Service SDK and the Run-Time SDK constitute and/or contain ***valuable trade secrets and are considered Confidential Information*** under the terms of the Agreement" and that "[u]nauthorized use or disclosure of the Applied Epic Integration Service or of the Run-Time SDK ***is prohibited and may be illegal***." *See, e.g.*, Ex. B § 5.7 (emphasis added) (PBC's SDK license agreement terms are representative of Applied's standard SDK license terms). The same provision also requires the customer to "acknowledge[] and agree[] that this Schedule ***does not authorize [customer] to use or disclose*** the Applied Epic Integration Service SDK or the Run-Time SDK ***other than as prescribed in this Schedule*** without the prior written consent of APPLIED." *Id.* (emphasis added).

**ANSWER:** The allegations in Paragraph 110 contain legal conclusions to which no response is required. Paragraph 110 purports to characterize a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 110.

111. Moreover, Section 5.7 of the standard Schedule SDK license prohibits Applied's customers from sharing confidential and trade secret information regarding the Epic SDK with any third party, including third-party consultants, absent confidentiality restrictions and Applied's consent. Applied expressly required that "[customer], its third-party consultant, and APPLIED shall first execute an Acknowledgement Form for Third-Party Consultants or Programmers attached hereto, and incorporated herein, as Exhibit 1, whereby [customer's] third-***party consultant assumes all of the confidentiality obligations assumed by [customer] hereunder*** and agrees to use and access Applied Epic and Applied Epic Integration Service SDK ***solely for [customer's] benefit in the course of [customer] exercising the limited rights granted to it under this Agreement***." *Id.* § 5.7 (emphasis added). In addition, "[customer] ***shall be strictly liable for any violation of the confidentiality obligations and use restrictions*** contained within this Agreement by its employees or third-party consultants" and "[t]his Section shall survive termination of this Schedule." *Id.* (emphasis added).

**ANSWER:** The allegations in Paragraph 111 contain legal conclusions to which no response is required. Paragraph 111 purports to characterize a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents.

Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 111.

112. The referenced "Acknowledgement Form for Third-Party Consultants or Programmers," attached hereto as Exhibit H, provides in Section 2.3 that "Third-Party Consultant agrees to be bound by the terms of the Non-Disclosure Agreement attached hereto as Exhibit 1" and "further agrees that its individual employees are bound to maintain confidentiality with terms as protective as those in Exhibit 1." Ex. H § 2.3. In addition, the "Third-Party Consultant agrees that its use of any Confidential Information (as defined in Exhibit 1), in whole and in part, ***shall be used solely for [customer's] benefit in the course of exercising the limited rights granted herein***." *Id.* (emphasis added).

**ANSWER:** The allegations in Paragraph 112 contain legal conclusions to which no response is required. Paragraph 112 purports to characterize a document (Exhibit H), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 112.

## L. Applied Has Incurred Significant Harm Due To Comulate's Misappropriation

113. The massive subterfuge by PBC/Comulate was designed to, and did, result in the improper acquisition of Applied's Epic Algorithm Trade Secrets by Comulate to Applied's detriment.

**ANSWER:** Comulate denies the allegations in Paragraph 113.

114. Years after its founding in 2022, Comulate launched its core product, an AI-driven revenue automation product that focuses specifically—and solely—on direct billing automation for insurance brokers (the "Comulate System"). The Comulate System provides end-to-end direct bill automation and reconciliation for direct billing.

**ANSWER:** Comulate denies the allegations in Paragraph 114.

115. Upon information and belief, Comulate has used Applied's trade secrets to refine Comulate's direct billing product in an effort to more effectively compete with Applied and ultimately seeks to use Applied's trade secrets to offer a product to replace Applied's Epic altogether.

**ANSWER:** Comulate denies the allegations in Paragraph 115.

116. Upon information and belief, Comulate is also in the process of introducing, or has already introduced, an agency billing product for the first time and developed its agency billing product using Applied's misappropriated trade secrets.

**ANSWER:** Comulate denies the allegations in Paragraph 116.

117. After discovering, investigating and confirming Comulate's breathtaking fraud, Applied terminated PBC's access to Epic and took other steps to ensure that Comulate had no other direct access to Applied's Epic to continue its misappropriation and reverse-engineering of Applied's Epic Algorithm Trade Secrets. Applied has already incurred substantial costs investigating and attempting to remediate Comulate's misconduct, including conducting a thorough forensic investigation and incurring legal expenses to protect Applied's trade secrets and prevent further harm by Comulate.

**ANSWER:** Paragraph 117 states legal conclusions as to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 117.

118. Upon information and belief, because Comulate also works with many of Applied's customers who integrate Comulate's product with Epic, terminating Comulate's improper access may also complicate or damage Applied's valuable relationships with its customers and prospective business opportunities, or may require Applied to take further steps to protect its customer relationships from harm by Comulate.

**ANSWER:** Paragraph 118 states legal conclusions as to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 118.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT ("DTSA")
## (Against Defendants PBC and Comulate)

119. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

120. Applied is the owner of the Epic Algorithm Trade Secrets, including without limitation the unique methods, logic, processes, and algorithms to perform agency billing, direct billing, billing automation, the month-end process, the reconciliation process, invoice generation, and invoicing and payment reconciliation within Epic, as described herein.

**ANSWER:** Paragraph 120 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 120.

121. Applied's trade secrets relate to information and/or products and services used in, and intended for use in, interstate or foreign commerce, including but not limited to technical data, formulas, algorithms, patterns, compilations, ratios, programs, methods, techniques, processes, know-how, and plans that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

**ANSWER:** Paragraph 121 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 121.

122. The information that Defendants have misappropriated qualifies as and contains trade secrets of Applied. The trade secrets misappropriated by Defendants concern and are related to products and services provided to customers throughout the United States and used in, and intended for use in, interstate or foreign commerce.

**ANSWER:** Paragraph 122 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 122.

123. Applied utilizes the trade secrets to provide services that are sold in interstate commerce.

**ANSWER:** Paragraph 123 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 123.

124. Consequently, the Applied trade secrets misappropriated by Defendants are subject to protection under the DTSA, 18 U.S.C. § 1831, *et seq*.

**ANSWER:** Paragraph 124 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 124.

125. Applied's trade secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

**ANSWER:** Paragraph 125 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 125.

126. Applied has spent thousands of hours, and tens of millions of dollars, in investment to develop and maintain the trade secrets, which would be of immense value to any competitor, including Comulate.

**ANSWER:** Paragraph 126 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 126.

127. Applied takes and, at all relevant times, has taken reasonable measures to maintain the confidential and secret nature of the Epic Algorithm Trade Secrets through the Employee Agreement; the Employee Handbook; providing data security training to its employees; prohibiting unauthorized access to trade secret and confidential information, both physically and in its electronic systems; and using security measures such as passwords and two-factor authentication to prevent unauthorized access to the trade secrets. In addition, Applied protects the confidentiality of the Epic Algorithm Trade Secrets by requiring customers and third parties to agree to the confidentiality and use obligations set forth in the Master Agreement and Schedule SDK before providing access to Epic and the SDK. *See* Exs. A and B. Moreover, Applied does not provide the Epic Algorithm Trade Secrets to any customers or third parties under any circumstances. Further, Applied Systems' SDK documentation does not disclose the methods, logic, processes, and algorithms underlying Applied Systems' SDK methods.

**ANSWER:** Paragraph 127 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 127.

128. On information and belief, Defendants' acts of misappropriation of Applied's trade secrets in violation of the DTSA include, but are not limited to:

a. Acquisition of Applied's trade secrets by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering;
b. Acquisition of Applied's trade secrets in circumstances where Defendants knew or had reason to know that the trade secrets had been acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering;
c. Disclosure, without Applied's consent, of Applied's trade secrets that Defendants acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering; and
d. Use, without Applied's consent, of Applied's trade secrets that Defendants acquired by improper means, including by theft, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, espionage, and unlawful reverse-engineering.

**ANSWER:** Paragraph 128 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 128.

129. Upon information and belief, Defendants have improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) Applied's trade secrets in violation of the DTSA.

**ANSWER:** Paragraph 129 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 129.

130. Upon information and belief, Comulate has gained, or will gain, substantial benefit from its misappropriation of Applied's trade secrets to Applied's substantial detriment.

**ANSWER:** Paragraph 130 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 130.

131. Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and to limit its use, including but not limited to the confidentiality provisions in the Master Agreement and the Schedule SDK.

**ANSWER:** Paragraph 131 states legal conclusions to which no response is required. Paragraph 131 purports to characterize documents (the Master Agreement or Schedule SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the allegations in Paragraph 131.

132. As a direct and proximate result of Defendants' past, current and continued misappropriation of Applied's trade secrets, which Defendants took for their own benefit, Applied has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law, and Defendants must be enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Applied.

**ANSWER:** Paragraph 132 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 132.

133. PBC and Comulate should therefore be preliminarily and permanently enjoined from any further misappropriation of Applied's trade secrets and ordered to immediately return and/or destroy Applied's trade secrets.

**ANSWER:** Paragraph 133 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 133.

134. As a direct and proximate result of Defendants' misappropriation, Applied has suffered and continues to suffer actual damages in a sum to be set forth according to proof at trial and irreparable harm and is entitled to all damages, attorneys' fees, costs, and other remedies permitted under the DTSA, including but not limited to actual damages, unjust enrichment, and/or a reasonable royalty based on Comulate's continued use of the trade secrets in, upon information and belief, competing product offerings and the development of competitive products.

**ANSWER:** Paragraph 134 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 134.

135. Applied is further entitled to a constructive trust over any trade secrets, confidential information, products, or other intellectual property developed by Comulate using or based on Applied's trade secrets.

**ANSWER:** Paragraph 135 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 135.

136. Upon information and belief, Defendants' conduct was and is malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Defendants acted with a purpose or willingness to commit the misappropriation, and the misappropriation was not reasonable under the circumstances at the time and was not undertaken in good faith. Applied is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the trade secret misappropriation damages recovered, as well as reasonable attorneys' fees and costs to be proven at trial.

**ANSWER:** Paragraph 136 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 136.

## COUNT II
## BREACH OF CONTRACT
## (Against Defendants PBC and Comulate)

137. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

138. The Master Agreement, including Schedule SDK and the exhibits thereto, is a valid and enforceable written contract, with definite and certain terms.

**ANSWER:** Paragraph 138 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 138.

139. Applied has at all times performed and continues to perform all of its required obligations under the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 139 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 139.

140. PBC has breached numerous provisions of the Master Agreement and Schedule SDK, including but not limited to those set forth below.

**ANSWER:** Paragraph 140 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 140.

141. PBC breached Section 3.2 of the Master Agreement, which provides in relevant part that "[u]sers are provisioned on a Named Basis only, must be located in the Territory, and must be Licensee's Employees" and that "[i]ncidental access to the Software by Licensee's Employees or Professional Advisors is permitted where: (a) the Employee is performing tasks principally related to internal network/systems administration and not to Licensee's internal insurance operations; and (b) the Professional Advisor is providing its professional services to Licensee in connection with Licensee's general business operations, such as auditing, and not to Licensee's insurance operations." Ex. A § 3.2. PBC's use of Epic breached Section 3.2 of the Master Agreement because PBC's users were not PBC employees. Rather, PBC was granting Comulate employees unauthorized access to Epic for, upon information and belief, the purpose of misappropriating Applied's valuable trade secrets and confidential information to develop competing products.

**ANSWER:** Paragraph 141 states legal conclusions to which no response is required. Paragraph 141 purports to characterize and quote a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any

characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 141.

142. PBC breached Section 3.3 of the Master Agreement because its use was not a "Permitted Use," defined as "use and access solely pursuant to an Order, in connection with Licensee's internal insurance operations, and in accordance with the Agreement and the Documentation." *See id.* §§ 3.3, 15 (definition of "Permitted Use"). Again, PBC did not use and access Epic solely in connection with its (fake) internal insurance operations, because it was not a real insurance agency and because PBC was operating as a front for Comulate to gain access to Applied's valuable trade secrets and confidential information.

**ANSWER:** Paragraph 142 states legal conclusions to which no response is required. Paragraph 142 purports to characterize a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 142.

143. PBC breached Section 3.6 of the Master Agreement by using Epic to develop and test competing products. *See id.* § 3.6.

**ANSWER:** Paragraph 143 states legal conclusions to which no response is required. Paragraph 143 purports to characterize a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 143.

144. PBC breached Section 3.6 of the Master Agreement by, among other things, reverse-engineering Applied's trade secrets and software, and attempting to gain unauthorized access to the software, creating derivative works, making Applied's software available to Comulate, using Applied's software "for purposes of benchmarking, competitive analysis, or for developing, using, or providing a competing software product, or service" and allowing Comulate to do the foregoing. *Id.* § 3.6.

**ANSWER:** Paragraph 144 states legal conclusions to which no response is required. Paragraph 144 purports to quote a document (Exhibit A), and Comulate respectfully refers the Court to the

document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 144.

145. PBC breached Section 10.1 of the Master Agreement because PBC used Applied's Confidential Information for purposes other than those for which it was permitted under the Agreement. *Id.* § 10.1. Specifically, PBC used that information to develop and refine competing products, rather than to conduct the insurance operations and HubSpot integration for which access was provided.

**ANSWER:** Paragraph 145 states legal conclusions to which no response is required. Paragraph 145 purports to characterize a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 145.

146. PBC breached Section 5 of the SDK because PBC did not use the SDK "solely in connection with managing [PBC's] insurance agency or brokerage." Ex. B § 5. PBC had no insurance agency or brokerage and used the SDK to misappropriate Applied's trade secrets.

**ANSWER:** Paragraph 146 states legal conclusions to which no response is required. Paragraph 146 purports to quote a document (Exhibit B), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 146.

147. PBC breached Section 5.1 of the Schedule SDK, which only permitted PBC to use Epic for the "Authorized Business Purpose[]" of "develop[ing] an integration between HubSpot and [Epic] via the SDK" and provided that "[t]he integration will be part of normal internal business operations which are owned and/or licensed by [PBC]." *Id.* § 5.1. PBC in fact used Epic to gain access to Applied's trade secrets, not to integrate with HubSpot. In addition, the integration was not part of any normal business operations or any business owned by PBC.

**ANSWER:** Paragraph 147 states legal conclusions to which no response is required. Paragraph 147 purports to quote a document (Exhibit A), and Comulate respectfully refers the Court to the

document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 147.

148. PBC breached Section 5.2 of the Schedule SDK by exceeding the "Authorized Integrations" set forth in Section 5.2, including but not limited to making millions of calls to Epic SDK methods outside the scope of the Epic SDK methods authorized by Section 5.2 of the Schedule SDK, such as its millions of SDK general ledger calls. Even as to the SDK methods within the scope of Section 5.2, PBC's use breached the Master Agreement because its use of those methods was not to integrate with HubSpot. *See id.* § 5.2.

**ANSWER:** Paragraph 148 states legal conclusions to which no response is required. Paragraph 148 purports to characterize documents (the Master Agreement and Schedule SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the allegations in Paragraph 148.

149. PBC breached Section 5.5 of the Schedule SDK, which provides in relevant part that "[a]ny use of Applied Epic Integration Service SDK or of the Run-Time SDK not authorized or beyond the scope of the licenses granted under this Schedule is prohibited. For the avoidance of doubt, Licensee shall use the Applied Epic Integration Service SDK and the Run-Time SDK for internal purposes only . . . . Unless expressly agreed otherwise, Licensee shall not use the Applied Epic Integration Service SDK or the Run-Time SDK to export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party and shall not utilize or leverage knowledge gained from access and use of the Applied Epic Integration Service SDK or of the Run-Time SDK to develop, create, link, and/or connect Interfaces, Integrations, tools, or other solutions unless expressly authorized hereunder and specifically within the scope of an Authorized Business Purpose and Authorized Integration." *Id.* § 5.5. For the same reasons set forth above, PBC violated this provision by using Epic to gain access to Applied's valuable trade secrets and confidential information and for the purpose of developing competing products.

**ANSWER:** Paragraph 149 states legal conclusions to which no response is required. Paragraph 149 purports to quote a document (Schedule SDK), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any

characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 149.

150. Finally, PBC breached Section 5.6 of the Schedule SDK, which similarly prohibited PBC from "us[ing] the Applied Epic Integration Service SDK or the Run-Time SDK for purposes of benchmarking or competitive analysis of the Applied Software or for developing, using or providing a competing software product or service." *Id.* § 5.6. PBC engaged in prohibited benchmarking and competitive analyses for the same reasons set forth above.

**ANSWER:** Paragraph 150 states legal conclusions to which no response is required. Paragraph 150 purports to characterize a document (the Schedule SDK), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 150.

151. PBC breached Section 5.7 of the Schedule SDK because PBC used the SDK other than as prescribed in the Schedule SDK without the prior written consent of Applied. *Id.* § 5.7.

**ANSWER:** Paragraph 151 states legal conclusions to which no response is required. Paragraph 151 purports to characterize a document (the Schedule SDK), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 151.

152. All of the above misconduct constitutes a material breach of the Master Agreement and Schedule SDK, including but not limited to the specific provisions set forth above.

**ANSWER:** Paragraph 152 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 152.

153. PBC is the alter ego of Comulate because there is such unity of interest and ownership that they are one and the same and, if the acts of PBC are treated as those of PBC alone, an inequitable result will follow.

**ANSWER:** Paragraph 153 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 153.

154. Upon information and belief, Bates, in entering into the Master Agreement and Schedule SDK on behalf of PBC, was acting as an agent and/or officer of Comulate or at Comulate's direction and for its benefit.

**ANSWER:** Paragraph 154 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 154.

155. Upon information and belief, Comulate substantially controlled PBC and PBC had no separate legal existence apart from Comulate. Comulate exerted substantial control over the daily affairs of PBC and Comulate holds out PBC as its agent.

**ANSWER:** Paragraph 155 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 155.

156. Comulate materially breached each of the provisions for the same reasons set forth above.

**ANSWER:** Paragraph 156 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 156.

157. As a direct and proximate result of PBC/Comulate's breaches, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate PBC/Comulate's breaches. Such damages are natural, highly probable consequences of PBC/Comulate's breaches.

**ANSWER:** Paragraph 157 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 157.

158. Applied is also entitled to a constructive trust over any trade secrets, confidential information, products, or intellectual property misappropriated by or developed by Comulate based on Applied's trade secrets and confidential information, including pursuant to Section 4.2 of the Master Agreement, which expressly provides that, "[t]o the extent Licensee violates this Section 4.2, Licensee automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests, without the necessity of further consideration and without any claim that Applied has waived Licensee's breach of this provision." *See* Ex. A § 4.2.

**ANSWER:** Paragraph 158 states legal conclusions to which no response is required. Paragraph 158 purports to characterize a document (Exhibit A), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the allegations in Paragraph 158.

**COUNT III**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Defendants PBC and Comulate)**

159. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

160. The Master Agreement, including the Schedule SDK and the Exhibits thereto, is a valid, enforceable written contract, with definite and certain terms.

**ANSWER:** Paragraph 160 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 160.

161. Applied has at all times performed and continues to perform all of its requirements and obligations under the Master Agreement and the Schedule SDK.

**ANSWER:** Paragraph 161 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 161.

162. PBC owed Applied a duty of good faith and fair dealing that is implied in every contract, including but not limited to because the Master Agreement and Schedule SDK granted PBC discretion in accessing Epic solely for the purposes outlined in, and to engage in the activities set forth in, the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 162 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 162.

163. PBC violated the covenant of good faith and fair dealing through the intentional, deliberate, and fraudulent conduct described herein, including but not limited to because PBC

used its access to Epic to gain access to Applied's valuable trade secrets and confidential information and to run tests designed to aid Comulate in developing competing products.

**ANSWER:** Paragraph 163 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 163.

164. PBC's conduct violated the spirit of the Master Agreement and Schedule SDK and deprived Applied of the fruits of those agreements through PBC's use of Epic for unauthorized purposes and for the goal of facilitating Comulate's development of competing products, including but not limited to abusing any discretion afforded by the Master Agreement and Schedule SDK to PBC in its use of Applied's system in bad faith and for the benefit of Comulate.

**ANSWER:** Paragraph 164 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 164.

165. As the alter ego of and the entity that substantially controls PBC, Comulate is bound by the covenant of good faith and fair dealing with respect to the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 165 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 165.

166. Comulate breached the covenant of good faith and fair dealing through the same conduct set forth above.

**ANSWER:** Paragraph 166 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 166.

167. As a direct and proximate result of PBC/Comulate's breaches, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate PBC/Comulate's breaches.

**ANSWER:** Paragraph 167 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 167.

168. Applied is also entitled to a constructive trust over any trade secrets, confidential information, products, or intellectual property misappropriated by or developed by Comulate based on Applied's trade secrets and confidential information, including pursuant to Section 4.2 of the Master Agreement. *See* Ex. A § 4.2.

**ANSWER:** Paragraph 168 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 168.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
**(Against Defendants PBC and Comulate)**

169. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

170. PBC, including Bates, made numerous fraudulent misrepresentations in order to induce Applied to enter into the Master Agreement and Schedule SDK and then continue its relationship with PBC.

**ANSWER:** Paragraph 170 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 170.

171. In connection with the intake interview process in March 2024, PBC, including Bates, misrepresented to Applied salespeople including Jason Shorter and Andy Sahl, among other things, that PBC was a legitimate, new three-person insurance agency, seeking to integrate HubSpot with Epic, and that it was exploring carrier interviews to expand its business.

**ANSWER:** Paragraph 171 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 171.

172. In fact, PBC is a fake agency with no customers or business and entered into the Master Agreement and Schedule SDK for the purpose of gaining access to Epic and the SDK for Comulate's own use, and for the purpose of developing competing product offerings, as described above.

**ANSWER:** Paragraph 172 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 172.

173. At the time that PBC made the representations alleged herein, PBC knew the representations were false. Specifically, PBC knew that it was not a legitimate insurance agency, that it would not be using Epic and other Applied software for the authorized business purposes

set forth in the Master Agreement and Schedule SDK, and that PBC was in fact a front for Comulate.

**ANSWER:** Paragraph 173 states legal conclusions to which no response is required. To the extent a response is required, Comulate admits that PBC Consulting is not a functioning entity and denies the remaining allegations in Paragraph 173.

174. PBC made the fraudulent representations alleged herein as part of a scheme to induce Applied to rely on them and to cause and induce Applied to enter into the Master Agreement and Schedule SDK and to maintain a relationship with PBC thereafter.

**ANSWER:** Paragraph 174 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 174.

175. PBC's fraudulent misrepresentations were material to Applied's decision to enter into the Master Agreement and Schedule SDK and subsequently to continue its relationship with PBC.

**ANSWER:** Paragraph 175 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 175.

176. Applied justifiably relied on PBC's fraudulent misrepresentations in entering into the Master Agreement and Schedule SDK. Specifically, Applied lacked any reason at the time to suspect that PBC was a fake agency, especially in light of the elaborate, brazen steps PBC took to conceal its true identity as a front for Comulate.

**ANSWER:** Paragraph 176 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 176.

177. PBC's fraudulent misrepresentations were made willfully and wantonly.

**ANSWER:** Paragraph 177 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 177.

178. Applied's reliance on PBC's fraudulent misrepresentations caused Applied to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred by Applied in investigating and attempting to remediate the fraud perpetrated by PBC, as well as exemplary and punitive damages given PBC's willful, wanton, malicious, fraudulent, and reckless conduct.

**ANSWER:** Paragraph 178 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 178.

179. As the alter ego of and the entity that substantially controls PBC, Comulate also committed the fraudulent misrepresentations set forth above.

**ANSWER:** Paragraph 179 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 179.

180. As a direct and proximate result of PBC/Comulate's fraudulent misrepresentations, and of Comulate's fraudulent procurement of access to Epic and the SDK, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate the fraud perpetrated by Comulate, as well as exemplary and punitive damages given Comulate's willful, wanton, malicious, fraudulent, and reckless conduct.

**ANSWER:** Paragraph 180 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 180.

**COUNT V**
**FRAUDULENT INDUCEMENT**
**(Against Defendants PBC and Comulate)**

181. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

182. PBC, including Bates, made numerous fraudulent misrepresentations under Illinois law in order to induce Applied to enter into the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 182 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 182.

183. In connection with the intake process in March 2024, PBC, including Bates, misrepresented to Applied salespeople including Jason Shorter and Andy Sahl, among other things, that PBC was a legitimate, new three-person insurance agency, seeking to integrate HubSpot with Epic, and that PBC was exploring carrier interviews to expand its business.

**ANSWER:** Paragraph 183 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 183.

184. In fact, PBC is a fake agency with no customers or business and entered into the Master Agreement and Schedule SDK for the purpose of gaining access to Epic and the SDK for Comulate's own use, and for the purpose of developing competing products, as set out above.

**ANSWER:** Paragraph 184 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 184.

185. At the time that PBC made the representations alleged herein, PBC knew the representations were false. Specifically, PBC knew that it was not a legitimate insurance agency, that it would not use Epic and other Applied software for the authorized business purposes set forth in the Master Agreement and Schedule SDK, and that it was in fact a front for Comulate.

**ANSWER:** Paragraph 185 states legal conclusions to which no response is required. To the extent a response is required, Comulate admits that PBC Consulting is not a functioning entity and denies the remaining allegations in Paragraph 185.

186. PBC made the fraudulent representations alleged herein as part of a scheme to induce Applied to rely on them and to cause and induce Applied to enter into the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 186 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 186.

187. PBC's fraudulent misrepresentations were material to Applied's decision to enter into the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 187 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 187.

188. Applied justifiably relied on PBC's fraudulent misrepresentations in entering into the Master Agreement and Schedule SDK. Specifically, Applied lacked any reason at the time to suspect that PBC was a fake agency, especially in light of the elaborate, brazen steps PBC took to conceal its true identity as a front for Comulate.

**ANSWER:** Paragraph 188 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 188.

189. PBC's fraudulent misrepresentations were made willfully and wantonly.

**ANSWER:** Paragraph 189 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 189.

190. As the alter ego of and the entity that substantially controls PBC, Comulate also committed the fraudulent inducement set forth above.

**ANSWER:** Paragraph 190 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 190.

191. As a direct and proximate result of PBC/Comulate's fraudulent inducement, and of Comulate's fraudulent procurement of access to Epic and the SDK, Applied has suffered and continues to suffer damages in an amount to be proven at trial, including but not limited to substantial costs incurred to investigate and attempt to remediate the fraud perpetrated by PBC/Comulate, as well as exemplary and punitive damages given PBC/Comulate's willful, wanton, malicious, fraudulent, and reckless conduct.

**ANSWER:** Paragraph 191 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 191.

**COUNT VI**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)**
**(Against Defendants PBC and Comulate)**

192. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

193. PBC/Comulate intentionally accessed Applied's protected computer systems without authorization by using SDK and Epic UI access it had obtained by fraud. PBC/Comulate's unauthorized access was undertaken to obtain non-public information from protected computers.

**ANSWER:** Paragraph 193 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 193.

194. PBC/Comulate gained unauthorized access to extract non-public information they were not authorized to obtain. For example, PBC/Comulate only obtained Epic UI access

through the fraudulent acquisition of the PBC agreement, and extracted non-public information in that manner. Through their unauthorized access, PBC/Comulate intentionally obtained "information" from Applied's protected computers within the meaning of 18 U.S.C. § 1030(a)(2)(C).

**ANSWER:** Paragraph 194 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 194.

195. The information PBC/Comulate obtained includes, at minimum: (a) proprietary SDK responses through the PBC/Comulate account, which SDK access is only available to those entities authorized by Applied to access the SDK; (b) proprietary information obtained from UI access to Epic, including information regarding content, sequencing, and effect of UI actions relating to agency billing reconciliation actions, where only those entities authorized by Applied may access the Epic UI; and (c) other information not generally available to the public.

**ANSWER:** Paragraph 195 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 195.

196. This proprietary information was obtained without authorization and provides substantial economic value to PBC/Comulate that derives from its confidential nature and is unavailable to competitors through lawful means.

**ANSWER:** Paragraph 196 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 196.

197. PBC/Comulate also accessed Applied's protected computers with intent to defraud and obtained "anything of value" within the meaning of 18 U.S.C. § 1030(a)(4).

**ANSWER:** Paragraph 197 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 197.

198. PBC/Comulate obtained substantial value through their fraudulent access, including but not limited to information necessary to develop its agency billing product and used to refine its direct billing product. PBC/Comulate's fraudulent scheme was designed to obtain this valuable information and gain unlawful competitive advantage over Applied. This scheme was fraudulent because PBC/Comulate misrepresented its identity and the purpose of its access in order to obtain access to Applied's systems. The value of PBC/Comulate's fraudulent use and access was over $5,000, at least because PBC/Comulate paid more than $5,000 for that access.

**ANSWER:** Paragraph 198 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 198.

199. PBC/Comulate's conduct caused damage and loss to Applied in excess of $5,000 during a one-year period as defined in 18 U.S.C. § 1030(e)(11), including: (a) reasonable costs of responding to the offense, including hiring advisors to assist with investigation, mitigation, and response; (b) costs of conducting damage assessment and implementing additional security measures to prevent further attacks by PBC/Comulate; and (c) costs incurred from business interruption and the need to divert resources to address the fraudulent access.

**ANSWER:** Paragraph 199 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 199.

200. Applied would not have provided Comulate with an SDK key or access to the Epic UI for Comulate's own use absent Comulate's fraudulent procurement of such access through the PBC agreement.

**ANSWER:** Paragraph 200 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 200.

201. PBC/Comulate's violations of the CFAA were willful and undertaken for commercial advantage, warranting enhanced penalties under 18 U.S.C. § 1030(c)(4)(A)(i).

**ANSWER:** Paragraph 201 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 201.

## COUNT VII
## DECLARATORY JUDGMENT OF OWNERSHIP OF DERIVATIVE WORKS
## (Against Defendants PBC and Comulate)

202. The allegations contained in the foregoing paragraphs are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the preceding Paragraphs of the Second Amended Complaint.

203. Section 4.2 of the Master Agreement states that "Licensee is not authorized to make any derivative works, modifications of, or implement any program improvements to any Applied intellectual property, including without limitation, the Applied Software." It continues, stating that "[t]o the extent Licensee violates this Section 4.2, Licensee automatically assigns to Applied, upon creation, all right, title, and interest in and to such materials, including copyright and any other intellectual property interests, without the necessity of further consideration."

**ANSWER:** Paragraph 203 states legal conclusions to which no response is required. Paragraph 203 purports to quote a document (the Master Agreement), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 203.

204. Section 5.8 of the Schedule SDK states that "Licensee is not authorized to make any such modifications of or to implement any such program improvements to Applied Epic Integration Service SDK or the Run-Time SDK except as expressly provided hereunder." It continues, stating that "[t]o the extent it does notwithstanding this prohibition, Licensee automatically assigns, upon their creation, to APPLIED the ownership of such unauthorized modifications and/or improvements, including copyright interests and any other intellectual property interests, without the necessity of further consideration."

**ANSWER:** Paragraph 204 states legal conclusions to which no response is required. Paragraph 204 purports to quote a document (the Schedule SDK), and Comulate respectfully refers the Court to the document for a full and accurate statement of its contents. Comulate denies any characterization of the document, which speaks for itself. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 204.

205. Comulate's agency billing product created using information from the PBC accounts constitutes a derivative work, modification of, or program improvement to Epic and the SDK, access to which Comulate obtained by way of its fraud. By operation of Section 4.2 of the Master Agreement and Section 5.8 of the Schedule SDK, Applied is thus the owner of all rights in Comulate's agency billing product created using information from the PBC account.

**ANSWER:** Paragraph 205 states legal conclusions to which no response is required. Paragraph 205 purports to characterize documents (the Master Agreement and the Schedule SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 205.

206. Accordingly, Applied is entitled to a declaration that it is the rightful owner of Comulate's agency billing product created using information from the PBC accounts. Comulate presently claims ownership of its agency billing product, and thus an actual and justiciable controversy exists regarding the rights in and to Comulate's agency billing product under the Master Agreement and Schedule SDK.

**ANSWER:** Paragraph 206 states legal conclusions to which no response is required. Paragraph 206 purports to characterize documents (the Master Agreement and the Schedule SDK), and Comulate respectfully refers the Court to the documents for a full and accurate statement of their contents. Comulate denies any characterization of the documents, which speak for themselves. To the extent a response is required, Comulate denies the remaining allegations in Paragraph 206.

## COUNT VIII
## UNJUST ENRICHMENT
## (Against Defendants PBC and Comulate)

207. The allegations contained in paragraphs 3, 14-17, the first sentence of paragraph 18, and paragraphs 22-32, 36, 57-58, 68, 88, 95-98, 100, and 103 are incorporated by reference as if specifically realleged herein.

**ANSWER:** Comulate incorporates, as if fully set forth herein, its answers to the corresponding Paragraphs of the Second Amended Complaint.

208. Applied pleads this claim in the alternative to its contract claims, and only to the extent no valid and enforceable contract governs the benefits at issue. PBC and Comulate have been unjustly enriched through (a) their unauthorized access to Applied's software platform, as well as (b) their use of information derived therefrom to develop their own agency billing and direct billing products. By falsely representing that PBC was a legitimate insurance agency seeking access for its insurance operations and an integration with HubSpot, Comulate induced Applied to provide access to Epic and the SDK for Comulate's own use. Applied would not have provided that access absent those misrepresentations. Comulate thereby obtained the benefit of access to and use of Applied's software platform at Applied's expense.

**ANSWER:** Paragraph 208 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 208.

209. It would be inequitable and unjust for PBC and Comulate to retain the benefits of their misconduct, obtained through fraud, without compensating Applied for the value of the

unauthorized access to and use of Applied's software platform, taking into account amounts already paid for that access.

**ANSWER:** Paragraph 209 states legal conclusions to which no response is required. To the extent a response is required, Comulate denies the allegations in Paragraph 209.

## PRAYER FOR RELIEF

WHEREFORE, Applied respectfully requests that the Court award the following:

(a) Preliminary injunctive relief;

(b) An award of compensatory damages in an amount to be proven at trial;

(c) Unjust enrichment damages in an amount to be proven at trial;

(d) A reasonable royalty in an amount to be proven at trial;

(e) A constructive trust over any trade secrets, confidential information, intellectual property, or products or services derived or developed from any of Applied's trade secrets and/or confidential information;

(f) Permanent injunctive relief;

(g) An award of exemplary and punitive damages to be proven at trial;

(h) An award of costs and reasonable attorneys' fees; and

(i) Such other and further relief as is just, equitable and proper.

**ANSWER:** Comulate denies all allegations unless specifically admitted. Comulate denies that Applied is entitled to any of the requested relief.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Comulate reasserts, without limitation, all defenses raised in its Motion to Dismiss, whether or not separately re-pleaded herein. Comulate also asserts the following affirmative and other defenses. In listing the defenses below, Comulate does not knowingly or intentionally waive any defenses, including

arguments about which issues fall within Plaintiff's burden of proof. By alleging the separate and additional defenses set forth below, Comulate does not in any way agree or concede that it has the burden of proof or burden of persuasion on any of these issues. Comulate also preserves the right to rely on any affirmative or other defense or claim that may subsequently come to light, and expressly reserves the right to amend its Answer to assert such additional defenses or claims.

**FIRST DEFENSE**

Applied fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

As detailed in Comulate's counterclaims, Applied's actions purporting to prohibit Comulate's business activities are part of an unlawful scheme to eliminate competition. As such, the contractual and legal restrictions alleged herein are void as a matter of law. Applied therefore has failed to state a cause of action.

**THIRD DEFENSE**

If and to the extent that Applied has been damaged, which Comulate denies, the amount of damages that Applied alleges to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

**FOURTH DEFENSE**

If and to the extent that Applied has been damaged, which Comulate denies, Applied, by the exercise of reasonable diligence, could have mitigated its damages but did not, and Applied therefore is barred from recovery. Alternatively, any damages sustained by Applied, which Comulate denies, must be reduced by the amount that such damages would have been reduced had Applied exercised reasonable diligence in mitigating its damages.

**FIFTH DEFENSE**

Applied's claims are barred, in whole or in part, because to the extent Applied suffered any injury or incurred any damages as alleged in the Second Amended Complaint, which Comulate denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than Comulate and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

**SIXTH DEFENSE**

Applied's claims are barred by the doctrine of unclean hands.

**SEVENTH DEFENSE**

Applied's claims are barred by the doctrine of illegality.

**EIGHTH DEFENSE**

Applied's claims are barred, in whole or in part, by the express terms of the relevant agreement(s).

**NINTH DEFENSE**

Applied's claims are barred, in whole or in part, because Applied has failed to satisfy its contractual obligations.

**TENTH DEFENSE**

To the extent lack of authorization for access is deemed an affirmative defense rather than an element on which Applied bears the burden of proof (and Comulate contends that the latter applies), Applied is barred from claiming violations of any statute or source of law because Comulate's access was authorized.

**ELEVENTH DEFENSE**

Applied's claims are barred by the doctrine of acquiescence.

**TWELFTH DEFENSE**

Applied's claims are barred by the doctrines of laches, waiver, and estoppel.

**THIRTEENTH DEFENSE**

The privilege of competition and other privileges available under state law bar Applied from pursuing its claims for relief.

**FOURTEENTH DEFENSE**

Applied's claims are barred, in whole or in part, because Applied has not suffered any legally cognizable injury, including because Applied has not suffered an injury-in-fact and its alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained and apportioned.

**FIFTEENTH DEFENSE**

Applied's claims are barred, in whole or in part, because to the extent Applied suffered any injury or incurred any damages as alleged, which Comulate denies, Comulate's alleged conduct was not the actual or proximate cause of any injury or damage to Applied.

**SIXTEENTH DEFENSE**

Applied's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Applied.

**SEVENTEENTH DEFENSE**

Applied is barred from recovery because its acts are in violation of public policy.

**EIGHTEENTH DEFENSE**

Applied's claims are barred because Applied first breached the relevant agreement(s), including the Master Agreement and the Schedule SDK.

**NINETEENTH DEFENSE**

Applied's DTSA claim is barred because none of the information at issue qualifies as a trade secret under the DTSA.

**TWENTIETH DEFENSE**

Applied's DTSA claim is barred because the alleged trade secrets have no independent economic value.

**TWENTY-FIRST DEFENSE**

Applied's DTSA claim is barred because Comulate did not misappropriate any alleged trade secret.

**TWENTY-SECOND DEFENSE**

Applied's DTSA claim is barred because allegations of reverse engineering are not cognizable as improper means or misappropriation under the DTSA.

**TWENTY-THIRD DEFENSE**

Applied's DTSA claim is barred because Comulate used no improper means to acquire any alleged trade secret.

**TWENTY-FOURTH DEFENSE**

Applied's DTSA claim is barred because independent invention is not improper means under the DTSA.

**TWENTY-FIFTH DEFENSE**

Applied's DTSA claim is barred because Comulate had no duty to protect the alleged information.

**TWENTY-SIXTH DEFENSE**

Applied's DTSA claim is barred because the alleged trade secrets were commonly known in the industry.

**TWENTY-SEVENTH DEFENSE**

Applied's DTSA claim is barred because the alleged trade secrets were already public information.

**TWENTY-EIGHTH DEFENSE**

Applied's DTSA claim is barred because the alleged trade secrets are readily ascertainable by proper means.

**TWENTY-NINTH DEFENSE**

Applied's DTSA claim is barred because Applied has voluntarily exposed and/or failed to reasonably protect the alleged trade secrets throughout this litigation.

**THIRTIETH DEFENSE**

Applied's DTSA claim is barred because Applied did not take reasonable measures to keep the alleged information secret.

**THIRTY-FIRST DEFENSE**

Applied's DTSA claim is barred because it is not described with the requisite specificity and Applied does not adequately describe the measures taken to protect the alleged trade secrets.

**THIRTY-SECOND DEFENSE**

Applied's DTSA claim is barred because Comulate did not use any trade secret in its business.

**THIRTY-THIRD DEFENSE**

Applied's DTSA claim is barred on the basis of Comulate's independent development.

**THIRTY-FOURTH DEFENSE**

Applied's Computer Fraud and Abuse Act claim is barred, in whole or in part, because Applied has not suffered any cognizable loss.

**THIRTY-FIFTH DEFENSE**

Applied's claims are barred, in whole or in part, because Applied did not reasonably or justifiably rely on Comulate's representations or omissions.

**THIRTY-SIXTH DEFENSE**

Applied's claims are preempted, in whole or in part, by 765 ILCS 1065/8(a).

**THIRTY-SEVENTH DEFENSE**

Applied's good faith and fair dealing claim is barred because there was no contractual discretion under the Master Agreement and Schedule SDK.

**THIRTY-EIGHTH DEFENSE**

Applied's claims are barred, in whole or in part, because the Master Agreement and Schedule SDK are unconscionable.

**THIRTY-NINTH DEFENSE**

Applied's claims are preempted by the Federal Copyright Act (17 U.S.C. § 301(a)).

**FORTIETH DEFENSE**

Applied's claims are barred on the basis of consent.

**FORTY-FIRST DEFENSE**

Applied's claims are barred to the extent the statute of limitations has expired.

**FORTY-SECOND DEFENSE**

Applied's claim for attorney's fees is barred because (1) Applied fails to state a claim upon which litigation expenses and/or attorney's fees may be awarded; (2) Comulate committed no acts justifying an award of litigation expenses and/or attorney's fees; and (3) there exists a bona fide controversy between the parties.

**FORTY-THIRD DEFENSE**

Comulate reserves the right to assert any additional defenses that may arise as discovery progresses or otherwise in the course of this litigation. Comulate further reserves the right to withdraw any of these defenses as may be appropriate.

**JURY DEMAND**

Comulate demands a trial by jury of all issues triable by jury.

**REQUESTED RELIEF**

WHEREFORE, Comulate respectfully requests that the Court enter judgment:

1. Denying Plaintiff's requested relief;
2. Dismissing the Second Amended Complaint in its entirety, with prejudice;
3. Awarding Comulate its attorney's fees and costs; and
4. Awarding such other and further relief to Comulate as the Court may deem just and proper.

## COUNTERCLAIMS AGAINST APPLIED SYSTEMS, INC.

Plaintiff Ardent Labs, Inc., d/b/a Comulate ("Comulate") has filed a separate complaint against Defendant Applied Systems, Inc. ("Applied") in the related action, *Ardent Labs, Inc., d/b/a Comulate v. Applied Systems, Inc.*, No. 1:26-cv-00591 (N.D. Ill.). Out of an abundance of caution, Comulate for its counterclaims against Applied in this action, hereby alleges as follows:

### I. PRELIMINARY STATEMENT

1. Comulate brings claims for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as state law claims, and seeks to halt an entrenched monopolist's unlawful campaign to destroy a competitor it could not acquire or outcompete. Applied controls the dominant software platform ("Epic") used by enterprise insurance agencies and brokerages in the United States. Through Epic, Applied commands more than 81% of the market for enterprise-scale insurance agency management systems ("AMSs"), rising to 92.3% among agencies with more than $100 million in annual revenue. Applied controls not just the software interface but also the essential data infrastructure, namely, the proprietary IVANS data exchange network that connects agencies and brokerages to carriers. Insurance agencies and brokerages cannot switch platforms without years of disruption and millions of dollars in costs. This structural lock-in is the source of Applied's power and one of several mechanisms through which Applied maintains power.

2. Comulate was founded in 2022 by Jordan Katz (CEO) and Michael Mattheakis (CTO). Comulate quickly became the leading independent provider of enterprise-level automated insurance agency accounting software. Comulate was the first mover in agency and brokerage accounting automation, rolling out its direct billing product in September 2022 and its agency billing product by January 2024. Before Comulate, the largest enterprise insurance brokerages employed teams of hundreds to manually reconcile carrier commission statements, a

process plagued by errors and delays. Comulate's AI-driven platform eliminated 90% of that manual work. The market reception has been overwhelming: a 99% gross customer retention rate and abundant customer praise. Comulate does not sell any AMS; its product integrates with and complements the AMSs that its customers use, principally Applied's Epic.

3. Applied initially treated Comulate as a valuable complement to Epic. Applied knew Comulate was interoperating with Epic through joint customers, worked with Comulate on technical integration, and even sought to use Comulate to solve problems for Applied's largest customer. On a March 2023 call, Brian Giometti, Applied's Senior Vice President of Corporate Development, asked Comulate to help onboard that customer, calling Comulate a "value-add" and a "good solution." Applied profited from the arrangement, earning thousands to tens of thousands of dollars per customer annually in integration fees. This prior course of dealing was voluntary, mutually beneficial, and profitable for Applied.

4. Applied reversed course only after failing to acquire Comulate. Between 2023 and 2025, Applied pursued acquisition through multiple overtures, each time seeking exclusivity and a right of first refusal rather than an arm's-length partnership. Applied's own Senior Vice President explained that internally building what Comulate had built would take "years" because Comulate's capabilities were not "anywhere remotely near [Applied's] roadmap." Applied's Senior Director of Partnerships admitted the acquisition path failed because Applied's board would not agree to pay enough for Comulate. Applied's board is controlled by Hellman & Friedman, the private equity firm that acquired Applied for $1.8 billion and that later identified Comulate as "#1 on their list of competition." When Comulate refused to sell or submit to exclusivity and a right of first refusal, Applied decided to build its own competing product, Applied Recon ("Recon"). But rather than compete on the merits with its inferior product,

Applied launched a systematic campaign to exclude Comulate from the market so that Recon could ultimately capture the full market share.

5. Applied launched a campaign to make Comulate less attractive to customers: increasing integration fees that customers would have to pay, delaying routine improvements that would benefit its own customers, and delaying routine integration requests. Those attempts did not deter customer uptake of Comulate. On the heels of a major customer's request to use Comulate despite Applied's attempts to make Comulate more costly and unwieldy, Applied finally decided to terminate Comulate's interoperability.

6. Applied's anticompetitive conduct toward Comulate is not isolated. Over recent years, Applied has used the same infrastructure controls to block, acquire, or destroy at least a dozen other firms across multiple adjacent markets. For years, Applied denied IVANS (a data exchange network that is a critical and necessary data infrastructure tool) access to Applied's principal global AMS competitor. Applied acquired TechCanary, a promising AMS built on Salesforce, for approximately $80 million after first blocking its IVANS access; its founder later said Applied "bought [TechCanary] to kill it" and to "protect the core." Applied acquired EzLynx, an AMS and rater platform, in what an Applied director described as "protecting the turf." Before launching Applied Pay, Applied cleared the market by excluding every competing payment vendor from the industry's flagship conference and fabricated security concerns to frighten customers away from the market leader. The exclusionary campaign against Comulate follows an established and documented pattern.

7. Applied's largest customer, [redacted], is a key aspect of this story. In March 2023, Applied asked Comulate to help solve [redacted] accounting challenges in Epic, calling Comulate a "value-add" and a "good solution." But after Comulate

rejected Applied's acquisition efforts, Applied then spent over two years trying to keep [redacted] from adopting Comulate, telling [redacted] decision-makers that Comulate could not work at [redacted] scale (after previously asking Comulate to assist in [redacted] onboarding) and promising that Applied's own product would be ready soon. None of Applied's efforts worked. [redacted] chose Comulate on the merits and signed a contract worth more than [redacted] over two years on November 5, 2025. Applied's President, Graham Blackwell, personally delayed the statement of work [redacted] needed to begin implementing Comulate. As [redacted] explained: "It's literally with the president of Applied [Blackwell], so we can't escalate any more than we're escalating it." After weeks of delays past the promised delivery date, Applied committed to deliver the statement of work on November 21, 2025. That day, it provided no statement of work and sued Comulate instead.

8. Applied's later attempts to justify its campaign by reference to the PBC Consulting Inc. ("PBC") sandbox account are pretextual. The exclusionary campaign began in January 2024, escalated throughout 2024 and 2025, and was already operationally complete before Applied claims to have discovered PBC in October 2025. By August 2025, Applied was telling customers Comulate "would only be available until the end of the year when something was going to happen which they wouldn't really explain," and a recently departed employee confirmed the shutdown was driven by competitive fear—not the PBC account. Applied filed its lawsuit, baselessly asserting Comulate had used the PBC account to steal Applied's intellectual property, then amended its complaint to remove core trade-secret allegations because they were based on publicly available information on Applied's own website. After filing, Applied's Chief Customer Officer told customers: "Even if Comulate wins, we still won't be allowing them to integrate with Epic." PBC was cover for Applied's exclusionary campaign. It was not its cause.

9. Recon could not compete on the merits: customers who demoed it called it "a really bad product" and its marketing had been "flatlining." And Recon was not yet ready for commercial launch. So Applied chose the company whose CEO Blackwell had called "a snake" just thirteen months earlier to serve as a transitional vessel for displaced customers. Applied and Comulate's competitor Slash Eureka, Inc. d/b/a Ascend ("Ascend"), a company initially focused on premium payments and financing but that has since entered Comulate's sphere, were already coordinating before Applied filed its lawsuit against Comulate: the day it filed suit, Applied's executives were calling Comulate's customers from scripts recommending Ascend with pre-negotiated pricing. Applied had already cleared the rest of the field. Between July and November 2025, Applied blocked SDK approvals for the only two other firms beginning to enter the market, ensuring that when it removed Comulate, no independent alternative remained. One day after Comulate filed its own action in the Delaware Court of Chancery, Applied and Ascend signed a written agreement formalizing what had been underway for weeks, designating Ascend as Applied's exclusive referral partner for the approximately sixty customers Applied was displacing. That agreement contains representations by Ascend that, upon information and belief, Applied knows to be false. Applied's conduct was contrary to its short-term economic interests absent the anticompetitive effect. Applied is sacrificing hundreds of thousands of dollars of high-margin recurring revenues from shared customers who had purchased certain subscriptions from Applied for the purpose of integrating Comulate. Applied also promoted Ascend, a direct rival with which Applied competes in premium payments, premium financing, and accounting automation, while suppressing the acknowledged market leader. A profit-maximizing platform operator would want the best complementary product on its platform to attract and retain customers. Applied instead promoted an inferior, ultimately more expensive

alternative with the goal of capturing the entire market for itself. By excluding Comulate, Applied sacrificed its own profits and the effectiveness of its Epic platform. Applied's facially self-defeating behavior is only rational as an effort to eliminate a strong competitor and wrongfully capture a dominant position in the market.

10. The effects on competition were immediate. Customers recognized what Applied was doing: "Obviously, they've got the stranglehold on the industry . . . we think competition is good and healthy, and so this shouldn't be a way to stifle that." Customers cannot switch away from Epic on any commercially realistic timeline. They can only watch as Applied replaces the product they chose on the merits with inferior alternatives. As one customer put it, restricting access to Comulate "represents a meaningful regression in technology, efficiency, and process control" because "Comulate has materially transformed the way we operate." Since Applied's coordination with Ascend began, Ascend has raised its per-seat prices approximately 55% and imposed new minimum commitments that quadrupled some customers' annual costs.

11. Higher prices, fewer choices, inferior products and restrictions that prevent customers from using their own data with the provider of their choice: unless restrained, Applied's conduct will entrench these harms permanently. When brokers are forced onto inferior technology at higher prices, the consequences flow downstream in the form of higher premiums for the millions of consumers and businesses they protect. This case will determine whether an entrenched monopolist can use exclusionary levers to destroy innovation that its own customers want, need, and have chosen on the merits. Insurance brokerages exist to serve policyholders.

## II. THE PARTIES

12. Plaintiff Ardent Labs, Inc., which operates under the name Comulate, is a highly successful insurance technology startup. Comulate's first-of-its-kind accounting automation

platform is used by the top insurance agencies and brokerages nationwide to streamline their accounting functions. Comulate is a Delaware corporation headquartered in San Francisco, California.

13. Defendant Applied Systems, Inc. is a Delaware corporation with headquarters in Chicago, Illinois. Applied is the dominant player in the enterprise-level insurance AMS market. Its flagship software, Epic, is used by the vast majority of insurance agencies and brokerages, including eight of the top ten insurance brokerage firms in the United States. Applied's majority owner is the private equity firm Hellman & Friedman LLC, whose portfolio includes Zendesk and Claritev (formerly MultiPlan).

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, over Comulate's federal antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has supplemental jurisdiction over Comulate's state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative fact as the federal antitrust claims and form part of the same case or controversy. Jurisdiction is also proper under 28 U.S.C. § 1367 because these claims arise from the same case or controversy as the claims brought by Applied against Comulate and PBC in the above-captioned matter.

15. This Court has personal jurisdiction over Applied under 735 Ill. Comp. Stat. § 5/2-209(b)(4) because Applied's principal place of business is in this State. This Court also has personal jurisdiction over Applied under 735 Ill. Comp. Stat. § 5/2-209(a)(1) and (a)(2) because Comulate's claims arise out of Applied transacting business and committing tortious acts in this State.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Applied's principal place of business is in this District and because a substantial part of the events and omissions giving rise to Comulate's claims occurred in this District.

## IV. RELEVANT MARKETS

### A. The Relevant Market for Enterprise-Level Insurance Agency Management Systems

17. The U.S. insurance industry is the largest in the world, with approximately $3 trillion in total net premiums as of 2024. Major lines of retail insurance, often marketed and sold through third-party distributors, include property and casualty insurance, health and employee benefits insurance, and life and annuity products.

18. Because insurance products, the willingness of insurers to underwrite risk, and potential insureds' risk levels vary widely, customers rely on "insurance agencies" and "insurance brokerages"—intermediaries that sell insurance policies to potential insureds—to match risk to markets, negotiate coverage and price, and service policies over their life cycle.

19. As intermediaries, insurance agencies and brokerages manage a broad range of functions, including submissions, quotes, binding, policy issuance, renewals, claims advocacy, compliance, and document management. And, central to this case, they are responsible for insurance-specific accounting functions, including reconciling carrier commission statements and managing premium payables.

20. An insurance agency management system ("AMS") is the operational backbone of a retail insurance agency or brokerage. An AMS is purpose-built software that manages the core workflows of insurance agencies and brokerages described above. Core insurance agency accounting functions, including commissions received, premiums collected, payables to carriers, and general-ledger-related reconciliation, flow through or are recorded in the AMS. AMSs

permit insurance agencies and brokerages to tailor their ecosystems by adding additional functionalities through third-party integrations. For example, agencies and brokerages can integrate third-party software to assist with data intake, quoting, and sales. And AMSs also connect to data hubs, such as IVANS, that enable carrier-to-agency data exchange.

21. Applied and other providers of AMSs sell these platforms to insurance agencies and brokerages throughout the United States. The especially complex needs of large, "enterprise-level" insurance agencies and brokerages—which may manage tens of thousands to even millions of policies—require enterprise-level insurance AMSs that can efficiently and reliably process the scale of their businesses. Compared with smaller insurance agencies and brokerages, which may be able to manage their business without such sophisticated insurance AMSs, enterprise-level insurance agencies and brokerages effectively have no choice but to use them.

22. The market for enterprise-level insurance AMSs is one of the two relevant product markets for this antitrust lawsuit.

23. Although many large companies in industries other than insurance employ commonly used business software, such as customer relationship management ("CRM") software (e.g., Salesforce) and enterprise resource planning software (e.g., Oracle NetSuite) to manage their day-to-day operations, these industry-agnostic platforms do not adequately support the needs of the insurance agency and brokerage industry, which has bespoke needs for commission tracking, policy-level invoicing, claims processing, and carrier connectivity. These platforms therefore are not reasonable substitutes for an enterprise-level insurance AMS, a fact that is well-recognized throughout the insurance industry.

24. Enterprise-level AMSs are distinguished from smaller-agency products by their ability to handle high transaction volumes, multi-entity structures, complex carrier relationships, and accounting complexity that is characteristic of large agencies and brokerages. Applied's own product strategy reflects this distinction: Epic is Applied's mid-size and enterprise-grade AMS, while EzLynx serves smaller agencies and is not a meaningfully competitive alternative for the enterprise agencies and brokerages that are Epic's primary market.

25. There are no interchangeable substitutes for enterprise-level insurance AMSs. Ostensible alternatives like CRM software, enterprise resource planning software, or smaller-agency products are not meaningful substitutes for enterprise-level insurance AMSs because they do not supply the majority of the functionalities offered by enterprise AMSs. Insurance agencies and brokerages thus would not turn to them for the same essential purposes for which they rely on enterprise-level insurance AMSs.

26. Applied's Epic is the dominant enterprise AMS in the United States. Applied has provided insurance AMSs to enterprise-level agencies and brokerages for more than forty years and boasts that "more agencies are leveraging an Applied agency management system than any other system among the largest agencies in the U.S." Aside from Applied, the only other meaningful participant in the relevant market is Vertafore. But Applied is the undisputed market leader, and no competing AMS constrains Applied's conduct in the enterprise segment.

27. Demand in the enterprise AMS market is highly inelastic, meaning that customers are unlikely to respond to an increase in price by deciding to forgo purchasing an enterprise-level insurance AMS product altogether, because the switching costs of transitioning from one insurance AMS to another are prohibitive. Enterprise-level insurance agencies and brokerages cannot operate without an AMS, and they cannot readily switch from one AMS to another in

response to price increases, degraded terms, or reduced interoperability. Migrating from one AMS to another requires years of planning, millions (if not tens of millions) of dollars in implementation costs, and significant operational risk related to the complexity of implementation, training, data migration, and workflow integration. As three separate customers have explained:

**"Moving away from an agency management system takes years."**

**"It's not like we could replace our agency management system."**

**"Obviously they've [Applied] got the stranglehold on the industry."**

Thus, the enterprise-level insurance AMS market is not a market that a customer is likely to enter and/or exit lightly, meaning agencies and brokerages typically must bear any price increases to insurance AMS services.

28. Because of the unique benefits of insurance AMSs and their low substitutability with other products, a hypothetical monopolist of enterprise-level insurance AMS platforms could profitably implement a small but significant, non-transitory increase in price ("SSNIP") because customers would not switch to other types of products in sufficient numbers to make the increase unprofitable. Indeed, Applied (an actual monopolist) has exercised its monopoly power to profitably charge excessive prices and fees on a sustained basis.

29. The enterprise AMS market poses significant barriers to entry. Developing a competitive insurance AMS requires amassing specialized engineering talent, significant capital, and deep industry-specific knowledge. Moreover, beyond the costs of building a competitive product, new entrants must overcome the prohibitive switching costs that lock existing customers into their current AMS. These barriers prevent nascent competitors from challenging Applied's established incumbency.

30. The relevant geographic market is the United States. U.S. insurance operations depend on U.S.-specific regulatory requirements, carrier data standards, and workflow needs that differ materially from other national markets.

### B. The Relevant Market for Enterprise-Level Automated Insurance Agency Accounting Software

31. Of the many functions that insurance agencies and brokerages perform as intermediaries, one of the most important is reconciling carrier commissions and payable statements to ensure that policyholders correctly pay for their insurance policies, and to ensure that insurance carriers (and agencies and brokerages) are correctly paid for the coverage (and services) they provide.

32. The complexity of this task stems from how different carriers bill their customers. Through the "direct billing" model, an insurance carrier bills the policyholder directly, collects the payment from the customer, then remits a commission to the insurance agency afterward. In comparison, through the "agency billing" model, the insurance agency bills the policyholder on behalf of the carrier, collects payment from the policyholder, deducts its commission from the payment, then pays the balance (*i.e.*, the premium) to the carrier. Insurance agencies must conduct this accounting reconciliation for each of the policies they administer.

33. Historically, this accounting function was performed manually by insurance agency and brokerage finance teams that expended significant time and expense manually entering and reconciling carrier bills. But with the advent of AI-powered automation, this task has been rapidly transformed, replacing finance teams with significantly more time- and cost-efficient software.

34. This market for enterprise-level automated insurance agency accounting software ("insurance accounting automation software") is the second of two relevant product markets for this antitrust lawsuit.

35. Insurance accounting automation software is distinct from insurance AMSs. An AMS is the operational system that houses an agency's policies, clients, and transactions, whereas accounting automation software is a separate application layer that processes, reconciles, matches, and posts the financial transactions those records generate, including cash application, payables processing, direct-bill reconciliation, agency-bill reconciliation, and general-ledger posting. Enterprise customers use the two together in a complementary relationship. Customers can use an AMS without accounting automation software, but they cannot use accounting automation software without an AMS with which to interoperate. Accounting automation software does not—and cannot—replace the vast majority of an AMS's functions.

36. Applied itself recognizes this distinction. In February 2023, Brian Giometti, Applied's Senior Vice President of Corporate Development, told Comulate's CEO, Jordan Katz, that Applied was "probably more open to partnership" because Applied "get[ing] smart on everything [Comulate is] doing and go try[ing] to do it ourselves" would take "years," as a product like Comulate was not "anywhere remotely near on [Applied's] roadmap." On July 1, 2025, Chase Petrey, the President of Applied Pay and Applied Recon, identified the same distinct market with specificity, ranking competitors within it. Petrey stated that Comulate is the "category winner" in direct bill reconciliation, is "the dominant player," and "understands the problem statement at a very different level than others in the space." Petrey likewise dismissed another arguable competitor, Ascend, as a "premium finance company" at its core, and described

Eventual Treasury, another accounting automation software company, as "early" and "not nearly as tight on the problem statement."

37. Applied's own conduct independently confirms the existence of the accounting automation software market as a distinct market. Applied built a separate product (Recon) to compete in this market, assigned a dedicated general manager to oversee it, marketed it through separate sales cycles, and priced it independently of Epic. Applied's controlling stockholder, Hellman & Friedman, conducted an internal competitive analysis of firms operating in this market and ranked Comulate as the primary competitive threat. And in their "Limited Referral Agreement," discussed herein, Applied and Ascend defined this market by reference to "automated reconciliation software."

38. In fact, Comulate created the accounting automation software market. Comulate was the first mover, rolling out its direct billing automation product to paying customers in September 2022 and its agency billing product by January 2024. Neither product competed with any Applied product at the time of its development or launch. Comulate's product is compatible with Epic, as well as with Vertafore and other insurance AMSs. Upon information and belief, as of November 2025, between 65% and 75% of large insurance agencies and brokerages that use accounting automation software use Comulate.

39. At the time of this lawsuit, Ascend and Applied are the only other companies besides Comulate selling such software at a meaningful scale. Eventual Treasury and SimplePin are newer entrants that also market such products, but as of 2025, neither held a material share of this market.

40. Comulate's capabilities are not easily replicated. Comulate supports any statement type, including scanned PDFs, carrier portal downloads, mailed checks, and electronic

downloads, and it regularly processes nearly 20,000 distinct statement formats. Comulate provides transaction type mapping, advanced reconciliation logic, full cash application workflows, direct bank integrations, automated receipt adjustments, passthrough processing, cash-to-production automation, and workload management. Whereas Comulate eliminates entire functions and fundamentally transforms how a finance team operates, no other product on the market automates at a comparable breadth or depth.

41. Applied's Senior Vice President of Corporate Development, Giometti, recognized this in February 2023 when he acknowledged building comparable functionality would take Applied "years" and asked "[y]ou don't have a competitor out there, right? . . . I haven't seen anyone who's doing this . . . is there anyone here who's, like, remotely doing anything like this or solving the specific pain point? I don't think so." Giometti—responsible for identifying competitive threats and acquisition targets for Applied—was aware of zero firms offering what Comulate offered at that time. Giometti's statement was echoed in July 2025, when Petrey identified the same distinct market and discussed Applied's progress in creating a separate product to compete within it. These statements further confirm that insurance accounting automation software is a recognized, distinct market.

42. Manual processing and offshore services are not reasonable substitutes for accounting automation software. Enterprise-level insurance agencies require software capable of handling large transaction volumes with greater speed, accuracy, auditability, and consistency than manual entry can provide. As one customer explained, Comulate eliminates the need for manual "data entry, formatting spreadsheets, VLOOKUP macro-powered workbooks, copy and pasting, or manual reconciliation." Comulate customers report that their "direct bill revenue processes become 90% faster." As one customer explained, its accounting team "would most

likely resign immediately" if asked to revert to the manual reconciliation process Comulate replaced. Likewise, offshore services such as ResourcePro and Patra supply low-priced labor but cannot offer the same functionality, automation, integration, processing speed, accuracy, compliance, or operational control that accounting automation software provides.

43. General-purpose (*i.e.*, non-insurance-specific) accounting software also is not substitutable for insurance accounting automation software, as the unique accounting parameters of the insurance industry and insurance policies necessitate specialized accounting software. For example, general-purpose accounting software does not address insurance-specific reconciliation logic, carrier commission statements, or AMS-integrated workflows, instead providing generalized assistance with conventional bookkeeping functions.

44. Customer behavior confirms that there is little to no cross elasticity of demand between insurance-specialized accounting automation software and manual processing, offshore services, or general-purpose accounting software. When Applied forced customers off of Comulate, customers considered (and have been coerced into migrating to) only Ascend and Recon, not other potential alternatives.

45. Because of the unique benefits of insurance accounting automation software and its low substitutability, a hypothetical monopolist could profitably implement a SSNIP. Insurance agencies and brokerages, confronted with a SSNIP by a hypothetical monopolist, would not revert to manual accounting or migrate to generalized accounting software but would rather suffer the price increase.

46. The accounting automation software market has low demand elasticity, given that billing and reconciliation are essential business functions for insurance agencies and brokerages.

Thus, customers are unlikely to respond to an increase in the price of accounting automation software products by forgoing the product, as they cannot do without these services.

47. This market includes software products that automate enterprise insurance accounting workflows whether sold for use with Epic or other enterprise AMSs. But because Epic customers comprise the overwhelming majority of enterprise agencies and brokerages, and because those customers are locked into Epic on commercially relevant timelines, the Epic-dependent portion of this market is economically critical. Any provider serving Epic-integrated agencies must obtain effective Epic interoperability, access to carrier and commission data, and access to the principal commercial channels through which Epic customers evaluate vendors. Applied controls those rails. That control is the mechanism through which Applied leverages its AMS monopoly to foreclose competition in the adjacent accounting automation software market.

48. The relevant geographic market is the United States. The U.S. insurance accounting automation market differs from other global markets because U.S. insurance accounting regulations, carrier data standards, and commission structures differ significantly from those of other countries.

## V. APPLIED'S MONOPOLY POWER AND CONTROL OF THE INFRASTRUCTURE ON WHICH THIRD-PARTY VENDORS DEPEND

### A. Applied Possesses Monopoly Power in Enterprise AMSs

49. Applied possesses monopoly power—the power to raise prices, restrict output, and exclude competition—in the relevant market for enterprise-level insurance AMS. Among enterprise-level brokerages, Epic is the AMS used by more than 81% of the market. Reagan Consulting Best Practices Study data, which Applied itself has relied upon in court filings, shows that Epic's share among enterprise agencies ranges from 61.1% to 92.3% by revenue tier, reaching 92.3% for agencies with more than $100 million in annual revenue. Eight of the ten

largest insurance brokerages use Epic. Applied itself has described Epic as the "world's most widely used insurance agency management system" for mid-size and enterprise agencies.[14]

50. Applied's EBITDA margins[15] are consistently between 45% and 55%, more than double the 18% to 26% average for public vertical Software as a Service (SaaS) companies. Enterprise customers face prohibitive switching costs measured in years of planning and millions of dollars. Applied's ability to sustain supracompetitive margins while excluding competitors and degrading customer choice is direct evidence of Applied's monopoly power.

51. Applied's ability to exclude competition in the U.S. market for enterprise-level insurance AMSs is further evidence of its monopoly power. As explained below, Applied has used its control over the Epic software development kit ("SDK"), IVANS, and Applied Client Network as tools of exclusion and to throttle competition. A participant in a competitive market could not successfully implement such practices—widely despised by customers whose choices are limited by them—without jeopardizing its market share. The fact that Applied has been able to maintain such high market share while openly throttling competition and limiting customer choice demonstrates that Applied has the power to raise prices, restrict output, and exclude competition.

[14] Even if the relevant market were defined as all insurance agency management systems, Applied still would possess monopoly power therein. As recently as 2025, Epic was used by more than 60% of all insurance agencies and brokerages with annual revenues exceeding $10 million and was used by a substantial proportion of agencies and brokerages with annual revenues greater than $1.25 million.

[15] Earnings before interest, taxes, depreciation, and amortization, abbreviated as "EBITDA," is a commonly used measure of a company's profitability.

### B. Applied Uses the SDK to Transfer Monopoly Power in Enterprise AMSs to Adjacent Markets

52. Applied leverages its monopoly power in enterprise AMSs to give itself power over adjacent products that must interoperate with Epic to be commercially viable. Control over the mechanisms by which third-party products interoperate with Epic translates directly into competitive power in adjacent markets, including the market for insurance accounting automation software.

53. The Epic SDK is the primary mechanism through which third-party applications read and write data to and from an Epic customer's environment. Applied provides the SDK to enable "developers to access the Applied Epic database from their own code." For independent software providers seeking to interoperate with a customer's instance of Epic, the SDK is the principal operational gate inside the platform.

54. As described further herein, until approximately 2025 Applied marketed Epic as an open and interoperable platform and invited developers to create software that would work with Epic. As one aspect of this initiative, Applied committed to releasing modern application-programming interfaces ("APIs") that third-party developers could use to facilitate their products' interoperability with Epic. But Applied never delivered the modern APIs it promised, forcing customers and third-party developers to rely on the SDK as the sole means of integrating other applications with a customer's Epic environment. There is no practical substitute for the SDK for real-time Epic data integration by independent applications.

55. Applied licenses the SDK to Epic customers. When an Epic customer wishes to use a third-party application alongside Epic, the customer must purchase an SDK license from Applied and pay both upfront and ongoing monthly fees. Applied charges a lower upfront price for a "runtime" SDK, intended for use with existing solutions, and a substantially higher upfront

price for a "developer" SDK, designated for custom integrations. The functional distinction between the two is not meaningful, as both offer substantially the same capabilities. Applied nevertheless has used these pricing tiers as a competitive lever, as described in detail below.

56. The SDK license functions as a tax on any customer that chooses to use a third-party product instead of, or in addition to, Applied's own offerings. Applied's own Senior Director of Partnerships described requiring customers to pay an SDK license on top of other fees as "the shittiest way ever to build the partnerships" and characterized the fee structure as "triple dipping." Applied maintains this system because, as a monopolist, it can, and because it disadvantages potential competitors. Granting SDK access requires trivial effort from Applied, yet Applied charges many customers tens of thousands of dollars in annual SDK fees per integration.

57. By design, Applied does not impose these constraints on its own products. Recon, which competes directly with Comulate in enterprise-level accounting automation, accesses Epic's underlying database natively. Recon does not require an SDK license, does not operate through the same access restrictions imposed on SDK-based integrations, and reaches data fields, methods, and endpoints that Applied does not make available to third parties through the SDK.

**C. Applied Uses IVANS, the Industry's Data Network, as a Means to Monopolize**

58. Applied also owns IVANS, the insurance industry's principal carrier-to-agency data exchange network. In 1984, a consortium of insurance carriers and industry participants founded Insurance Value Added Network Services ("IVANS") to provide essential data-exchange infrastructure, including carrier-to-agency policy data, claims data, and commission statements data. Commission statements data, which tracks the commissions earned by

insurance agencies and brokerages (and paid by insurance carriers) for these intermediaries' services to policyholders and carriers, is especially vital for insurance accounting automation.

59. Today, no insurance AMS can function without IVANS connectivity, and no meaningful alternative exists for carrier-to-agency data exchange. From its founding until 2013, when Applied acquired control of it, IVANS operated as an open platform available to all industry participants on equal terms.

60. Applied's 2013 acquisition of IVANS's property and casualty division raised immediate alarms, as industry participants recognized that Applied would now control the infrastructure on which Applied's competitors depended. To allay these concerns, Applied publicly committed to maintain IVANS as an "open platform." But six months later, Applied was itself acquired by private equity firm Hellman & Friedman for $1.8 billion, and Applied has since reneged on its commitment to IVANS's openness.

61. Applied carefully controls IVANS access. Agencies cannot receive carrier data without an IVANS mailbox, the designated endpoint through which carriers transmit policy, claims, and commission data to an agency, and an IVANS mailbox requires affiliation with a certified AMS: "You can't just not have an AMS . . . . [A] mailbox . . . has to be affiliated with one of our certified AMS." Rob Marinello, Applied's IVANS Director of Partnerships, admitted that the one-mailbox-to-one-certified-AMS restriction is "more of a decision" than a technical necessity and exists to "protect the AMSs." Indeed, D.J. Wischmeyer, Applied's IVANS Director of Technology Partnerships, separately confirmed that routing IVANS data to multiple vendors simultaneously, such as a CRM or even more than one AMS, is technically feasible. Applied maintains the restriction to entrench the AMS as the mandatory gateway for carrier data, forcing any firm that depends on that data to go through Applied. Applied controls the

certification process and its outcome, meaning entry into any market that depends on carrier-to-agency data flows requires Applied's permission at the infrastructure level.

62. Applied's own IVANS personnel recognized the one-mailbox restriction as unjustified and advocated internally for its relaxation. Marinello stated: "I personally and some of my peers have been pushing to have a little more openness and sharing of this data." Marinello explained that IVANS was exploring whether to allow third parties to receive specific data types, such as claims data, separately from the AMS. But Applied's leadership overruled those efforts. On information and belief, the one-mailbox restriction persists not because IVANS's infrastructure team believes it serves a legitimate purpose but because Applied's leadership has determined that the restriction protects Applied's competitive position.

63. For those entities that do obtain IVANS access, Applied uses IVANS to extract fees and preserve leverage. A former IVANS executive described IVANS under Applied's control as having "a very bad reputation of being the extractor," characterizing it as "just raising prices because they could" while "giving [customers] the same technology and not enhancing it." IVANS licenses run for only one year and may be terminated on 60-to-120 days' notice. And anti-assignment clauses give Applied the unilateral power to terminate access if an IVANS user is acquired by any "direct competitor of Applied Systems."

64. Applied uses IVANS gatekeeping not to protect a legitimate technical distinction but to prevent platforms outside the AMS category from accessing the carrier data they would need to compete with Epic. Even Vertafore, Applied's main competitor in the U.S. insurance AMS market, does not regard its access as secure. A top Vertafore executive acknowledged concern that Applied could cut off their IVANS connectivity. Applied's access decisions track competitive threat level and economic self-interest, not any consistent commitment to openness.

65. Applied's control over IVANS gives it a second gate through which it can impose costs, delays, and denials on independent competitors while sparing its own products those same burdens.

**D. Applied Controls the Putatively Independent Applied Client Network to Restrict Third Parties from Marketing to Epic Customers**

66. Applied controls a third infrastructure gate: the Applied Client Network ("ACN"). In 1985, users of Applied products formed the National User Group of Applied Systems ("NUGAS"), an independent, user-run organization. NUGAS established, and for many years operated, "TENCon," the segment's primary annual conference and the most concentrated sales opportunity of the year for vendors selling products that integrate with Epic. The organization also operated local, online, and offline communities of insurance professionals using products made by Applied.

67. Like IVANS, ACN was founded as independent, neutral industry infrastructure and was later brought under Applied's control. Between 2011 and 2014, Applied moved to absorb and take greater control of NUGAS, which had already undergone a name change to "ASCnet." In 2011, Applied relocated ACN's headquarters from Altamonte Springs, Florida to Illinois, where it now occupies an office in Chicago eight minutes from Applied's own headquarters. The annual conference was rebranded from "TENCon" to "Applied Net" in 2014, and the organization renamed itself "Applied Client Network."

68. ACN manages sponsorship and exhibitors at the annual Applied Net conference. However, Emily Marxer of ACN confirmed that "every single group who exhibits or sponsors is run past Brian [Giometti]" of Applied and that Giometti "has to give the final approvals on that list of individual companies." Applied's stated policy, as Marxer explained, is that Applied does

not "really want anyone with high overlapping offerings within their products and services" at Applied Net. In other words, Applied controls ACN and Applied Net.

69. Applied's control extends beyond vendor access to Applied Net. According to customers, Applied has censored or hidden posts on the user forum that ACN operates, removing content that references competing products Applied is hostile to or that reflects negatively on Applied. ACN members pay for access to the forum and reasonably believe it to be an independent industry community. But Applied in practice uses the forum as an additional channel through which to suppress information about competitors and increase customers' lock-in.

70. Applied's competitive determinations are delivered through ACN's voice. When [redacted], a carrier connectivity provider, sought access to ACN, ACN told [redacted] that Applied had "deemed [redacted] competitive with IVANS" and that Applied had "a preferred carrier connectivity relationship with IVANS so they focus their marketing efforts there."

71. ACN presents itself as a 501(c)(6) non-profit in its commercial sponsorship contracts, holding itself out as an independent industry organization. On information and belief, it appears that ACN never obtained tax-exempt status from the IRS under any name, employer identification number, or predecessor entity.[16] The 501(c)(6) label suggests independence that Applied exploits when ACN's vendor decisions are challenged.

**E. Applied Uses Each of These Levers as Barriers Against Competition**

[16] ACN's EIN (45-4696497) is absent from the IRS Tax Exempt Organization Search, the Exempt Organizations Business Master File, and the IRS Auto-Revocation List. A March 4, 2026 call to the IRS confirmed there is "no record of an approved application" for ACN's tax-exempt status.

72. Applied leverages its control over the SDK, IVANS, and ACN to impose barriers against competition in the market for insurance accounting automation software. Any firm seeking to integrate with, sell to, or compete for Epic customers needs to traverse one or more of Applied's gates: effective interoperability inside Epic, access to required IVANS carrier-to-agency transmission data, and efficient access to the concentrated Epic customer base through ACN.

73. Those barriers are not ordinary market frictions. They are bottlenecks that Applied created, owns, and administers. Applied can tighten or loosen each gate through architectural design choices that create dependency, discretionary access and pricing decisions, contractual and procedural conditions imposed on those with access, and direct pressure on customers.

74. Applied's control over IVANS provides a prime example of the pattern. When Comulate requested a standard IVANS API Agreement in December 2023, IVANS's initial response was that there was no "viable opportunity for a partnership." Only after Comulate pushed back repeatedly did IVANS engage. What followed was six weeks of procedural delay across eight follow-ups: IVANS blamed its legal team, promised documents "early next week," explained it needed to "jump through a few hoops" to get approval, and claimed the agreement was legal's "highest priority today" before finally producing it 46 days after the initial request.

75. [redacted], an insurance operating system [redacted], fared worse. [redacted] began the IVANS contracting process in early 2024. Applied took months to respond to redlines, repeatedly deferred next steps, and after nearly six months went silent without ever returning a response. TechCanary, a competing AMS, had to bring legal pressure just to clear the path to IVANS access. Applied then acquired

TechCanary for $80 million and promptly shut it down. Acturis, Applied's principal global competitor, has been trying to obtain IVANS connectivity for years. Applied has overtly blocked its entry into the U.S. market. In each case, Applied used its administrative control over IVANS to set the pace, the price, and ultimately the outcome of competitive entry.

## VI. APPLIED MARKETED EPIC AS OPEN AND INVITED THIRD-PARTY INTEROPERABILITY

### A. From 2021 to 2025, Applied Represented That Epic Would Operate as an Open and Interoperable Platform

76. Before Applied began restricting Comulate and other independent vendors, Applied affirmatively marketed Epic as the foundation for an ecosystem of third-party applications that customers could choose and combine to meet their operational needs. Applied maintained a Developer Center and published SDK materials as the mechanism through which developers could build applications that interoperated with Epic, describing those resources as a "comprehensive environment to explore available APIs, understand their capabilities, [and] generate credentials to connect your apps." Applied thus invited third-party developers to invest in Epic interoperability, developing tools and products that would improve end-customers' overall experience, thereby improving the quality and robustness of Epic's service offerings.

77. On August 23, 2021, Applied announced that the latest version of Epic featured a "[n]ew, open architecture" that would "enable greater choice, flexibility and operational efficiency" and give customers "choice for how to build in and around Applied Epic." Applied proclaimed that Epic's "open, API-based architecture" would "enable[] easier data exchange in and out of the platform" so that customers and third parties would have "the flexibility to build the tech stack that is right for their business[es]." Applied described this as a "company transformation," as "closed business models [we]re a thing of the past," and emphasized that customers could "be in control of [their] own tech destiny."

78. Applied advertised the "Open Architecture" of Epic on its website, illustrating how applications developed by Applied would stand on an equal footing with third-party applications within the Epic ecosystem. Applied demonstrated this visually in its public-facing materials, depicting "Applied Applications" and "Third Party Applications" as having the same level of access within Epic.

79. This "Open Approach" was a central pillar of Applied's promotion of Epic. Until recent months, Applied's main webpage touted Applied's "Open Approach" as the first pillar of the corporate philosophy that made up "the Applied Difference." Applied used this messaging consistently, defining Epic as a "technology foundation" using a "standard, open, and secure cloud-native architecture" so that customers could "easily integrate [Epic] with the partners you choose as part of your tech stack."

### B. Customers and Developers Invested in Building Software to be Interoperable with Epic in Reliance on Applied's Open-Platform Representations

80. Applied's open-platform representations mattered to enterprise agencies and brokerages deciding whether to adopt or remain on Epic. Brokerages adopted Epic not just for its core capabilities but because they believed they could use Epic as the foundation for a market of innovative and flexible third-party integrated solutions that met their individual needs. As one customer explained, "[t]hese representations were a material factor in our decision to invest in Epic and to select integrated partners like Comulate." And developers like Comulate reasonably believed they would be allowed to compete fairly to sell products developed on top of the Epic platform.

81. Enterprise customers paid substantial licensing fees, invested years in implementation, and organized their operations around Epic's architecture, in part because Applied represented that Epic would support an open ecosystem of complementary applications.

That expectation was especially important because Epic customers are highly locked in. Customers who adopted Epic in reliance on Applied's promises of openness reasonably understood they would be able to build and maintain a technology stack around Epic without later being forced into Applied-controlled replacements. Multiple Comulate customers later described the bind Applied's about-face put them in: they could not move away from Epic on any commercially realistic timeline but had lost their ability to choose complementary software they had come to rely on. Applied has significant leverage over its Epic customers because it can terminate a third-party integration much more easily than a customer can replace its insurance AMS.

82. Despite its market dominance as a platform, Epic lacked certain functionality that customers desired. In 2022, Epic had limited automation in its accounting module, meaning that customers were forced to manually perform much of their own accounting work, with the largest brokerages relying on hundreds of people to complete manual accounting tasks.

83. Comulate relied on Applied's open-platform representations to meet the unmet customer demand for a product that would complement Epic and supply this accounting automation functionality. Beginning in 2022, Comulate invested substantial capital, engineering time, and product-development effort to build enterprise accounting automation software designed to interoperate with Epic and other AMSs. Applied's own conduct reinforced that reliance. Applied facilitated Comulate's introduction to the Epic SDK, directed Comulate to publicly available resources, provided direct SDK access for integration work, and did not object to Comulate's use of customer SDK access during 2022 and 2023.

### C. In 2025, Applied Reversed Its Open-Platform Philosophy

84. Between June 25 and July 7, 2025, Applied removed the "Open Approach" and related openness messaging from its website. In a harbinger of things to come, Applied replaced its "open" platform messaging with "AI-Powered Insurance" messaging, touting itself as a "vertical market specialist":




85. Applied's removal of its open-platform messaging did not undo Epic customers' expectations and third-party applications' investment based on Applied's prior representations. But the reversal did mark Applied's departure from its open-platform approach, through which Applied built and consolidated its monopoly power in the insurance AMS market.

## VII. APPLIED'S VOLUNTARY AND PROFITABLE COURSE OF DEALING WITH COMULATE

### A. In 2022 and 2023, with Applied's Knowledge and Encouragement, Comulate Developed Software to Be Interoperable with Epic

86. Comulate's relationship with Applied began in November 2022, when an early Comulate customer asked Comulate to integrate its product into the customer's Epic instance. The parties entered into a non-disclosure agreement on November 21, 2022. On December 1, 2022, a senior Applied employee sent Comulate public SDK documentation, access details, and an authentication key for a database named DE22_APPLIS1_DEMO. Applied facilitated Comulate's integration efforts, without requiring Comulate to sign any additional contracts.

87. Applied never objected to Comulate integrating with the Epic SDK, and at no time during this period did Applied require Comulate to agree to contractual restrictions in order to develop the Epic integration shared customers demanded. Applied and Comulate discussed Comulate's use of the Epic SDK on scores of occasions during 2023. Applied knew what Comulate was building, how it was building it, and which customers were using it. Applied did not ask Comulate to stop but rather consented to Comulate's expansion, providing services to Epic customers.

### B. Applied Recognized and Promoted Comulate as a Value-Add for its Customers

88. Applied's support for Comulate was not passive. In December 2022, Applied requested a product demonstration from Comulate, which Comulate delivered. Applied liked what it saw and pursued Comulate. On January 25, 2023, a senior Applied employee inquired about Comulate's long-term vision, including whether Comulate's team was interested in a strategic partnership or an acquisition. Katz responded that Comulate was not interested in being acquired, calling such discussions "premature."

89. After Comulate made clear that it was interested in a partnership rather than an acquisition, Applied's reaction suggested that it remained interested in proceeding in a partnership as well. That reaction was unsurprising: Comulate was a complementary product, and greater integration between Comulate and Applied would benefit Applied's existing customers and make Epic more attractive to the insurance agencies and brokerages not already using it. After one of Comulate's earliest demonstrations to Applied, in February 2023, Giometti told Katz: "[Y]our product showed very well."

90. Indeed, Comulate's user base exploded after its launch. Comulate identified a previously underappreciated problem that industry experts had called "critical," and insurance agencies and brokerages quickly realized the massive savings that could be achieved by using Comulate—to the ultimate benefit of policyholders.

91. Applied expressly identified Comulate as a value-add for its most important customer relationships. On March 3, 2023, Katz and Giometti held a conference call to discuss enhancing the companies' partnership. Giometti asked Comulate to provide its product to assist in the onboarding of Applied's largest customer, [redacted], which was in the early stages of adopting Epic as its AMS. Giometti acknowledged that bringing Comulate to [redacted] was a "value-add" and a "good solution" for [redacted].[17]

92. Beginning in February 2023, Applied and Comulate explored the financial relationship between the companies, evaluating revenue-sharing models to ensure a partnership would be operationally viable and strategically beneficial. The parties discussed a 5% revenue share, with Applied removing the requirement for clients to pay Applied for an SDK license to

[17] Nearly two-and-a-half years later, after much delay due to Applied's campaign of friction and exclusion against Comulate, [redacted] executed a Master Services Agreement with Comulate on November 5, 2025.

integrate with Comulate's software, a charge that customers considered part of Comulate's pricing.

93. While financial discussions were ongoing, Applied and Comulate had in-depth discussions regarding the technical aspects of Comulate's Epic integration, including data security, system compatibility, and workflow interoperability. Comulate demonstrated its direct billing automation product to Applied in December 2022, February 2023, and twice in June 2023. Katz personally demonstrated Comulate's agency billing product to Blackwell in November 2023 at Hellman & Friedman's office. Comulate demonstrated its agency billing product again at the Applied Net Conference in September 2024, where Applied employees personally observed it.

94. On April 25, 2023, Applied convened a meeting of eight employees spanning platform, product, and engineering, including two platform product managers, an application architect, a tech lead, and the team manager for Epic accounting, for the sole purpose of planning how to deepen Comulate's integration with Epic, in part to support [redacted]. John Hartigan, Applied's Director of Product Management, stated that [redacted] "ha[d] spreadsheets of larger than 10,000 and . . . w[as] not going to spend the money on Epic to increase the spreadsheet to, like, 20,000 rows . . . that's wh[y] [[redacted] was] looking at th[e] partnership" with an accounting automation provider. Hartigan described the integration as "the number one ask" for Applied's Customer Experience group and targeted Q3 2023 for roadmap inclusion.

95. Applied's platform product manager asked Comulate to provide detailed specifications of the data elements and filters Comulate needed so that Applied could "actually sit there and estimate" the engineering work required for [redacted]. No Applied employee suggested that Comulate's use of the SDK to integrate with Epic would be improper. Thus,

Applied was not merely aware of Comulate's Epic integration, it expressly invited Comulate to engage in cross-functional engineering to make Epic work better.

96. During this period, Applied did not treat Comulate as an unauthorized presence in the Epic ecosystem. Applied treated Comulate as a complementary product that could increase Epic's value to important customers. Applied's own in-house counsel later confirmed as much: in August 2024, while serving Comulate a frivolous cease-and-desist letter (later withdrawn), Applied's cover letter stated that "Applied Systems values its business relationship with Comulate."

### C. Applied Provided Comulate with Technical Cooperation to Allow Epic Interoperability

97. Comulate's team worked with Applied's engineers to address the technical aspects of integration, much of which centered on the Epic SDK. Most of Epic's third-party integrations rely on the SDK for both development and post-deployment operations.

98. In their discussions, Applied's engineers acknowledged that the SDK "doesn't work very well," including because it "breaks down for large updates." Applied's employees admitted that requiring customers and developers to rely on the SDK for day-to-day operations was a poor approach.

99. Comulate identified numerous potential improvements to the Epic SDK that would improve its functionality for customers using third-party integrations. Comulate highlighted the SDK's inability to grant differentiated levels of access to a given customer's data, which is customarily possible with modern APIs. Comulate also flagged gaps in functionality, such as problems with real-time updates to account information that made the SDK cumbersome and not readily scalable.

100. Applied's and Comulate's teams examined options to address the limitations of the SDK. Both teams agreed that a modern API-based integration would provide better security and scalability, and they discussed plans for Applied to build APIs for this purpose. In the interim, Comulate had no other option but to build integrations using the Epic SDK, with Applied providing technical support.

101. Thus, Applied knew that the SDK was the only integration mechanism available for Comulate, knew the SDK's limitations, agreed to build better alternatives, and supported Comulate's use of the SDK throughout this period.

102. The depth of Applied's technical support for Comulate's Epic integration was not superficial. On January 3, 2023, Comulate reported an urgent SDK issue to a leader at Applied. Within hours, Applied personnel were reviewing the issue and subsequently looped in Charlie Janik, a Senior Solutions Developer in Applied's Solution Services group. Janik then spent three days on the problem, ultimately determining that the issue had been caused by an undocumented gap in Applied's own SDK. Five Applied employees across three departments worked to troubleshoot the issue, all with the goal of enabling Comulate's SDK access.

103. Janik remained Comulate's primary Applied engineering contact for the next two years. Over that period, Applied's support personnel sent nearly 600 emails to Comulate's engineers, over hundreds of threads. During this time, Applied acknowledged at least eighteen SDK defects affecting Comulate's customers, working collaboratively with Comulate each time to resolve them. On at least one occasion, in March 2023, Janik escalated one of the defects to "Product leadership" to fix an issue that solely affected Comulate. The issue was handled as urgent on Applied's roadmap and implemented within weeks.

104. During this period, Applied did not identify Comulate's methods as unauthorized, objectionable, or inconsistent with Applied policy. Applied worked with Comulate on the practical mechanics of getting Comulate's product to function with Epic.

105. Applied's cooperation extended beyond the SDK. In June 2023, Applied's Platform Product Manager circulated formal requirements for a plan Applied titled "Comulate Enablement at Applied Data Lake" and assisted with the Data Lake environments for multiple Comulate customers. In written feedback, Comulate noted that the Data Lake "will be very important for us to serve large Epic customers, such as [redacted] and [redacted], where the SDK breaks down." Applied dedicated data infrastructure for Comulate's use, under a plan that bore Comulate's name, knowing its own SDK's limitations made that infrastructure necessary.

### D. Applied Promised Comulate Dedicated Development and Testing Access but Failed to Provide It

106. Applied initiated and drafted a Pilot Agreement (the "POC Agreement") to give Comulate its own access to a dedicated test environment, including an Epic SDK. On May 25, 2023, the parties signed the POC Agreement. Through it, Applied promised to grant Comulate its own license to access a sandbox environment to facilitate Comulate's development and testing of its product outside its customers' SDK environments.

107. Applied did not provide the promised environment. Once the POC Agreement was signed, Comulate followed up about getting access repeatedly over the course of several months. When Comulate first asked about getting access on June 14, 2023, Applied replied that it would "get this moving." That was not true. Despite Comulate following up on July 6, August 8, and August 14, Applied was radio silent. In the August 14 follow-up, Comulate specifically told Applied that Comulate needed access to demonstrate to a potential customer

how Comulate works within the Epic ecosystem. Applied never provided the access that Comulate was entitled to under the POC Agreement.

108. Applied's failure to provide the promised test environment left Comulate with no other choice but to continue using the Epic SDK through Comulate's and Applied's joint customers, the same customer-side SDK arrangements that Applied had previously facilitated and from which Applied continued to collect SDK-related revenues.

### E. Applied Profited from Comulate-Related SDK and Data-Access Arrangements

109. Applied's course of dealing with Comulate and its customers was profitable to Applied. Comulate works on top of separately purchased AMSs. To integrate Comulate's product with Epic, Comulate customers need access to the Epic SDK from Applied, which processes SDK proposals and work orders and collects upfront and recurring fees charged to shared customers. Applied earns thousands or tens of thousands of dollars off of each customer arrangement per year.[18] Applied also collects revenue from Data Lake access required for Comulate's deeper accounting automation functionalities, which ranges from $[redacted] annually per shared customer, depending on the volume of data accessed.[19] Many shared customers purchased the SDK and Data Lake licenses from Applied for the sole purpose of using Comulate's product, thus making the revenue directly attributable to Comulate's presence on the

---

[18] Applied's own November 2024 email to [redacted] quoted the Runtime SDK at [redacted] upfront and [redacted] per month, or approximately [redacted] in annual recurring fees per shared customer. The Developer SDK that Applied later required for Comulate integrations carried a [redacted] upfront fee, a [redacted] increase, with ongoing monthly charges on top.

[19] Due to Applied's business choices about which categories of IVANS carrier-to-agency data to make available through Epic, IVANS commission statement data is not available through the SDK. Rather, for an insurance agency or brokerage—or for a third-party vendor integrated with Epic through the SDK—to access such data, the customer must purchase an additional "Data Lake subscription."

Epic platform. Applied's profitable course of dealing was accelerating as a result of the joint efforts integrating Comulate and Epic and the rapid growth of Comulate's customer base.

110. Even without a formal partnership, Comulate continued to grow, ultimately bringing in hundreds of thousands of dollars of revenue for Applied through SDK and Data Lake fees.

111. Applied also maintained an internal list of integrations that identified third-party vendors whose integrations qualified for the less expensive runtime SDK tier. Comulate was on that list. Customers seeking to integrate Comulate with Epic were quoted runtime SDK pricing because Applied had affirmatively authorized Comulate at that level and included it on an internal list to this effect. Applied's later removal of Comulate from that list, as described below, was the mechanism through which Applied escalated SDK costs for Comulate's customers.

112. Applied's later decision to abandon this course of dealing, impose Comulate-specific restrictions, and foreclose Comulate from Epic customers was a departure from its prior conduct. For years, Applied supported Comulate's integration, recognized Comulate as complementary to Epic, used Comulate as a value-add for its most important customers, and profited from the arrangement.

## VIII. APPLIED'S FAILED ACQUISITION ATTEMPTS AND REVERSAL OF ITS PRIOR COURSE OF DEALING

### A. In 2023, Applied's Interest in Partnering with Comulate Shifted to Interest in Acquiring Comulate

113. Applied's interest in Comulate as an acquisition target began well before its later exclusionary campaign. As noted above, Comulate declined Applied's entreaties in January 2023 regarding a potential acquisition, though Comulate "remained interested" in a genuine commercial partnership. Through the first half of 2023, Applied continued engaging with

Comulate technically and commercially, facilitated integration access for joint customers, and discussed partnership structures while also exploring whether Comulate could be brought more closely under Applied's control.

114. In June 2023, after months of technical cooperation, Comulate delivered two highly successful product demonstrations that showcased its integration with Epic, highlighting Comulate's real-time data synchronization and automation features. Approximately one dozen Applied employees attended the June 2023 demonstrations, which were also recorded and subsequently viewed by Applied's President, Graham Blackwell, who was and still is responsible for mergers and acquisitions.

115. Applied was impressed. But following the successful demonstrations, Applied wanted to own the capabilities it saw. Applied understood that Comulate was offering AI-driven automation functionality that Applied was not offering and would take years to develop in-house. As Giometti had explained months earlier: "It's sort of like how long you think it [will] take [Applied] to, like, get smart on everything you're doing and go try and do it ourselves, right? And like, [Applied would] actually have to execute it. I mean, that's like you're years away, you know, from being realistic."

116. So rather than partner with Comulate, Applied again began pursuing an acquisition. During a June 15, 2023 call between Katz, Blackwell, and Giometti, Applied made clear it viewed Comulate as a target, not a partner. Applied congratulated Comulate on its success and conveyed that Applied wanted to acquire Comulate. Comulate declined, as its enterprise value was set to increase significantly due to the company's strong growth as an independent business.

117. After Comulate's refusal, Applied killed the pilot project and put a formal partnership agreement on ice. When the parties finally resumed partnership discussions in September 2023, Applied demanded revenue shares of up to 30%, far beyond the 5% to 10% the parties had originally discussed.

118. In late 2023, Applied and Comulate had several meetings during which Applied emphasized that any partnership with Comulate would be in furtherance of a later acquisition. On December 20, 2023, Blackwell met with Katz and proposed an immediate acquisition. Blackwell's offer was a short-term "partnership" that would have required Comulate to enter into an exclusivity agreement with Applied to create "a degree of integration that [the parties would not] replicate with others in the market." The exclusivity agreement would have restricted the features and functionality that Comulate could offer to competing AMS providers and would have granted Applied a right of first refusal to purchase Comulate at a predetermined price once Comulate achieved a certain revenue mark.

119. Blackwell was explicit about the alternative and the economics. He framed the question as binary: "The question is, is it with Comulate with high certainty or is it, if not, we need to go build it." He also identified the valuation constraint: "Would [redacted] for a company that goes from [redacted] in twelve months? Yeah, maybe. Will we pay [redacted] . . . I don't think so." To Applied, partnership without an acquisition path was nonviable, meaning Applied would "just have to go build" the desired capability.

120. Applied's own Senior Director of Partnerships admitted that the acquisition attempt failed not because Applied lacked interest but because of board constraints: "I don't think he would get the approval from the board to spend what it would take . . . ."

121. Blackwell flatly rejected a non-acquisition-focused partnership with Comulate, calling it "hard for [Applied] to wrap our head around." Applied made its partnership doctrine clear: any third-party provider in accounting automation would either submit to exclusivity with a right of first refusal or Applied would "charge ahead" and build one itself. What Blackwell did not say—and would become clear only as Applied's monopolistic misconduct unfolded—is that "charging ahead" also meant Applied using its monopoly power and infrastructure control to clear the field.

**B. Comulate Refused to Sell or Submit to Exclusivity**

122. In January 2024, Comulate formally rejected Applied's exclusivity and right-of-first-refusal proposal, the latest idea Blackwell pitched the prior month. As discussed further below, Applied's exclusionary campaign began immediately thereafter with Applied probing whether it could force a Comulate customer onto the more expensive Developer SDK.

123. Comulate's refusal was not a rejection of commercial cooperation. Given Applied's dominance in the AMS market, Comulate had no choice but to remain on friendly terms with Applied, and Comulate remained interested in pursuing a genuine partnership between the two entities. But every "partnership" option that Applied offered required Comulate to submit to exclusivity, restrict the features Comulate could offer to customers of competing AMS platforms, or grant Applied a right of first refusal. Comulate kept declining these overtures because accepting them would have ended Comulate's independence.

124. Applied nevertheless treated Comulate's refusal as a turning point.

### C. In 2024, After Failing to Acquire Comulate, Applied Launched an Effort to Build Its Own Product, Recon

125. Unable to acquire Comulate, Applied decided to build Recon and launch an obstructive and exclusionary campaign to clear the field for insurance accounting automation software so its new product could succeed without needing to compete on the merits.

126. On September 11, 2024, Applied's President, Graham Blackwell, met in person with Katz at Applied Net. In that conversation, Blackwell expressed that Applied was no longer interested in acquiring Comulate, as Applied had begun developing its own product in the hopes of replicating Comulate's functionality. According to Blackwell, because Applied viewed Comulate as competition, Applied would block Comulate from ACN events going forward.

127. Applied's resolve to the organic path began to waver almost immediately. After learning that Salesforce planned to announce an expansion into insurance brokerage software at its Dreamforce conference, Applied sent Devin McNamara, a Corporate Development employee, to gather competitive intelligence, registering just one day before the event. The morning after the conference ended, Giometti texted Katz unprompted to "catch up today." On the call that followed, Giometti said Applied does not "really feel the heat from the traditional competitors," but viewed Salesforce as a genuine platform threat. Giometti, at Blackwell's direction, then reopened acquisition discussions, offering a "narrow window" to revisit a deal and warning that "there's going to be at some point of no return for us here, and it's coming pretty soon." Giometti closed by stating he would "socialize internally" and follow up. Applied never did.

128. By the end of 2024, Comulate had [redacted] its revenue over the prior year, signed several dozen of the 100 largest insurance brokers as customers, and achieved more than [redacted]. On the strength of its performance, Comulate attracted $20 million in

Series B financing in February 2025. On information and belief, Comulate's rapid success fueled Applied's urgency to take over the insurance accounting automation software market.

129. When Applied later announced its accounting automation product to the public on April 29, 2025, Applied described the product as an "AI-powered statement recording and reconciliation application for direct bill commission and agency bill payables." Blackwell even marketed Recon as "Comulate Plus."

## IX. APPLIED'S USE OF INSURANCE AMS INFRASTRUCTURE TO FORECLOSE COMPETITION IN ENTERPRISE-LEVEL AUTOMATED INSURANCE AGENCY ACCOUNTING SOFTWARE

130. Over a 22-month campaign beginning nearly two years before Applied's claimed discovery of the PBC account, Applied deployed four modes of infrastructural control against Comulate in an escalating sequence: architectural choices that engendered Epic customers' dependency on Applied infrastructure, discretionary gatekeeping that limited customer and third-party access to Applied's controlled infrastructure, burdensome contractual provisions and procedural hurdles that constrained Epic customers and third-party vendors, and explicit coercion of customers to force them off competitors' products in markets adjacent to insurance AMS. These modes did not operate independently. Applied layered them across the three infrastructure gates under Applied's unchecked control—the Epic SDK, IVANS, and ACN—in coordinated sequence.

### A. The 22-Month Escalating Anticompetitive Campaign

**Phase 1: Escalation Across Infrastructure (2024)**

131. In the first half of 2024, Applied began probing whether it could impose more onerous SDK requirements for Comulate's integration with Epic to impose unnecessary hurdles, making it more costly for Comulate to provide its accounting automation services to customers.

132. On January 3, 2024, an Applied representative told [redacted] that Comulate required the more expensive developer SDK, rather than the cheaper runtime SDK, to operate. Following pushback from Comulate and [redacted], Applied retreated and confirmed that the standard runtime SDK would be sufficient. And on June 18, 2024, Applied's Ron Buzzetta emailed [redacted] suggesting that Comulate required a custom SDK to integrate with Epic. Following pushback, Applied confirmed that the runtime SDK was the correct product and quoted standard pricing. Each time Applied tested whether it could impose more burdensome technical and pricing requirements on Comulate's customers, it backed down when challenged.[20]

133. In late July 2024, however, Applied stopped backing down. Applied changed its SDK access policy, its commercial posture, and its legal posture toward Comulate within weeks of each other. The coordinated timing of these changes, across three separate Applied departments, evinces Applied's deliberate decision to intensify its obstruction of Comulate's business.

134. First, Applied began to insist, without justification, that Comulate customers needed to purchase the more expensive developer SDK to facilitate Comulate's integration with Epic.

135. On July 30, 2024, Applied told [redacted] that there was "confusion" about whether [redacted] existing Epic integration infrastructure could be used for Comulate. [redacted] already had an active SDK-based integration with another product, [redacted], running on its existing runtime SDK license. But Applied forced [redacted] to purchase the more expensive developer SDK for Comulate's integration with Epic, despite the customer's preexisting runtime

[20] During the first half of 2024, Applied continued to process SDK requests for Comulate's customers while profiting from SDK licensing fees. Applied also completed work orders for [redacted] in fourteen days and issued runtime SDK proposals at zero upfront cost.

infrastructure being what many other Comulate customers used for Epic integrations. [redacted] stated: "They're [Applied] not making this easy for us."

136. On August 9, 2024, Applied waited until the day of [redacted] signing deadline to rescind its assurances from months prior that the runtime SDK was adequate to enable Comulate's integration with Epic. Applied now claimed that the runtime SDK was "insufficient," quoting a [redacted] implementation fee.

137. That same day, Applied began to probe Comulate's response to legal pressure as well. Nicole Chimienti, an Applied in-house attorney, sent Comulate a cease-and-desist letter, falsely claiming that Comulate's website advertising its integration with Applied Epic constituted trademark infringement and breach of Comulate and Applied's IVANS API Agreement, pursuant to which Applied licensed its IVANS API directly to Comulate. When Comulate raised the letter with Blackwell and Giometti, they both feigned ignorance. Giometti blamed Applied's legal team, claiming the letter "would never get written from anybody coming from [his] group."

138. On November 19, 2024, Applied memorialized its unjustified policy change requiring customers to purchase a more expensive developer SDK to implement Comulate's Epic integration. An Applied sales representative emailed [redacted] stating: "Runtime SDK is [redacted] BUT [C]omulate needs Custom SDK. In the past Runtime would work for them and it doesn't any longer." The representative proceeded to provide a revised quote with a [redacted] over the runtime SDK price this customer had previously been quoted by Applied. This email confirmed that the compulsory switch from runtime to developer SDK was Comulate-specific.

139. Having already imposed discriminatory SDK pricing on Comulate's customers and served a baseless cease-and-desist letter, Applied moved to exclude Comulate from Applied Net, cutting off Comulate's ability to engage with present and prospective customers. In 2023 and 2024, Comulate participated in Applied Net as a platinum sponsor, having committed to paying ACN $[redacted] over a two-year period to sponsor Applied Net. Comulate's contract with ACN provided that the sponsorship agreement "shall renew . . . provided ACN or Comulate does not provide notice of intent to make changes to the terms by October 31, 2024." Neither ACN nor Comulate notified the other of any changes before that deadline, and the agreement automatically renewed.

140. But on November 22, 2024, more than three weeks after the contractual notice deadline had passed, Emily Marxer of ACN emailed Comulate to advise that "Applied has made the decision not to renew your sponsorship contract for Applied Net 2025 or any sponsorships associated with Applied Client Network and Applied Systems." Marxer made no pretense about the reason: "As Graham [Blackwell] discussed with Jordan [Katz], our company's strategic direction and evolving priorities no longer align with the opportunity to host Comulate as a sponsor at our events or within our organization." Applied had formally classified Comulate as a competitor and caused ACN to breach its sponsorship agreement with Comulate to serve Applied's own anticompetitive ends.

141. During that same period, Applied introduced new barriers that further saddled Comulate and its customers with unnecessary steps and costs to make Comulate less competitive. On December 17, 2024, Applied required [redacted] to engage in specific "IT department" intervention to update its license keys that were necessary for Comulate's integration. Applied had never before required these administrative hurdles, which included

unnecessary scoping and discovery sessions with Applied's team, who were already deeply familiar with the Comulate integration.

142. In December 2024, Applied for the first time requested that Comulate execute a Third-Party Consulting Agreement ("TPA") to continue providing accounting automation services to an Epic customer, [redacted]. But the proposed agreement contained terms that Comulate could not accept. For example, Section 5 would have expressly prohibited Comulate from using knowledge gained from its work relating to Applied software "to develop, create, link, and/or connect interfaces, integrations tools or other solutions," even though developing integration tools is fundamental to Comulate's business and exactly how Comulate integrates with Epic. That same section also included an IP assignment clause that purported to "automatically assign[] to Applied" Comulate's intellectual property in the event of a breach.[21]

143. As Applied knew, Comulate had previously worked with dozens of Epic customers but had never been required to execute a TPA. Applied's demand was targeted at disfavoring Comulate. Even to this day, shared customers say they utilize third-party vendors that are permitted to integrate with Epic without such a consulting agreement in place. And after Comulate refused to sign the as-drafted agreement, Applied permitted Comulate to continue its work with [redacted] without further objection.

**Phase 2: Deepening Friction and Obstruction (January–July 2025)**

144. Applied's coordinated campaign against Comulate intensified in the ensuing months as Applied piled additional burdens on Comulate, seeking to raise its costs of doing business.

[21] In January 2025, Lauren Kingston, in-house counsel at Applied, confirmed that without signing the agreement, Comulate could not pursue its relationship with [redacted].

145. On February 23, 2025, [redacted] escalated its concerns to Applied's executive team because Applied was "digging in their heels" on the customer's request to expose a single necessary data element to the SDK without which the customer could not perform core revenue recognition through its Comulate integration. Blackwell later admitted Applied was devoting executive-level resources to blocking a specific capability of Comulate's product.

146. In April 2025, Applied imposed the TPA requirement on two additional joint customers, [redacted] and [redacted] delaying those customers' access to Comulate's services and jeopardizing Comulate's business relationships.

147. On May 2, 2025, after Comulate objected to the TPA, Applied's Assistant General Counsel, Lauren Kingston, proposed a blanket consulting agreement that would "remove the friction for mutual customers," offering Comulate "blanket approval" for Epic integration consulting. The parties went back and forth a few times, with Kingston sending redlines on May 15. Comulate followed up on May 27, but Applied never responded, and the blanket agreement was never finalized.

148. During those May 2025 discussions, Kingston confirmed that Comulate had been removed from Applied's runtime SDK—the cheaper integration—authorization list. She could not explain why. Kingston further stated that SDK pricing was "based on how many methods the customer needs" and should not have been discriminatorily "priced based on vendor." Applied's own in-house counsel had no justification for the Comulate-specific escalation.

149. On May 29, 2025, Katz spoke with Blackwell to address the intentional friction that Applied had begun imposing on Comulate and its customers over recent months. On this call, Blackwell made a series of admissions confirming Applied's exclusionary strategy.

150. Blackwell initially feigned ignorance of the issues creating friction between Comulate and its customers. But when pressed, Blackwell dropped the pretense and admitted that he was personally involved in directing Applied's exclusionary campaign. Blackwell acknowledged that Applied had begun developing a new product to attempt to replicate Comulate's functionality. He stated that because Comulate refused to be acquired, Applied was "going to go build" a product that was "very similar to what you guys [Comulate] have done from a functionality perspective" because that was the "only alternative" Applied had.

151. Blackwell further admitted that "Comulate integrate[d] a lot of [Applied's] customers," that Comulate was a "good product" that did "cool stuff," and that Applied knew other third-party products were not truly competitive with Comulate. But because Comulate was the key competitor in the automated accounting market and Applied could not build a better product, Applied was intentionally obstructing Comulate's ability to integrate with Epic and was treating Comulate differently from other third-party vendors.

152. Blackwell expressly confirmed that the game was rigged against Comulate, telling Katz that there was "friction that you guys [*i.e.*, Comulate] are going to feel" because there was a "message" coming "from the top [that] we want to win."

153. To illustrate the friction Applied was intentionally imposing on Comulate, Blackwell pointed to an exemplary instance in which a Comulate customer asked Applied to enable a minor feature within Epic that would have allowed an additional transaction data element to be automatically written by Comulate. Blackwell admitted that although Applied could have easily accommodated the customer's request, Applied refused to enable the feature specifically because it would have improved Comulate's functionality.

154. Applied was "trying to drive points of differentiation" between its product and Comulate. And in Blackwell's own words, Applied's view was "why would we . . . make it easier for everyone else?" Blackwell confirmed that the customer's minor request had ultimately made it up to him, the President of a 2,800-employee company, before he finally approved it under unrelenting pressure from the customer.

155. On that same May 29, 2025 call, Blackwell threatened Comulate by previewing the nuclear option to remove Comulate from the field: cutting off Comulate's access to the Epic SDK, the essential means for Comulate to function within Epic's purported "open architecture." Months later, as described herein, Applied executed that threat.

156. On July 1, 2025, Chase Petrey, the President of Applied Pay and Applied Recon, met with Katz to make one last acquisition overture. During the meeting, Petrey explained how Applied saw the market: Comulate was the "category winner" in direct bill reconciliation and "very clearly [the] only one dominant player," whereas Ascend was a "premium finance company" at its core and Eventual Treasury was "early" in its development.

157. Petrey confidently declared that Applied was going to do an acquisition in this enterprise-level automated insurance agency accounting software market in the coming months, expressing the benefits of acquiring Comulate, the "category winner," to accelerate its own development: "If we can acquire a market leader like yourselves [Comulate] to start us off, it brings a huge accelerant." He also hinted that Applied may have been in ongoing acquisition discussions with Ascend and Eventual Treasury. That Applied, after investing substantial time and effort building Recon, still wanted to buy Comulate or another accounting automation product is telling—Applied in truth was far from building a competitive product.

158. On October 6, 2025, a Comulate employee reported informally connecting with an old friend who, coincidentally, worked at Hellman & Friedman. The Hellman & Friedman employee disclosed that Applied and Hellman & Friedman "[we]re very very scared of" Comulate and, in their internal market analysis of relevant startups, placed Comulate as "#1 on their list of competition." Despite this, the employee "had glowing things to say" about Comulate's capabilities, confirming that Applied knew Comulate was a good-faith competitor in the market.[22]

159. On July 28, 2025, Applied introduced the "API Suite" as a mandatory requirement for [redacted] integration of Comulate, at a cost of [redacted] for setup plus a new [redacted] professional services fee, contingent on Applied's "sign-off." This represented a [redacted] increase over the November 2024 treatment and the additional step introduced yet another commercial barrier that had not existed for any prior Comulate integration. On November 6, 2025, [redacted] president emailed Comulate to report that the deal was on hold: "the Epic pricing just threw us into a pause with all the other balls in the air."

**Phase 3: Platform Closure and Foreclosure (August 2025–January 2026)**

160. Despite Applied's actions that made Comulate more costly and challenging to use and procure, customers still wanted Comulate because of its unrivaled product quality.

161. In August 2025, Comulate contracted with [redacted], an Epic customer. When [redacted] informed Applied, Applied "pushed back on why [the company] even wanted to work with Comulate," accused Comulate of "crazy arrogance" for declining Applied's acquisition

[22] Three weeks later, an investment firm engaged a private investigator to gather information on Katz and "what ma[de] [him] stand out," offering $450 per hour for Katz's prior contacts to speak with the private investigator. On information and belief, the investment firm was Hellman & Friedman.

offers, and lied that Comulate would soon be "out of business." Applied also represented that obtaining SDK access for Comulate to integrate with Epic would take months. But after some pushback, Applied completed it in two weeks.

162. On August 20, 2025, [redacted] emailed Comulate after a follow-up call with Applied: ***"[Applied] also said [Comulate] would only be available until the end of the year when something was going to happen which they wouldn't really explain."***

163. That same month, another startup in the Applied ecosystem reached out to Comulate. That startup's customer had been told by Applied that it was "unable to put a proposal together" for SDK access because "there has been a hold put on SDK Authorizations for the moment," and that Applied was conducting "some assessment being made of agencies and Third Parties using SDK beyond its intended scope." The startup asked Comulate: "Have you guys ran into anything weird recently with SDK?"

164. On October 7, 2025, after working over a year to impede Comulate's growth and ability to serve customers, Applied formally unveiled its own accounting automation product, Recon, at Applied Net 2025—from which Comulate had been barred. Customers attending Applied Net were initially confused and surprised that Comulate was not on the vendor list, until at the "very first session [Applied] showed a product called Applied Recon." Upon seeing that presentation, one customer remarked: "[O]h, I know why Comulate's not here." Customers who saw the demo recognized that Recon was "nowhere near what [Comulate] ha[d] to offer." But because Applied already had begun to force Comulate out of the market, Recon did not need to outperform Comulate: shutting off Comulate's access to a market that had grown to rely on its functionality would ensure Recon would launch in a receptive market.

165. Applied's standard SDK terms provided a one-year term and a 60-day termination right. On November 13, 2025, eight days before filing its lawsuit, Applied issued SDK terms to [redacted] that departed from those standards: [redacted], or available SDK methods (such as Attachments) . . . at any time" on [redacted]. The "Attachments" methods are noteworthy for their use by Comulate and many other third-party AI software companies serving Epic customers. By reserving the right to revise them at will, Applied gave itself the ability to break those integrations and restrict export of brokers' files without formally terminating the agreement. When [redacted] COO raised the terms with Applied, Applied refused to amend them. [redacted] wrote to Katz: "My concern is that if in the future the integration is not supported by Applied, it breaks and we have a useless Comulate product and have to scramble for alternatives." Eight days later, Applied filed suit.

**B. The Structural Asymmetry Applied Engineered for Recon Using Its Monopoly Infrastructure**

166. On November 13, 2025, Chase Petrey, the President of Applied Pay and Applied Recon, hosted a webinar previewing Recon for customers. He told them they could route IVANS commission downloads through Recon "at no additional cost," but added: "you do need to have a license to Recon to use this for IVANS." There is no alternative carrier data exchange network. Petrey explained why Recon held these advantages: "Having it be built in Epic really shines because we have all of the endpoints available to us." The advantages Petrey described are the product of three architectural choices Applied made about who can access what data inside the infrastructure Applied controls.

167. First, Applied restricts each IVANS mailbox to a single certified AMS, ensuring that for Epic customers, IVANS-downloaded commission transactions flow only into Epic and

nowhere else. Applied's own personnel have admitted this restriction is a business decision, not a technical necessity, and that routing IVANS data to multiple simultaneous recipients is technically feasible.

168. Second, Applied does not expose IVANS-downloaded commission data through any SDK endpoint accessible to third parties. The only alternative path for a third-party accounting automation provider to access that data is through the Epic Data Lake, a separate subscription product Applied controls. Recon accesses the same data through native database connectivity without requiring a Data Lake subscription.

169. Third, Applied reserves post-processing functionality for Recon that it withholds from third parties. After IVANS-downloaded transactions are processed within Epic, they must be cleared from a processing queue. Applied provides Recon with a programmatic endpoint to clear the queue. It provides no equivalent endpoint to third parties, forcing Comulate's customers to clear the queue manually. In February 2026, [redacted], a Top 100 broker, demoed Recon and called it "a huge step back . . . it's terrible." Recon's only notable capability, according to the customer, was the automatic clearing of the IVANS suspense queue—the very endpoint Applied withholds from independent providers.

170. As described above, Blackwell articulated the logic behind these choices around third-party access to SDK endpoints when he personally blocked a shared customer's request for a minor feature improvement: "why would we . . . make it easier for everyone else?"

171. Even an independent provider that navigates all three gates faces a compounding procurement burden that Recon does not. A customer must first request SDK authorization from Applied, then sit through procedural delays, discovery and scoping sessions with Applied's solutions team—who are already familiar with the integration—before obtaining sign-off and

paying for the license. But the SDK does not surface the commission data the customer actually needs; the Data Lake exists to fill that gap, and procuring it requires a separate contracting cycle. And after spending tens of thousands of dollars navigating that gauntlet, Applied can revoke SDK access on short notice, stranding the entire investment. Recon requires none of it. It runs natively inside Epic, accesses the same data without separate subscriptions, and requires no Applied authorization because it is Applied's own product and benefits from infrastructure Applied increasingly operates to disadvantage competitors and to restrict customers' access to their own data.

172. Applied does not merely tax its chokepoints. It has refused to sell customers access to those chokepoints when it has learned that Comulate is the third-party accounting automation provider. In 2025, [redacted], an Epic customer, sought to purchase a Data Lake subscription to leverage Comulate's advanced functionality. Upon learning the subscription would support Comulate, Applied refused to sell it. Applied chose to earn no revenue for the purpose of preventing Comulate from servicing one additional customer.

### C. SDK License Clauses That Convert the Interoperability Gate into a Legal Prohibition on Independent Accounting

173. Applied's exclusionary conduct extends beyond pricing, approvals, channel control, and design and development of monopoly infrastructure. Applied also invokes customer-facing contract terms drafted as purportedly neutral license provisions to restrict the competitive use of Epic data and to limit customers' ability to use or remain with Comulate. Applied selectively invoked those provisions to threaten customers once Applied came to view Comulate as a competitive threat, in sharp contrast with Applied's public open-architecture representations.

174. Applied's SDK License contains provisions that, if enforced as written, would restrict or prohibit the integrations Applied facilitated for years. Section 5.1 prohibits integrations that have "the effect or result (whether intended or unintended) of reducing the number of human interactions with Epic or the number of Authorized Users." Section 5.5 prohibits using the SDK to "export data, configurations, tools, stored procedures, and/or data views from its Applied Software database(s) to any third party." Section 5.6 prohibits using the SDK for developing, using, or providing "a competing software product or service." Applied did not invoke any of these provisions against Comulate during three years of known, facilitated, and profitable integration, nor did Applied invoke them against Ascend despite Ascend's documented violations of identical restrictions. Applied began citing them only after it decided to enter the accounting automation market with Recon.

175. Applied has not enforced these contractual provisions neutrally across the Epic ecosystem. Rather, it has invoked them selectively against Comulate and Comulate's customers as additional mechanisms to cause delay, create uncertainty, and threaten cutoff. Applied only purportedly continues to support third-party integrations with Epic in markets that Applied is not currently seeking to dominate. Those third-party providers are not subjected to the same anti-automation, anti-export, or competition-restriction requirements that Applied exercises against Comulate in order to dominate the market for insurance accounting automation software. Applied's selective invocation of these provisions confirms that they are deployed as anticompetitive tools, not as neutral contractual terms.

176. The combined effect of Applied's architectural choices, IVANS toll structures, and SDK License restrictions is a permanent competitive asymmetry between Recon and any independent provider of accounting automation software. Recon receives the same data, the

same integration, and the same functionality without SDK fees, Data Lake fees, or contractual restrictions. Independent providers face cumulative costs and compliance burdens that do not apply to Recon. This asymmetry is not the product of superior innovation. It is the product of Applied's control over the infrastructure on which all participants depend.

### D. Applied Has Deployed the Same Restrictions Against Other Firms in Other Markets

177. Applied has used these same infrastructure controls to exclude firms in multiple markets adjacent to the insurance AMS market that Applied seeks to dominate. In other words, Applied's challenged misconduct is not an isolated response to a novel competitive concern; it is Applied employing a well-rehearsed playbook to dominate a new market.

#### 1. Applied's Clearing of the Premium Payments Market

178. Before Applied developed Applied Pay, its ecosystem was open to payment processors. Applied Net "used to have tons of payment systems people" as sponsors and exhibitors, according to ACN's Emily Marxer. ePayPolicy, formerly the category leader in insurance payment processing for Applied's Epic customers, was a top sponsor at Applied Net as recently as 2021, and its co-founder Todd Sorrel previously called Applied "a wonderful partner." The Applied Net 2020 sponsor guide listed at least five premium payment vendors, including [redacted] [redacted] ePayPolicy, SimplePin, and [redacted].

179. Yet when Applied decided to enter insurance payment processing with Applied Pay in October 2022, Applied decided it did not need to compete on its product's merit. Instead, it cleared the field to give Applied Pay a runway to dominance. As Marxer observed: "Applied Pay has come in and so now [ACN, at Applied's direction,] nixed all of those exhibitors and sponsors because they aren't to compete with Applied." Applied did not remove one vendor from Applied Net; it removed an entire category of vendors. [redacted], and [redacted]

[redacted] each were removed. None has any connection to Comulate or to the PBC account.

180. ePayPolicy received the sharpest treatment as the category leader. Applied first tried to acquire ePayPolicy, but when ePayPolicy refused to sell, Applied removed ePayPolicy from Applied Net and fabricated security concerns to justify its exclusion, telling customers that ePayPolicy's use of the Epic SDK left them "at risk of being hacked" and that these risks would be "eased up" with Applied Pay. The Applied Net exclusion extended to other payment competitors as well. In October 2023, Ascend co-founder Andrew Wynn confirmed that Applied had blocked Ascend, which sells payment processing software, from sponsoring the conference.

181. SimplePin, a premium payments vendor for Epic users, was pushed out of the U.S. market as part of the same clearing of payment vendors that displaced ePayPolicy. SimplePin retreated to Canada, where Applied tolerated its presence and featured it on Applied's Canadian ecosystem website. When Applied launched Applied Pay in Canada in September 2025, Applied removed SimplePin from its Canadian partner program. SimplePin pivoted to include accounting automation. Applied blocked its SDK approvals.

182. At the Applied Pay launch webinar in June 2022, an Applied presenter publicly telegraphed the SDK-based exclusion strategy Applied later deployed against Comulate: "So when you're looking at ePayPolicy and others, those are third party payment providers that are leveraging our SDK . . . we have no intentions of picking that offline anytime soon, but we aren't putting any more future development into it. So as new things and compliance comes out . . . all of those things are going to be eased up within our payment API and through Applied Pay. So ePayPolicy will continue to work, but not sure how long until that SDK becomes a moot point." In other words, Applied confirmed that it would decay the SDK support for payment processing

competitors, leaving Applied's own product as the only option that would receive continued investment and guaranteed interoperability with Epic.

183. This strategy is identical to that later deployed by Applied against Comulate: try to acquire the category leader, clear the field if unable to do so, fabricate technical or IP concerns about the category leader's SDK use to excuse its exclusion, and launch Applied's own product as the sole option.

**2. Applied Used IVANS to Exclude AMS Competitors**

184. Applied has used its control over IVANS to establish and maintain its dominance over the insurance AMS market as well.

185. Acturis is Applied's primary global AMS competitor, based in the United Kingdom, and a fierce rival of Applied in select European markets. Applied has blocked Acturis from IVANS access for years. In January 2025, Applied informed Acturis that Applied would not do business with them. As a result, Acturis has been prevented from entering the U.S. insurance AMS market, as Applied controls the only carrier data exchange network.

186. [redacted] is an upstart AMS platform that Applied's own president cited in a sworn declaration as an alternative to Epic. [redacted] began the IVANS contracting process in early 2024. Applied took months to respond to redlines, repeatedly deferred next steps, and, after nearly six months of engagement, went silent without returning a response. Applied cited [redacted] as evidence of a competitive market but in fact had ensured that [redacted] could not obtain the infrastructure access it needed to compete.

187. Salesforce, the world's largest CRM platform, sought IVANS connectivity to enter the insurance AMS market. Applied refused, stating that IVANS data was available only "into an AMS" and not "into a CRM." A Salesforce director familiar with the discussions stated:

"Applied, they own IVANS and they're a little threatened by us. Hence . . . capture and kill of TechCanary."

188. TechCanary was a promising insurance AMS built on integration with Salesforce. TechCanary fought a legal battle for IVANS access after Applied initially denied it connectivity. Once competing, TechCanary was "putting on a million dollars a month in new business." Applied acquired TechCanary for approximately $80 million on approximately $10 million in annual revenue. As one former user explained: "Applied purchased it and shut it down six weeks after we launched the new management system." TechCanary's founder, Reed Holzworth, who later became IVANS CEO, stated that Applied "bought it to kill it" because TechCanary "was crushing them."

189. EzLynx was a competing AMS and rater platform that Applied acquired in March 2021. Kevin Coplin, Applied's Senior Director of Partnerships, stated that the acquisition was about "protecting the turf," as EZLynx had been "nipping at [Applied's] tail." Coplin explained that EzLynx was "trying to put IVANS out of business" because agencies "don't need a third party in the middle of our communications anymore." Beyond neutralizing that threat, Applied used the acquisition to pick up EzLynx's rater, a quoting infrastructure layer embedded in agencies' daily workflows, extending its control over an adjacent workflow chokepoint.

190. Applied's exercise of its complete control over IVANS to disadvantage and exclude insurance AMS competitors illustrates Applied's playbook to wield that critical input as a sword to stifle competition. The fact that Applied has leveraged its control of IVANS to dominate the insurance AMS market establishes that IVANS is a "Sword of Damocles" that Applied can and does wield to subvert the competitive process in other markets, namely the insurance accounting automation software market. Just as Applied has withheld IVANS

connectivity from insurance AMS competitors to prevent them from entering in the U.S. market, Applied threatens to withhold IVANS connectivity (and critical carrier-to-agency commission statements data) on which accounting automation programs like Comulate depend.

191. Applied also has used its control over the SDK, IVANS, and ACN to degrade or destroy other third-party integrations like Comulate that stood in Applied's way of dominating a targeted market.

### 3. Applied Excluded Other Competitive Threats Through CAN

192. Applied deployed the same infrastructure controls against every independent firm attempting to compete in accounting automation for Epic customers, not just Comulate, and against vendors seeking access to the industry's principal commercial channel.

193. Eventual Treasury, a newer entrant in the insurance accounting automation software market, had negligible enterprise market share as of November 21, 2025. Beforehand, between July and November 2025, Applied had begun blocking SDK access using the same SDK permissioning lever that it deployed against Comulate in the same window.

194. [redacted], an AI-powered insurance platform, registered for Applied Net sponsorship immediately after the 2025 conference. After months of unexplained delay, [redacted] was stripped of all prior sponsorship tiers and quoted approximately [redacted] for a bare double-booth, compared to ACN's published 2026 double-booth price of approximately $22,000. In early 2026, Applied and ACN have formalized this: vendors that Applied deems competitive are designated as "Participating Companies" and offered a bare booth with no standard sponsorship

packages, no speaking sessions, and no add-ons available to other sponsors.

195. [redacted] a data and analytics vendor that had exhibited at Applied Net since at least 2023, received the same "Participating Companies" designation and the same constructive-

exclusion price point as [redacted]. The consistency of the pricing and terms across multiple vendors confirms that Applied has institutionalized discriminatory access to the industry's principal vendor channel.

196. [redacted], a startup bringing AI to insurance sales and service teams, received the most elaborate obstruction. Applied subjected [redacted] to five separate SDK scoping calls covering the same ground, told [redacted] customers that [redacted] refusal to sign the Third-Party Consulting Agreement was "the source of integration delays," and had Giometti simultaneously request a product demonstration to gather competitive intelligence. Applied then excluded [redacted] from Applied Net 2026 as a "competitive vendor" with no option to exhibit at any price.

197. [redacted], a carrier connectivity provider, was denied access to ACN after Applied "deemed [redacted] competitive with IVANS" and informed [redacted] that Applied maintained "a preferred carrier connectivity relationship with IVANS so they focus their marketing efforts there." Applied used ACN's voice to deliver a competitive determination that served Applied's own infrastructure interests.

**4. The Pattern Is the Playbook**

198. These are not isolated incidents. As detailed above, Applied has excluded more than a dozen firms other than Comulate from competitive markets using the same infrastructural controls and tactics it has deployed against Comulate: constructive exclusion through discriminatory pricing, IVANS access denial, SDK and partner access revocation, Applied Net exclusion, and fabricated security or IP concerns.

199. No intellectual property concern or business dispute explains this pattern of exclusionary conduct, directed at established competitors and nascent innovators alike, across this large and growing class of independent software companies.

200. This established practice reveals that Applied employs some combination of tactics from its playbook to exclude competitive threats in markets that it seeks to dominate, varying only the number of modes required to accomplish its exclusionary goals.

## X. THE PBC SANDBOX ACCOUNT WAS NOT THE CAUSE OF APPLIED'S EXCLUSIONARY CAMPAIGN

### A. Applied's Trade-Secret Accusations Were Baseless

201. In this litigation and a related litigation, Applied has sought to justify its conduct by reference to the PBC account, which Applied claims to have first discovered in October 2025. The timeline, the evidence, and Applied's own admissions say otherwise.

202. Applied filed suit on November 21, 2025, accusing Comulate of trade secret misappropriation through "reverse engineering" and proclaiming "clear evidence" of theft. Applied broadcast those accusations to nearly all of Comulate's customers on the same day, using them to threaten customers with contractual liability and coerce them to terminate their relationships with Comulate.

203. Applied then amended its complaint to remove core trade-secret allegations because they were based on publicly available information on Applied's own website. Nothing about Epic's SDK "methods" is a trade secret. Applied publicly posts articles on its website, including the "Generate Invoices" help file published in July 2023, that provide the exact information Applied claimed constituted trade secrets. Comulate only ever accessed Epic using the same view that any of Epic's more than 100,000 users can see. There is no way to reverse engineer Epic's algorithms by merely using Epic or its SDK as a customer. Applied cannot identify a single feature of Comulate that incorporates an alleged trade secret, despite possessing records of every SDK call Comulate made and hundreds of Comulate emails. Applied's own accusations were baseless from the beginning.

204. Comulate's products predate the PBC account by years. Comulate launched its direct billing automation product to paying customers in September 2022, whereas PBC was created in March 2024. Comulate likewise began developing its agency billing product in September 2023 and was serving customers by Q1 2024. Blackwell personally watched Comulate demonstrate agency billing at Hellman & Friedman's offices in November 2023, months before the PBC account had SDK access for agency billing.

205. Applied's personnel, including Blackwell, acknowledged Comulate's regular use of the Epic SDK without objection throughout Applied and Comulate's prior course of dealing. Applied's own in-house attorneys assessed Comulate's integration with Epic and raised no issues with Comulate's access to the SDK.

**B. By August 2025, Applied Had Already Decided to Terminate Comulate's Access, and Applied's Anticompetitive Scheme Largely Predates Its Claimed Discovery of the PBC Account**

206. Applied's exclusionary campaign against Comulate began in January 2024, immediately after Comulate rejected Applied's exclusivity and right-of-first-refusal proposal. And over the following 22 months, as detailed above, Applied imposed discriminatory SDK pricing, issued a baseless cease-and-desist letter, demanded onerous Third-Party Consulting Agreements, required discovery and scoping reviews, increased fees for its SDKs, breached an auto-renewed contract to ban Comulate from ACN, and froze all new SDK authorizations market-wide, among other things, in an attempt to oust Comulate from the market.

207. Each of these acts predated Applied's claimed October 2025 discovery of the PBC account. Approximately two months before Applied's purported discovery of the PBC account, Applied's representatives already were telling individual customers that Comulate's access would end by year-end.

208. In August 2025, two months before Applied claims to have discovered the PBC account, a former Applied Vice President described the coming shutdown as driven by competitive fear, not intellectual property:

> "The reason Applied is pounding is because they . . . ***didn't like that you guys [Comulate] were able to capture the market like you did***. . . . They're acting scared. You'll probably see that or have seen it or they're . . . ***going to try to shut all access off***.

209. The employee disclosed that he had warned Applied's leadership directly that the access shutdown was legally and ethically indefensible and that Applied nevertheless dismissed the warning:

> There's going to be a moment in time here where you're going to ***end up with a lawsuit***. ***I'm like, who owns the data?*** And we don't own it. . . . If we keep ***trying to restrict our customers from getting their own data and making it almost damn near impossible***, you guys are doing the wrong things. . . . They're cocky right now, man. They're real cocky.

210. The directive came from the top. Applied's CEO, Taylor Rhodes, personally directed the company to move faster against Comulate. As the former employee explained:

> Taylor came from Rackspace and he got his ass handed to him by Jeff Bezos because . . . Bezos came with AWS and just [ran] over Rackspace. So now Taylor's . . . ***scared that Applied is about to lose their competitive advantage*** because they're so archaic and, you know, ***Comulate[s] of the world . . . [are going to] pop up and take market share***.
>
> . . . ***Taylor specifically calls [Comulate] out in SMG meetings in some strong language***. . . . He wants to make sure that everyone knows that they need to move faster so that Comulate[s] of the world don't continue to pop up and take market share. . . . ***You guys [Comulate] are creating an entire company to solve a problem that if Applied was actually worth a damn, they would have never had that as a weakness***. Like they would have been already doing this.

211. Rhodes told Applied's leadership that the company could not match the pace of the competitors it feared:

> **There are AI startup companies . . . these people eat, sleep, breathe the problem they're trying to solve**. They'll work 18 to 20 hours a day because there's a payout at the end of it and ***we can't do that***. . . . That was his last pitch at the meeting.

212. In sum, Applied's CEO told his senior management team that Applied could not outcompete Comulate on merit. Applied's conduct that followed, formulated to drive Comulate out of the market by other means, was consistent with that admission.

### C. Applied's Lack of Urgency and Its Own Admissions Confirm Pretext

213. Applied's shifting PR strategy and litigation conduct underscore that its accusations are pretextual. Despite alleging misappropriation of trade secrets, Applied has not acted with urgency in its lawsuit. After providing customers with different deadlines for moving away from Comulate, Applied unified its communications around a transition date of June 30, 2026, by which time Recon will have launched. Applied's Chief Customer Officer, Trevor Bunker, affirmatively stated to at least one customer that Applied would not interfere with that customer's access to Comulate until litigation was resolved. Applied knows that it faces no threat to its intellectual property from providing customers full and unimpeded access to Comulate.

214. Applied's own representatives confirmed the disconnect between Applied's stated justification for bringing IP litigation against Comulate—to protect allegedly misappropriated trade secrets—and Applied's actual objective—to fabricate an excuse to cut off Comulate's SDK access and effectuate Comulate's wholesale exclusion from the insurance accounting automation software market. To be sure, after filing its IP lawsuit, Applied's representatives told customers: "Even if Comulate wins [*i.e.*, successfully defends Applied's claims of trade secret

misappropriation], ***we still won't be allowing them to integrate with Epic."*** Thus, Comulate's exclusion from the accounting automation market has always been the objective; PBC is merely Applied's pretextual cover for its monopolistic conduct.

215. Comulate's Epic integration was developed using the same SDK that Applied facilitated access to, endorsed, and profited from for years. Applied's decision to characterize that longstanding arrangement as misappropriation occurred only after Applied's acquisition attempts failed, its Recon marketing was rejected by customers, and its largest prospective Recon customer chose Comulate instead. Applied's filing was the culmination of a 22-month campaign to clear the field for Applied's product that could not compete on merit.

## XI. APPLIED'S COORDINATION WITH ASCEND TO ALLOCATE DISPLACED COMULATE CUSTOMERS AND SUPPRESS INDEPENDENT COMPETITION

216. To eliminate Comulate and monopolize the insurance accounting automation software market, Applied coordinated with Ascend, with which Applied directly competes in that market. Ascend, like Recon, could not compete with Comulate on the merits. But Applied nevertheless chose Ascend as its co-conspirator to effectuate the unlawful exclusion of Comulate from the market because Ascend is controllable.

217. As detailed herein, Ascend is dependent on Applied's SDK permissions, its founders have sought an exit, and Ascend is willing to serve as the interim provider of accounting automation software (*i.e.*, a "bridge") until Recon is fully ready and Applied eliminates Ascend from the market as well, through either acquisition or destruction. Applied and Ascend's coordination predates their contrived December 4, 2025 Limited Referral Agreement ("LRA") and was designed to ensure that customers forced off of Comulate can temporarily move to an Applied-controlled channel rather than into a genuinely competitive market.

218. Applied and Ascend's coordination involves three steps. *First*, Applied excludes the market leader, Comulate, by leveraging its control over key infrastructure (*i.e.*, SDK, IVANS, ACN). *Second*, Applied and Ascend jointly reach out to Comulate's customers to reinforce their need to depart Comulate by no later than Q2 2026, offering Ascend as the only immediately available alternative at the time of Applied's lawsuit (with Recon slated to fully launch in Q2 2026). *Third*, based on Applied's functional control over Ascend, Applied will capture any customers that temporarily migrate to Ascend by either acquiring or killing Ascend (again using its infrastructural control to do so).

**A. Ascend's Background and Its Inability to Compete with Comulate**

219. Ascend was founded in March 2021, a year before Comulate, as a premium finance company. Its core business since founding has been in financial services, namely, premium financing and premium payment processing. Ascend's May 2025 financials confirm that over 90 percent of its revenue comes from financial services, not software. This business model allowed Ascend to subsidize its accounting automation pricing by capturing premium finance revenue from the same clients.

**Rounded Ascend Financial KPIs (May 2025)**

| | |
|---|---|
| Monthly gross payments/financing volume | ~$100,000,000 |
| Monthly net revenue from payments/financing | ~$1,000,000 |
| Monthly software subscription revenue | ~$100,000 |
| Net burn (losses) since inception | $20M – $30M |

220. Ascend's CEO, Andrew Wynn, viewed Comulate as a threat from its founding. During Comulate's seed fundraising in July 2022, Wynn pressured potential investors to withdraw, claiming that Ascend and Comulate were competitors despite there being no product

overlap, and multiple insurance-focused investors withdrew. And in May 2024, Wynn blocked a go-to-market advisor from working with Comulate.

221. Also in May 2024, Ascend announced a direct bill product to compete with the product Comulate had launched two years earlier. Despite repositioning itself as an accounting automation software company in mid-2024, and despite subsidizing its software pricing through premium finance, Ascend continued to lose 80-90% of head-to-head enterprise opportunities to Comulate.

### B. Applied's Years of Hostility Toward Ascend and Its Unexplained Reversal

222. Applied and Ascend have competed directly in premium payments since 2022 and premium financing since 2023. Applied, through ACN, banned Ascend (along with ePayPolicy and others), as a direct competitor to Applied Pay, from exhibiting at Applied Net. Wynn attended anyway without a badge and was discovered by Blackwell in the audience in a roadmap session for Applied Pay. Blackwell personally ejected him. Petrey told Katz at the same event that Applied "could just block out Ascend" from the SDK if it chose to. In February 2024, Applied's legal department threatened Saima Shaukat, a former Applied/IVANS executive who had joined Ascend's advisory board, with forfeiture of her Applied equity unless she resigned. She did, within days. In October 2024, Blackwell described Wynn to Katz as "a snake."

223. On July 1, 2025, Petrey told Katz that Applied was "planning to do an acquisition in this space in [the] next 3-4 months" but dismissed Ascend as a likely target, deeming it "not competitive." But five months later, Applied's yearslong hostility toward Ascend reversed overnight. In December 2025, Ascend was named Applied's exclusive "Preferred Referral Partner" for accounting automation software. On information and belief, the only reason Applied partnered with Ascend was that Applied needed a transitional vessel to temporarily

absorb Comulate's displaced customers until Recon was ready to launch and take the market for itself.

224. Despite Applied and Ascend's coordination, Applied downplayed its relationship with Ascend to customers. In December 2025, Blackwell said he "didn't really know those guys [Ascend]" but had "met with them very recently and it was very positive and promising." Blackwell's statement was false. Wynn had visited Applied's Chicago headquarters between 2021 and 2023 for direct discussions, and Applied had engaged in acquisition conversations with Ascend earlier in 2025. Applied knew Ascend intimately, as an adversary it had spent years suppressing.

225. The CEO of a major payments company in the insurance technology space confirmed that Ascend's founders held acquisition discussions with his company in 2025. And from Applied's perspective, Ascend is an affordable acquisition target in a way Comulate never was. Ascend earns a fraction of Comulate's software revenue, has far lower valuation multiples, and lacks deep relationships with the industry's largest firms.

### C. Chronology of Applied and Ascend's Coordination

226. On November 14, 2025, seven days before Applied filed suit against Comulate, Applied's logo disappeared from several placements on Ascend's website. The logo slot which Applied had occupied on Ascend's homepage was replaced by Salesforce's. Web archives confirm the logo had been displayed continuously from June 2024 through October 2025. During this period, no partnership between Applied and Ascend existed.[23] In fact, Applied was

[23] Applied was not the only logo Ascend displayed without a partnership behind it. Ascend's sales collateral in Q3 2025 listed Applied without the "preferred partner" designation it gave other companies like Vertafore. Ascend was also expelled from the Council of Insurance Agents & Brokers after misleading it about the scale of its premium finance business.

actively hostile toward Ascend. Ascend advertised a partnership that did not exist, then concealed the real one once it formed. The Limited Referral Agreement containing the confidentiality clause that required concealment was not signed until December 4, more than three weeks *after* Ascend began scrubbing references to Applied from its website.

227. On November 21, 2025, the day Applied filed suit against Comulate, Applied's executives began calling Comulate's customers recommending Ascend as a replacement. When a customer asked what differentiated Ascend from Comulate, an Applied representative "started reading from a script" and confirmed that "discounting has been negotiated for all the options being shared," indicating that Ascend had pre-approved pricing for these targeted customers. Applied would not have been able to provide such specific information, let alone pre-approved discounts, unless Applied and Ascend had been coordinating on Applied's outreach and displacement strategy in advance.[24]

228. Between November 21 and 25, 2025, customers reported that Applied, in response to why Ascend was treated differently than Comulate, said Ascend had provided "attestations" that it had not done what Comulate allegedly did, further suggesting coordination between Applied and Ascend.

229. On December 2, 2025, Ascend's CEO, Andrew Wynn, emailed the CFO of [redacted]: "Applied has been actively recommending Ascend to agencies that now need a replacement."

[24] Fifteen minutes after Katz learned of Applied's lawsuit, Wynn texted Comulate's CEO: "Hey man, I'm genuinely sorry to see the applied BS. We may be competitors but big picture we're always on the side of startups/tech/builders so if there's anything we can do to help lmk." On information and belief, Ascend was already operating as an instrument of Applied's displacement campaign when Wynn sent this message.

230. On December 3, 2025, Wynn emailed the CFO of [redacted]: "Applied plans to cut off [Comulate's] access in the near future. . . . Just to be clear, we're not in the same situation [as Comulate]. Ascend is actually a referral partner of Applied and they are recommending our software to agencies now looking for a replacement." In another communication to customers, Wynn wrote: "I can also share some details on how we're working with Applied to make this seamless (e.g. no changes to SDK fees, etc)."

231. On December 4, 2025, two weeks after Applied and Ascend's coordinated outreach began and one day after Comulate sued Applied in the Delaware Court of Chancery, Applied and Ascend executed the LRA, discussed in further detail below.

232. On December 5, 2025, an Ascend sales representative confirmed the coordination: "As a preferred referral partner, Applied has been directing agencies to us for a seamless transition."

233. On December 5, 2025, a CFO of a Top 100 insurance broker reported: "Word on the street is Epic will close the link with Comulate and require all users to partner with Ascend, sometime during mid 2026." Weeks later another CFO texted Comulate: "We are being told a very hard end of June deadline and they are pushing us to use Ascend which is weird to me." Both individuals found the coordination sufficiently unusual to volunteer the information.[25]

234. On December 11, 2025, Applied Senior Vice President Ashley Fimian sent a co-branded PDF to [redacted], an insurance agency, titled "Applied Preferred Referral Partner: Make the seamless switch to Ascend." The document included a testimonial from the [redacted],

[25] The CFO of [redacted] reported that Applied "would not answer questions about its financial relationship with Ascend over email and required a meeting to discuss this; during the meeting he deflected to Comulate's behavior."

cited as a "Transformation Leader from a Top 10 Broker," drawing on design-partner knowledge that [redacted] had developed while working with Comulate.

235. On December 18, 2025, Applied instructed [redacted], which sought to purchase the SDK for use with Comulate, that Ascend was "the only third party working on Commission Reconciliation that is currently being authorized" to integrate with Epic.

236. On January 7, 2026, Wynn repeated Applied's mischaracterization of the Delaware Court of Chancery's ruling on Comulate's motion for a temporary restraining order and preliminary injunction in an email to a prospect, providing a link to Applied's website. The communication misleadingly stated that multiple "courts" had already "upheld" Applied's June 2026 cut-off.

237. On January 26, 2026, Applied Senior Vice President Ashley Fimian emailed a customer, presenting Comulate's SDK cutoff as a settled calendar event. She further stated: "Whether you're leaning toward Ascend, utilizing ResourcePro or Patra, or exploring our new Recon solution launching in February, we're here to help." ResourcePro and Patra are manual offshoring services that are not reasonable substitutes for Comulate's software.

238. On February 17, 2026, Fimian followed up: "we want to make sure everyone has a plan in place once the Epic-Comulate SDK integration is turned off." No court order authorized turning off the integration. The customer forwarded the email to Comulate, questioning it as either a plan to "disable SDK access to Comulate at the end of Q2 or it's just a scare tactic to get customers to switch on their own."

239. As Applied and Ascend pressured customers to transition, Ascend raised its prices. Ascend's post-coordination pricing, including per-seat increases of approximately 55%

and new minimum commitments that quadrupled some customers' annual costs, is described in Section XIV.B.

**D. Applied and Ascend Deploy Misleading Co-Branded Marketing**

240. As part of their joint campaign to transition customers away from Comulate, Applied and Ascend deployed co-branded marketing materials and a companion "case study" based, at the time, on the only Comulate customer to transition to Ascend. Those materials are riddled with false statements. The customer, a Top 15 insurance brokerage, had become a Comulate customer in 2023. Within six months, the customer's leadership proposed a three-year partnership agreement and became a design partner, actively using Comulate's Cash Application module and praising its impact on operations.

241. The customer transitioned from Comulate to Ascend because of a company-wide initiative to slash software expenses, not because of any dissatisfaction with Comulate itself. The customer had demanded a 70% or greater price reduction, which Comulate declined because that pricing was unsustainable for Comulate to offer. The customer's executive leader confirmed: "It's not that Comulate's not performing. It's more of a reflection on [the customer] . . . not performing." ResourcePro, an offshore accounting firm that the customer had abandoned for Comulate, reengaged the customer in conjunction with Ascend with a deal promising similar automation services at the price the customer demanded. On information and belief, Ascend priced its software at 90% below what the customer had paid Comulate. That pricing is economically irrational unless Ascend received something more valuable than contract revenue from the customer, like the customer's endorsement for marketing purposes or the customer's insight into Comulate's product and roadmap.

242. Applied and Ascend's co-branded marketing materials claimed that a migration from Comulate to Ascend would take only 60 days, when the migration for the one customer that actually transitioned to Ascend from Comulate took over six months, requiring custom development. Those marketing materials also falsely attributed operational improvements that Comulate achieved to Ascend and falsely advertised savings up to 90% based on that single customer's below-market pricing that Ascend could not replicate for other customers.

243. The marketing materials' companion case study touts that the transitioning customer's "2,400+ monthly statements" processed through Ascend's "automation at scale" was a "200+ increase" over the volume that Comulate processed. But, in fact, the monthly processing of 2,400 statements is approximately a 1,000-statement *reduction* from the monthly volume of statements that Comulate previously processed for that customer. The missing 1,000 statements appear to be processed by Ascend's offshore partner, ResourcePro, whose own joint marketing describes the combined Ascend-ResourcePro solution as providing only "65% automation."

244. Applied and Ascend's willingness to distribute these false materials demonstrates they are not acting as neutral recommenders of viable alternatives to Comulate. Rather, they are driving customers off of Comulate to Ascend regardless of whether those customers are actually well served by the transition.

### E. Applied Cleared the Field by Blocking the Only Other Independent Entrants

245. The Applied-Ascend allocation required a closed market. If displaced Comulate customers could migrate to another independent provider, the steering scheme would have failed. Applied ensured it would not.

246. Between July and November 2025, the same window in which Applied was preparing its arrangement with Ascend, Applied blocked SDK approvals for Eventual Treasury and SimplePin, the only two other firms attempting to enter enterprise-level accounting automation for Epic customers. Neither had any connection to Comulate. Neither had any connection to the PBC sandbox, and neither was sued by Applied. With Comulate excluded, Eventual Treasury blocked, and SimplePin blocked, the only remaining providers of accounting automation software for Epic customers were Ascend, whose SDK access Applied can revoke at will, and Recon. Applied cleared the field so the allocation would hold.

**F. The LRA Is Direct Evidence of Applied and Ascend's Unlawful Conspiracy to Drive Comulate from the Market**

247. On December 4, 2025, one day after Comulate sued Applied in the Delaware Court of Chancery, Applied and Ascend executed the LRA, purporting to set forth the basis for Ascend's designation as Applied's Preferred Referral Partner. That express agreement between Applied and Ascend—the only two companies (and direct competitors) [redacted]

248. Under the LRA, Applied [redacted]. On its face, the LRA is an

explicit agreement between head-to-head competitors that [redacted].

249. Additionally, the LRA provides that [redacted]

250. On information and belief, in spite of the formalized LRA memorializing aspects of their agreement, Applied and Ascend have agreed to other terms setting forth that Ascend will [redacted] The LRA itself states only that [redacted]

251. To be sure, throughout 2023 and 2024, Blackwell told Katz that Applied does not enter partnerships in areas core to its business without acquisition paths: "If we feel like there isn't a concrete path to get married, we kind of default into . . . we just have to go build it." He rejected a non-acquisition partnership with Comulate as "hard for us to wrap our head around," and he demanded 30% revenue sharing if Comulate were to partner with Applied. Nevertheless, Applied seemingly entered into the Ascend LRA [redacted]. On information and belief, the terms Blackwell described as sine qua nons for Applied govern Ascend's status.

252. Moreover, the LRA post-dates Comulate's filing of its lawsuit in the Delaware Court of Chancery by one day and further post-dates Applied and Ascend's coordinated outreach

to Comulate's customers to encourage them to transition away from Comulate, demonstrating that the formalized agreement is merely a litigation-generated document intended to insulate the two companies from scrutiny.

253. Furthermore, the certifications Ascend made as a condition of the LRA are false. Ascend certified that [redacted] Ascend certified that it [redacted] In July 2025, Ascend's CTO stated: [redacted]. Ascend certified that it used Epic access [redacted]. Ascend used [redacted]. Applied accepted every one of these certifications without investigation, audit, or verification, further suggesting that the agreement is little more than a litigation cover.

* * * * *

254. In summary, Applied's arrangement with Ascend is a market consolidation, not a partnership, that inexorably leads to the same outcome. Under the first scenario, Ascend will

capture Comulate's displaced customers, but Ascend's continued cash burn and its founders' desire to exit will create conditions for Applied to acquire Ascend at a fraction of Comulate's value, acquiring Comulate's customer base that had temporarily transitioned to Ascend because of Applied and Ascend's coordinated campaign. Under the second scenario, Ascend will fail to capture sufficient share, with Recon capturing customers forced to depart from Comulate. Under this scenario, Applied can easily terminate Ascend's SDK access (as it did for Comulate, Eventual Treasury, and SimplePin), deploying Recon into a truly empty field. In either scenario, Comulate will be gone, eliminated not by competition but by coordinated foreclosure. And in either scenario, Applied will dominate the market for insurance accounting automation software by default. Even if Applied permits Ascend to continue to exist, Applied and Ascend have allocated the market among themselves, agreeing on who gets which customers during each phase, with Applied holding the keys throughout.

## XII. APPLIED USED LITIGATION THREATS, CUTOFF DEADLINES, AND CUSTOMER-SPECIFIC PRESSURE TO FORCE MIGRATION AWAY FROM COMULATE

255. The pre-litigation exclusionary campaign documented above was operationally complete by November 21, 2025. Beginning on that date, Applied used litigation threats, cutoff deadlines, and customer-specific pressure to force customers to abandon Comulate. Applied directed customers to terminate their relationships with Comulate, imposed fixed transition deadlines, and steered customers toward Applied-designated replacements. These acts caused customers who had chosen Comulate on the merits to unwind, delay, or abandon those relationships, effectuating Applied's clearing of the field.

256. Beginning on November 21, 2025, Applied converted its infrastructural friction campaign into a full-bore, customer coercion campaign. The earlier phases of Applied's exclusionary campaign made Comulate's continued service technically and commercially

precarious. This new phase used litigation threats, accusations of IP misappropriation, migration deadlines, and customer-specific pressure to force actual and prospective Comulate customers away.

### A. For [redacted], Applied Moved from Value-Add Partnership to Customer Foreclosure

257. Applied's treatment of [redacted], Applied's largest and most strategically important Epic customer, illustrates Applied's escalation of its exclusionary practices against Comulate. In March 2023, Applied asked Comulate to help solve accounting challenges in Epic for [redacted]. Applied's Senior Vice President of Corporate Development, Brian Giometti, characterized Comulate as a "value-add" and a "good solution" for [redacted], and Applied participated in scoping and integration discussions over the following months to facilitate Comulate providing accounting automation services to [redacted].

258. On September 13, 2023, [redacted] national commissions operation independently held a call with Comulate to describe the challenges [redacted] faced that Comulate might help solve. As [redacted] team lead described, [redacted] relied heavily on manual entry to handle the accounting needs related to hundreds of small insurance carriers, depended on offshore vendor labor to meet those needs, and was about to begin migrating from Vertafore's insurance AMS, BenefitPoint, to Epic, which likely would disrupt workflows across approximately a dozen regions.

259. Two weeks later, on September 29, 2023, Applied's Kevin Coplin told Katz that [redacted] no longer sought Comulate's assistance, having found "a solution for [their problems]." When pressed on what had changed, Coplin was unable to answer, stating his contact at [redacted] "d[idn't] have any clue as to what it was other than [conveying] [redacted] said they're fine." Applied's claim was false, as [redacted] had not found a solution and was still burdened with using

expensive and inefficient manual entry for its accounting needs. Rather, Applied merely decided to attempt to block Comulate from providing services to [redacted], while again attempting to continue acquisition talks with Katz in late 2023.

260. On February 16, 2024, Comulate delivered a full product demonstration to [redacted] team. [redacted], [redacted] Assistant Controller and the internal project lead for the initiative to secure an accounting automation vendor, explained that [redacted] Controllers were "very hesitant [of] promises" because other vendors had "not been able to meet any promise" that had "been given thus far." Yet [redacted] distinguished Comulate from those past experiences, noting that Comulate was "not telling [[redacted]] what [they were] going to build" but rather "showing [[redacted]] what [Comulate had] built that is already working for other people." Following this successful demonstration, [redacted] began its formal vendor approval process to onboard Comulate.

261. On April 23, 2024, Comulate demonstrated its product to [redacted] finance and IT teams. An [redacted] finance liaison stated: "God, I wish we talked to you a year ago." On May 3, 2024, [redacted] Controller, [redacted] joined a call with Comulate for the first time. [redacted] was responsible for [redacted] accounting department and hundreds of employees, and he was responsible for billions of annual revenue. On the call, he told Comulate that if its product "truly c[ould] do what it appear[ed] to be able to do, it w[ould] be a game changer for us." [redacted] disclosed that [redacted] had identified existing Comulate customers and was independently arranging reference calls with them to confirm Comulate's capabilities and quality, and he stated that he was "pushing [his] IT guys to get in front of you guys" to begin the security review necessary to begin using Comulate. Four days later, [redacted] convened a cross-functional demonstration for [redacted] broader parent organization, telling the group: "We think

[Comulate] is a game changer for us." By mid-May 2024, [redacted] reported that [redacted] was communicating to [redacted] regional controllers that he hoped Comulate would be available for [redacted] to use by February 2025.

262. Also in April 2024, an [redacted] employee reported that Applied's competing offering was not a product at all and still was at the stage of "talking conceptual levels." Whereas at the time Applied was promoting to [redacted] a product it had not yet built, Comulate was demonstrating a product already in use by dozens of the nation's largest brokerages. Foreshadowing Applied's entire exclusionary campaign, [redacted] project lead asked Comulate whether "there [is] anything that [Applied] could do that would prevent your software from doing what it does in the future?" Thus, [redacted] anticipated that Applied might use its infrastructural control to block Comulate.

263. In October 2024, Comulate presented a formal proposal to [redacted] Controller and procurement lead, who confirmed [redacted] interest in a multi-year partnership. [redacted] stated that "everyone" at [redacted] knew Comulate's value and that Comulate's "product functionality or benefit" wasn't "anything [Comulate] ha[d] to sell anymore," that being "a done deal for everybody." Yet between October 2024 and early February 2025, no commercial terms were finalized. During this window, Applied continued telling [redacted] decisionmakers that Comulate's product would not work at [redacted] scale, that Recon would be ready soon, and that Recon would be available to [redacted] for free or at a significant discount. Applied had daily access to [redacted] IT and finance leadership through the Epic implementation; Comulate did not.

264. In early February 2025, [redacted] first regional Epic rollout failed. On February 5, 2025, [redacted] and [redacted] re-engaged Comulate, requesting a call the following day. On February 6, Comulate offered [redacted] multiple flexible engagement structures, including a

narrower initial scope limited to reduce [redacted] commitment. [redacted] did not respond. On February 25, Comulate followed up.

265. On March 1, [redacted] finally replied, tracking Applied's messaging: "[I]t will be very challenging [for [redacted]] to partner with Comulate due to challenges with the SDK technology that Comulate works with, and [the] IT resources available to implement" the integration. But the bases for such a statement were false: Applied suppressed [redacted] renewed interest in Comulate by falsely suggesting that Comulate's product could not work and that Applied's subsidized (and inferior) alternative was imminent. Moreover, Applied ensured—by its own design—that third-party providers like Comulate could integrate with Epic only through the limited SDK, refused to develop replacement APIs that would have vastly improved interoperability, then cited the unfixed state of its own infrastructure to suggest that Comulate would be unable to serve [redacted]

266. By September 2025, [redacted] had reached its wits' end with Epic. [redacted] reported extremely slow loading times on Epic, with some screens taking five minutes to load while posting a single statement sometimes took hours. In addition, month after month, [redacted] experienced disastrous month-end closings, explaining it "would never want to be the first group on a new Applied product": "[I]f their code was good, we wouldn't even be having this conversation." Given these negative experiences with Applied's products, [redacted] again chose Comulate to solve its real operational pain using its accounting automation software.

267. But Applied again obstructed Comulate selling its services to [redacted]. On October 2, 2025, Blackwell called [redacted] COO, [redacted], to lobby against Comulate. Blackwell stated that Comulate "d[id]n't work with any of the big five brokers" and lacked the scalability [redacted] required. Both statements were false. Comulate already served insurance brokerages at

commercial scale, including within the top five. In contrast, Recon had not yet been released, had zero customers, and had never been employed at commercial scale.

268. The differences between Comulate's and Applied's accounting automation software capabilities did not end there. Comulate regularly processed individual statements containing hundreds of thousands of transactions. Epic, on the other hand, imposed an import limit of 10,000 transactions per statement.

269. Other of Applied's infrastructural and design failures drove [redacted] interest in Comulate. Comulate had processed over 19,000% more statements than the approximately 6,000 Recon had been developed as of July 2025. Epic was actively taking up to eight hours to process certain [redacted] statements, and deleting statements from Epic required Applied engineers to run manual scripts. Recon runs natively inside Epic and inherits every one of those constraints. Thus, Blackwell made false statements about Comulate's capabilities and customer base to deflect away from Applied's own products' shortcomings and to prevent [redacted] from choosing a competitor.

270. Following these communications, [redacted] told Comulate what he anticipated would follow: "[Applied] might start to play games . . . and they might say one thing but not do that and say well look you're having real pain and Comulate's the reason . . . as a way to further the fear and doubt and to encourage and incentivize us to swap to Applied Recon." Applied's subsequent conduct confirmed [redacted] prediction in every respect.

271. In response to Applied's attempts to throw cold water on [redacted] onboarding of Comulate, [redacted] insisted that it needed Comulate and that Applied "need[ed] to not be a barrier and be prohibitive to the [Comulate] solution working." On or about November 5, 2025, [redacted] and Comulate executed a Master Services Agreement and Order Form with a total contract value

exceeding [redacted]. In relation to that agreement, [redacted] required Applied to execute a one-page statement of work to enable Comulate's integration. Applied delayed that simple statement of work for weeks. As [redacted] explained, it "[didn't] even have a statement of work to review and sign yet from Applied. . . . [The statement of work was] literally with the president of Applied [*i.e.*, Blackwell], so [[redacted]] [couldn't] escalate any more" than it had been.

272. After weeks of unjustified delay, Applied finally committed to deliver the statement of work on November 21, 2025, after missing several prior dates it had committed to. But on November 21, Applied did not provide [redacted] with a statement of work. Instead, Applied sued Comulate for trade secret misappropriation and other claims, sent a mass email to joint customers, including [redacted], accusing Comulate of "clear evidence" of IP theft and warning customers that continuing to utilize Comulate may constitute breach of their contracts with Applied, and launched coordinated calls directing customers toward Applied-approved replacements.

273. On November 25, 2025, [redacted] moved to terminate its contract with Comulate. [redacted] did so not because of any dissatisfaction with Comulate's product but solely because Applied's filing, threats, and refusal to cooperate on integration made the relationship commercially untenable.

274. In short order, Applied directed [redacted] to Ascend, a company that competes with Applied across more markets than Comulate ever did, whose CEO Blackwell called "a snake" thirteen months earlier, and whose product Petrey dismissed as "not competitive" five months earlier. [redacted] personnel regarded Ascend as inferior, but Applied had ensured there was nothing left to choose. Applied, through its escalating anticompetitive misconduct, had spent nearly two-and-a-half years keeping Comulate from working with [redacted], ultimately filing a lawsuit to avoid delivering the statement of work [redacted] needed to proceed with Comulate. What Applied spent years preventing for Comulate, it handed to Ascend in days.

**B. Applied Implemented the Same Pattern to Drive Other Epic Customers Off of Comulate**

275. The [redacted] sequence was not unique. Beginning on November 21, 2025, Applied deployed the same general pattern across Comulate's customer base, coordinating its meritless lawsuit with an outreach effort to Comulate customers.

276. Within hours of filing its complaint, Applied began contacting joint Applied-Comulate customers to threaten them into terminating their relationships with Comulate. Applied emailed Comulate's customers, telling them that "directly or indirectly giving access to Comulate personnel to Applied Epic" was a "violation of your Agreement with Applied Systems," suggesting that customers' continued use of Comulate—which integrates with Epic through customers' SDK—would jeopardize their ability to continue using Epic (and, consequently, any other third-party integrations customers use).Applied identified no provisions in customers' Epic SDK licenses or other agreements that this threat was based on, deliberately leaving customers in doubt about how Applied interpreted their agreements and whether customers were at risk of being kicked off of Epic. Although Applied's coercive language was intentionally vague, the message was clear—ditch Comulate or face legal action (or, at the least, lose Epic access).

277. Applied's scare tactics worked. Customers quickly began contacting Comulate, confused and outraged by Applied's actions but worried that they would have to cut ties with Comulate to stay out of Applied's crosshairs. One customer understood Applied's letter to be a "cease and desist," commanding it to immediately stop using Comulate. Another reported being told by Applied that "having [Comulate] operate through the SDK" was a "breach of the Applied agreement" and that Applied would "be successful in shutting [Comulate] down."

278. Applied followed up its mass communication with customer-specific calls urging that customers migrate to one of two Applied-endorsed replacements. Applied delivered different messages to different customers, calibrating pressure strategically rather than communicating a uniform position. Some customers were told they must stop using Comulate immediately. One reported that its Comulate functionality was abruptly deactivated without its knowledge or consent, threatening to disrupt the agency's financial closing for November 2025. Several others were told that the absolute latest they could continue using Comulate was the second quarter of 2026, by which time Recon would have launched. Applied told yet another customer, which was in the process of onboarding Comulate, that existing customers would be "given until Q2 to unwind" their Comulate integration and that new customers that had not yet completed onboarding would be prohibited from enabling Comulate at all.

279. Applied selectively recommended alternatives that served Applied's interests rather than customers' needs. Applied told some customers they could replace Comulate with antiquated offshore services relying on manual data entry, such as ResourcePro or Patra. But most customers had recently transitioned away from such manual solutions and had no interest in taking a technological step backward, making that option nonviable. When customers pushed back, Applied told some that Ascend was a third-party alternative until Recon came online. But, as described below, that option was no option at all, given Ascend, for all intents and purposes, is under Applied's control.

**C. Applied Imposed Fixed Transition Deadlines Designed to Force Customers to Immediately Migrate Away from Comulate**

280. As noted above, Applied told customers that Comulate would be cut off in Q2 2026. But that cut-off date was a coercive device used to drive customers off of Comulate. Applied knows that enterprise customers require substantial lead time to transition off a deeply

integrated accounting automation provider. Customers must evaluate alternatives, negotiate contracts, plan integrations, migrate data, hire additional staff, retrain existing staff, and run parallel systems before transitioning. Applied's Q2 2026 deadline, communicated in late 2025, forced customers to immediately begin transition planning, before the merits of Applied's allegations had been tested and before customers could see whether Comulate would remain viable.

281. Thus, Applied's December 10, 2025 email "asking all customers to register or re-register their Comulate SDK integration" and stating that Applied "w[ould] allow [customers] to continue using the Comulate SDK integration through [Q2 2026]" was an empty gesture. Regardless of Applied's posturing, customers have begun shifting away from Comulate in order to comply with Applied's cut-off deadline.

### D. Applied Used Accusations of Theft and Reverse Engineering as Tools to Pressure Customers into Changing Accounting Automation Providers

282. Applied's public accusation that Comulate engaged in theft, reverse engineering, and trade-secret misappropriation was a central instrument of Applied's customer-coercion campaign. Applied has long known that Comulate—like numerous other third-party integrations that Applied continues to permit—integrated with Epic through customers' SDK licenses. Indeed, Applied facilitated that arrangement for years. Applied nevertheless used its November 21, 2025 filing and related press releases to mischaracterize Comulate's previously endorsed integration with Epic as theft and reverse engineering.

283. As described above, Applied's leading trade-secret allegations were baseless, and Applied later amended its complaint to remove core allegations. But by the time Applied removed those allegations, they already had been circulated to customers and caused competitive damage.

284. Given Recon's design deficiencies and poor quality, Applied could not attract customers from Comulate, so Applied used these baseless allegations to improperly repel customers away from Comulate.

285. Customers who demoed Recon recognized that it was a vastly inferior product to Comulate. As one customer stated after seeing a demo of Recon: "it's just . . . a really bad product. I don't know how else to say that." Another reported that Recon "was even worse than Ascend, wh[ich] wasn't great either." Insurance agency and brokerage customers generally are "very leery" about Applied products because they typically are "half baked," defectively designed, and poorly executed.

286. Another customer stated that Recon was "not anywhere near capable of what [Comulate] can do." One customer noted that while its internal accounting team receives and processes 5,000 different types of carrier statements, Recon was developed to function with only 93 types of statements. That same customer reported that when it asked how Recon handled statements beyond those 93 types, Applied advised that the customer would be forced to "put in a ticket" for Applied support to manually address the problem. But accounting automation software exists to eliminate manual statement processing, and a product—like Recon—that requires support tickets for 98% of a customer's statement volume is not actually automated. In contrast, Comulate natively processes nearly 20,000 distinct statement formats without any intervention. And despite being a significantly inferior product, Recon was priced "too close [to Comulate]," such that customers would not "even consider changing."

### E. Applied Mischaracterized Court Proceedings to Mislead Customers into Believing the Court Did Not Preserve Their Access to Comulate

287. As Applied's litigation against Comulate proceeded, Applied and Ascend made coordinated false statements about those court proceedings to create false urgency among Comulate customers to expedite their transition off Comulate.

288. On December 12, 2025, the Delaware Court of Chancery entered a temporary restraining order in Comulate's favor. The order prohibited Applied from "interrupt[ing] existing joint customers' access to or use of [Applied's] Epic system for purposes of using [Comulate's] software" and required Applied to "allow onboarding for existing joint customers to [Applied's] Epic system." The order preserved the status quo: customers could continue using Comulate while the dispute proceeded.

289. Applied knew the court had entered a TRO and mischaracterized it to customers anyway. On December 18, 2025, the same day Blackwell emailed customers that the court "did not support" Comulate's request, Applied's Senior Vice President of Strategic Accounts, Ashley Fimian, emailed a different customer referencing "the email sent by Graham Blackwell today in response to the TRO." Applied's own executive called it "the TRO" internally while Blackwell's customer-facing email denied the court had granted one. The customer in that email thread had asked whether a follow-up call was "still necessary given the court ruling in Delaware yesterday," confirming that customers understood the court had ruled in Comulate's favor until Applied's messaging overrode that understanding.

290. Applied then published a formal document titled "Applied Systems Sets the Record Straight on Comulate's Fraud and Applied's Commitments to Competition and Customer Access." That document reframed the same ruling as "the Delaware court accepted Applied's proposal."

291. These misstatements mattered because they deprived customers of the most immediate reason to resist Applied's migration demands: the understanding that a court had preserved customer access while the dispute proceeded. Applied's three-layer messaging replaced customers' understanding of court-ordered protection with the impression that Applied was free to force transitions. Customers reached out to Comulate trying to understand the actual legal situation. By the time customers received accurate information, the commercial damage of Applied's initial messaging had already been done.

### F. Applied Told Customers That No Litigation Outcome Would Restore Interoperability

292. Applied compounded the migration pressure by telling at least two customers that even if Comulate prevailed in litigation, Applied still would not allow Comulate to integrate with Epic. Such statements confirm that Applied was not pursuing a temporary remediation tied to a particular alleged access issue. Applied was pursuing permanent exclusion. The stated justification, PBC, was irrelevant to that ultimate exclusionary objective.

293. Applied also gave inconsistent messages across customers. Applied's Chief Customer Officer, Trevor Bunker, affirmatively stated to at least one customer that Applied would not interfere with that customer's access to Comulate until litigation was resolved. Other customers received hard Q2 2026 deadlines and immediate migration pressure. The inconsistency shows that Applied was calibrating pressure strategically, account by account, rather than communicating a 8uniform, good-faith position. Even after filing suit, Applied's published materials continued to state: "Applied integrates with hundreds of third-party companies that are used by 100K+ users, and we vigorously support those experiences to enable better agency workflows." Applied was publicly reaffirming its open-platform position while

simultaneously freezing SDK authorizations to block independent accounting automation vendors and coercing customers to transition off Comulate.

### G. Applied's Pressure Campaign Caused Customers to Unwind, Delay, or Reconsider Comulate Relationships

294. Applied's customer-coercion campaign produced the intended commercial effects. Customers recognized what Applied was doing but were powerless to resist. One agency had a "knee-jerk reaction to bullying" and stated that its employees were reluctant to switch to Applied's product that "doesn't seem to have the same potential or [even] work." Another customer described the strategy bluntly: "Seems they are trying to tie legs of their competition . . . felt dirty." A third summarized: "Obviously, they've got the stranglehold on the industry for the most part. You know, we think competition is good and healthy, and so this shouldn't be a way to stifle that for sure. That's how we feel. So any event, yeah, we're kind of pulling for you guys, but we have a lot of eggs in that basket, too." Another acknowledged that Applied "has leverage in this situation" because customers "can turn off [Comulate's] end point solution much faster" and can more quickly "pivot away from [Comulate] than they can Applied." [redacted], a Top 100 broker, reported after testing Applied's Recon product: "We tried Recon. It was not even close to being ready. . . . I don't see how they can sell that." [redacted] also articulated the lock-in asymmetry that gives Applied its coercive power: "We can't cut off Applied like we can cut off Comulate."

295. Customers were locked into Epic by years of implementation, millions of dollars in transition costs, and operational dependence, stating that "[m]oving away from an agency management system takes years," and "[i]t's not like we could replace our agency management system." Applied exploited that lock-in to force them off the accounting automation provider they preferred. Customers who remained with Comulate expressed the harm Applied's

campaign was inflicting. One customer stated that restricting access to Comulate "represents a meaningful regression in technology, efficiency, and process control" because "Comulate has materially transformed the way we operate." Another described transition off Comulate as "a last resort" because of the "substantial disruption to our business and operations." A third expressed that no competitive product "offer[s] the level of automation, intelligence, and reliability we experience with Comulate" or has the "seamless posting capabilities [of Comulate] . . . [which] has become foundational to our operations."

296. Numerous Comulate customers have breached or terminated their contracts with Comulate as a result of Applied's actions, including [redacted]. Other existing customers, including [redacted], Insurance Brokerage F, [redacted] paused, rescaled, or reconsidered their Comulate deployments. Customers in the process of onboarding were told that new integrations would not be enabled. Prospective customers placed evaluations on hold. Customers who remained with Comulate moved to month-to-month renewal rather than the contractually provided annual terms, creating uncertainty and business risk.

[redacted] The impact of Applied's actions on Comulate's trajectory is measurable. Before November 21, 2025, Comulate's annualized revenue was growing at a rate [redacted]. Within four months of Applied's filing and coordinated customer-outreach campaign, Comulate's revenue [redacted]. Comulate [redacted]

[redacted]

298. A leader at a Top 5 insurance brokerage had the impression that "even if Comulate wins, Applied still won't be allowing them to integrate with Epic." Another CFO reported that Applied's Chief Customer Officer said "they don't believe the courts can stop them from severing the connection." Customers recognized that they were being coerced but had no recourse short of abandoning their entire AMS platform.

299. Customers have been explicit that their breaches of their contracts with Comulate or decisions to terminate their future business relationships with Comulate are driven by Applied's actions. [redacted], a Top 10 global insurance brokerage, stated: "We don't like what they are doing but there is no other option" but to depart from Comulate, since it could not realistically transition away from its AMS. [redacted] stated in March 2026 that it would "have to move forward with cancelling [its] Comulate subscription," because Applied "is still acknowledging we need to be fully moved [away from Comulate] by June." An executive from [redacted] advised that he was "not happy with how Applied has handled this, but [he] need[ed] to eliminate the risk [his] agency is exposed to" and therefore would "be moving to Ascend by the 6/30/2026 cutoff date." An executive from [redacted] expressed that he was "somewhat fearful of retribution" by Applied, but was willing to share that "[t]he only reason [[redacted]] would make a change" in its relationship with Comulate "would be because of

[the] threat by Applied Epic to cut off our subscribed . . . access to both our data and our customer[s'] data." Insurance Brokerage F asked that its name not be disclosed to Applied but put it plainly: "we've been very happy with Comulate and if not for the June 30th deadline we wouldn't have any reason to make a change from Comulate." [redacted] stated that "Applied's conduct and their threats to shut down Comulate's access to the SDK is the only factor that is affecting our decision whether to continue with Comulate or find a viable alternative by 6/30/2026." [redacted] expressed that "Applied has directed [redacted] to terminate access for any and all Comulate personnel (and Comulate software) to our Applied Epic platform," and although [redacted] had "engaged with Applied to ask that it reconsider its direction to [redacted]" because it "consider[ed] the transition off of Comulate to be a last resort," it "believe[d] that prudent business practice oblige[d] [it] to take the necessary steps" to prepare to transition. Another large independent broker asked that its name not be revealed to Applied but stated that "Applied has communicated that the Comulate integration with Epic will end after June 30, 2026. Because of that announced cutoff, we have begun evaluating potential alternatives in order to prepare for a possible transition," and confirmed that its actions were "a direct response to the announced integration cutoff." [redacted] stated that "[a]s a result of Applied Systems cutting off Comulate on June 30th, [redacted] must explore other options to run [its] business."

300. On March 12, 2026, [redacted] one of Comulate's earliest customers, sent a formal termination letter. [redacted] pegged its termination to Applied's conduct, making it "effective on the earlier of June 30, 2026, or at such time as Applied Systems, Inc. terminates customers' access to Comulate." [redacted] Vice President of Finance and Accounting explained that [redacted] needed to "ensure ongoing coverage without violation of Applied's terms or a

court order," citing the fact that "a separate court recently denied Comulate's motion for a temporary restraining order seeking continued customer access" and that, "[a]s a result, [redacted] cannot rely on ongoing Comulate access." [redacted] was not dissatisfied with Comulate. [redacted] stated it "wishes to keep the Comulate Services and the Agreement in force for as long as legally permissible" and that if the June 30, 2026 deadline were extended, [redacted] "would consider extending its agreement." [redacted] terminated because Applied's coercive campaign left it no commercially viable alternative.

301. These effects harmed competition, not only Comulate. Customers lost or delayed access to the leading independent accounting automation product at critical operational moments and were forced toward inferior or less preferred alternatives. Applied's conduct functionally punished its own locked-in customers for choosing to deal with a competitor.

## XIII. APPLIED SACRIFICED SHORT-RUN PROFITS TO CLEAR THE FIELD FOR RECON

### A. Applied Sacrificed Profitable Revenue Streams to Exclude Comulate

302. Applied earned high-margin recurring revenue from every customer that used Comulate with Epic. Each integration required an SDK license and, in some cases, a Data Lake subscription purchased from Applied, at a cost of thousands to tens of thousands of dollars per customer annually. Many shared customers purchased SDK access solely because they wanted to use Comulate and have no other use for it; absent Comulate, Applied would not have earned the revenue at all. Applied chose to forfeit those revenues.

303. [redacted] purchased an SDK license from Applied at [redacted] per month plus [redacted] to implement, solely to enable Comulate. [redacted] Accounting Manager, stated that Comulate is worth paying for "even at a much higher price point than Recon." She described Recon as "cheaper . . . but [it] does much less." Applied forced [redacted]

[redacted] off Comulate five months after it began using the product and plans to cancel the SDK, since they do not have other use cases for it. Applied will forfeit [redacted] per year in SDK revenue from a customer who preferred Comulate and was willing to pay more for it.

304. These were not isolated cases. Between May 2024 and July 2025, Applied collected SDK and Data Lake fees from at least seven Comulate customer accounts that Applied subsequently forced to migrate from Comulate to Recon. From Insurance Brokerage F, Applied collected $[redacted] per year in SDK fees. Across all known examples, Applied's infrastructure revenues ranged from approximately $[redacted] to more than $[redacted] per customer annually. Applied's cost of providing SDK access is negligible—approximately $[redacted] per year per customer. Multiplied across Comulate's more than sixty shared customers, Applied is forgoing substantial recurring high-margin revenue to replace third-party integrations with a first-party product that eliminates the infrastructure fees those integrations generated.

305. Applied did not merely forfeit revenues it was already collecting. It refused to earn new revenues when it learned they would support Comulate. In late 2025, [redacted], an Epic customer, sought to purchase a Data Lake subscription to utilize Comulate's advanced functionality. Applied sells Data Lake subscriptions as a standard product. Upon learning the subscription would support Comulate, Applied refused to sell it. Applied had a willing buyer for a product it sells to other customers. It chose to earn nothing.

**B. Applied's Short-Term Revenue Sacrifice Confirms Its Exclusionary Purpose**

306. Applied's asserted intellectual property, security, and technical justifications do not explain its willingness to sacrifice unrelated revenues from customers who wanted to purchase SDK or Data Lake access for use with Comulate. Nor do they explain why Applied froze new SDK authorizations market-wide, refused Data Lake sales to customers like [redacted],

exempted Recon from the very tolls and limitations it imposed on rivals, or selectively tolerated comparable technical methods by Ascend while suing Comulate for the same conduct. Rather, Applied's economically irrational decision reveals its anticompetitive aims: to accept short-term losses but make them all back once Applied has established its unrivaled monopoly over the insurance accounting automation software market.

307. Applied's treatment of third-party integrations in markets where Applied does not compete underscores the point. As advertised on its website, Applied supports numerous integrations with third-party vendors that depend on customers' SDK access. Applied permits those providers to continue integrating with Epic through the SDK, yielding the same financial benefits Applied has chosen to forgo only in the accounting automation market where it is actively seeking to dominate through Recon.

## XIV. APPLIED'S CONDUCT HARMED COMPETITION AND CAUSED ANTITRUST INJURY

### A. Applied's Conduct Reduced Choice and Foreclosed Competition

308. Applied's exclusionary campaign harmed competition, not merely a competitor. Applied used its monopoly power and the infrastructure it controlled in the enterprise AMS market to foreclose competition in the adjacent market for accounting automation software. Applied froze SDK authorizations to block new entrants. Applied refused to sell Data Lake access to [redacted] because the customer intended to use the data with Comulate. Applied directed ACN to breach its auto-renewed sponsorship contract with Comulate, removing Comulate from the principal commercial channel to reach Epic customers. Applied coordinated with Ascend to steer displaced Comulate customers into an Applied-dependent replacement product. And Applied converted its lawsuit into a customer-coercion campaign, threatening customers with contractual liability for continuing to use Comulate. The cumulative effect of this

anticompetitive conduct was to eliminate the leading independent provider of insurance accounting automation software, block the only two other independent accounting automation software providers from serving Epic customers, and replace independent competition with controlled or dependent alternatives.

309. Before Applied's exclusionary campaign, accounting automation software for Epic-integrated agencies was a functioning competitive space. Before November 21, 2025, Comulate held the leading independent position with between 65% and 75% of enterprise agencies that used accounting automation software. Other firms, including Ascend, maintained or were attempting to develop competing offerings. Customers evaluated vendors on product capability, implementation fit, and price.

310. Applied's campaign eliminated that competitive structure. By freezing new SDK authorizations, restricting data access, excluding Comulate from Applied Net, imposing coercive customer conditions, and steering customers toward Applied-approved alternatives, Applied prevented Epic customers from choosing, keeping, or adopting Comulate. Because Epic customers comprise the overwhelming majority of the enterprise segment and because migration away from Epic is not commercially realistic on a timely basis, foreclosing Comulate from Epic customers meant foreclosing independent competition from a substantial portion of the relevant market.

311. Applied's conduct also reduced the availability of independent replacement supply. Comulate was the leading independent provider. Ascend was positioned as a dependent transitional alternative whose continued access depends on Applied's permissions. Eventual Treasury and SimplePin were blocked from SDK and partner access. The result was not a

market in which one competitor won on the merits. It was a market in which Applied reduced and controlled the available sources of independent supply.

### B. Applied's Conduct and Coordination with Ascend Raised Prices or Enabled Higher Prices and Degraded Product Quality

312. Since Applied sued Comulate, Ascend has increased its pricing for its accounting automation software in ways that would not have been commercially viable in a competitive market. Ascend raised per-seat prices approximately 55% to [redacted] and imposed new four-seat minimums, a prerequisite that didn't previously exist and that forces customers to pay for capacity they do not need, artificially raising contract values without additional value being delivered. Comulate's customers and prospects indicated that Ascend's pricing increase and minimums created a [redacted] annual floor, nearly triple what some Comulate customers pay for superior software. As a case study, [redacted], an Epic customer, chose Comulate over Ascend prior to the lawsuit, selecting the superior product despite Comulate costing twice as much. Ascend's post-lawsuit pricing drove [redacted]'s quoted cost 30% above what [redacted] had been paying Comulate.

313. Customers also experienced quality degradation. One customer told Applied directly that Recon offered "less than 30% of what Comulate can do." Another reported after demoing Recon that it was "a huge step back" with no email integration, no activity posting, and no agency bill capability. [redacted], forced onto Recon after five months on Comulate, stated: "We're being forced into an inferior product." Customers who evaluated Ascend reported that it "was not nearly as good as Comulate." Ascend's own CEO acknowledged in 2024 that its software "could not stand independently as an economically viable product." Customers recognized what was happening but had no recourse. Thus, Applied's campaign pushed customers toward higher priced, less capable, or less preferred alternatives and away from the product they had selected on the merits. Such effects, sustained by the elimination of

competition from the market's leading provider of accounting automation software, are direct customer harms.

### C. Applied's Conduct Restricted Customers' Ability to Use Their Own Epic-Connected Data

314. Applied's SDK, IVANS, and Data Lake restrictions harmed a distinct customer interest recognized by the antitrust laws: the ability of platform customers to use their own Epic-connected data with the complementary provider of their choosing. Enterprise agencies had adopted and remained on Epic in reliance on Applied's representations that Epic operated as an open architecture platform. Applied then converted that represented openness into a captive arrangement by invoking contractual provisions, re-registration requirements, and access controls to prevent customers from using their own data with Comulate.

315. Customers recognized that their Epic lock-in made them vulnerable. They could not stop using Epic on a commercially realistic timeline even if they wanted to resist Applied's demands. Applied exploited that lock-in to dictate which accounting automation products customers could practically use. Customers adopted Epic in part because Applied promised they could "be in control of [their] own tech destiny." Applied broke that promise and used Epic as a tool to foreclose competition in the accounting automation software market.

### D. Structural Barriers Made Timely New Entry Impracticable

316. Applied's campaign did not merely remove Comulate. It removed Comulate while simultaneously ensuring that no independent replacement could enter on a commercially meaningful timeline. Any new entrant would need Applied-controlled SDK authorization (which Applied froze market-wide in August 2025), IVANS-related data access (which Applied refused to sell to [redacted] when the customer intended to use it with Comulate), and access to the principal commercial channel through which Epic customers evaluate vendors (from which

Applied excluded Comulate and imposed constructive-exclusion pricing on [redacted], [redacted], and [redacted]). Applied demonstrated through each of these acts that it could tighten or block every gate when a competitive threat became significant. Applied's partner ecosystem, per its own website, has contracted from approximately 40+ "Certified Integrations" in 2021 to just 10 in 2026, a 75% reduction, during a period in which Applied's revenue grew approximately 60%. Applied represents that it supports "100+ custom and pre-built integrations," but Applied's own website acknowledges that this figure "includes a set of pre-built integrations developed by the Applied Solution Services team." Those are not independent third-party partners. They are Applied's own internal consulting projects, counted to obscure the contraction. A healthy platform's partner ecosystem grows with its revenue. Applied's ecosystem shrinks as a result of culling the value-add products built on top of its platform to foreclose competition.

317. The timing of potential entry matters. Customers facing Applied's transition deadlines in late 2025 and the first half of 2026 could not wait for a hypothetical entrant to obtain SDK access, complete IVANS-related processes, build commercial visibility, and deploy a proven enterprise product. By the time a new entrant could realistically serve Epic agencies at scale, Comulate's customer relationships would already have been severed and Applied's controlled alternatives (Recon and Ascend) positioned as the new incumbents.

**E. Comulate Suffered Antitrust Injury As a Direct Result of Applied's Anti-Competitive Conduct**

318. Comulate was injured by the same conduct that harmed competition in the relevant market. Applied's market foreclosure campaign—including its coordinated campaign with Ascend to coerce customers to transition away from Comulate—caused Comulate to lose major existing and prospective customer relationships, including contracted business such as [redacted], [redacted], and [redacted]. Other customers paused, deferred, or reconsidered their Comulate

deployments. Customers who remained with Comulate moved to month-to-month renewal rather than the contractually provided annual terms, creating uncertainty and business risk. Applied excluded Comulate from SDK access and from the principal commercial channel to Epic customers, thereby impeding Comulate's ability to compete on price and quality.

319. As Applied escalated infrastructure costs on Comulate's customers during the exclusionary campaign, customers asked Comulate to cover the increases. Comulate absorbed them to avoid losing the accounts. At Insurance Brokerage F, Applied's SDK fees consumed [redacted] of Comulate's [redacted] annual contract value. Across a sample of seven customer accounts between May 2024 and July 2025, Applied's Comulate-specific fee escalations consumed between [redacted] of Comulate's annual contract values. The toll Applied levied on customers through the Data Lake subscription restriction was even steeper. In late October 2024, [redacted], a shared customer, discontinued its Data Lake subscription without notice to Comulate. Core Comulate functionality stopped working immediately. The company's CIO asked whether the SDK could provide the commission data its team needed. It could not—Applied had designed the SDK not to surface that data. [redacted] CFO emailed Comulate: "We need your team to figure a way . . . to do this. Alternative would be to knock [redacted] off our contract." The customer gave Comulate two options: invest engineering resources building a workaround for a limitation Applied designed into the SDK, or absorb [redacted] in Applied's Data Lake fees. The customer did not ask Applied to reduce its price. It asked Comulate to bear the cost of Applied's architectural choices.

320. As a direct, foreseeable, and intentional consequence of Applied's actions, Comulate has lost substantial enterprise value, including current and future profits, from customers who terminated their agreements with Comulate at Applied's urging or out of fear of

Applied's coercive threats. Given the superiority of Comulate's prices and product, but for Applied's unlawful conduct, Comulate would have retained those departing customers, consistent with Comulate's previous gross customer retention rate of 99%. Comulate has suffered diminished revenues and business valuation, and artificially lost market share. To defend against Applied's baseless trade-secret misappropriation lawsuit, Comulate has been forced to incur attorneys' fees and litigation expenses, draining resources that would otherwise have been invested in growth and product improvement.

321. Comulate also suffered reputational injury from Applied's public accusations of theft, reverse engineering, and contractual wrongdoing—accusations that were disseminated to customers and the market and later withdrawn after the commercial damage had been done.

322. These injuries are antitrust injuries. They are not losses caused by successful competition on the merits. They are the direct consequence of Applied's use of monopoly power, infrastructure control, contractual leverage, customer coercion, and coordinated displacement to foreclose independent competition in accounting automation software for Epic customers. Comulate's damages will continue to grow as the full consequences of Applied's wrongdoing unfold over time and are expected to exceed [redacted].

323. Absent Applied's unlawful conduct, Comulate would have continued competing successfully in an open market on the bases of product quality, price, and customer preference. The gap between that competitive outcome and the outcome Applied imposed through foreclosure is the antitrust injury Comulate seeks to remedy.

## XV. COUNTS

### COUNT I

### Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

324. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

325. Applied has a market share of approximately 81% in the market for enterprise-level insurance AMSs.

326. Applied has monopoly power, *i.e.*, the ability to control prices, reduce output, and exclude competition, in the U.S. market for enterprise-level insurance AMSs, which is a relevant antitrust market.

327. Applied has attempted to monopolize the U.S. market for enterprise-level automated insurance agency accounting software, which is a relevant antitrust market, by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

328. Applied has specifically intended to monopolize the market for enterprise-level automated insurance agency accounting software by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

329. As a direct and foreseeable result of Applied's anticompetitive conduct, competition in the relevant market for enterprise-level automated insurance agency accounting software has been and/or will be unreasonably restrained in at least the following ways: (i) a lower cost, higher quality seller of enterprise-level automated insurance agency accounting software with the ability and incentive to drive competition is excluded from the market; and (ii) other potential entry to the relevant market for enterprise-level automated insurance agency accounting software is thwarted. Applied's conduct has no legitimate business purpose or procompetitive

effect. Any non-pretextual business rationale for its conduct that Applied attempts to claim could have been achieved through less restrictive means.

330. Applied's anticompetitive conduct includes terminating interconnection with existing customers and refusing to provide the necessary permissions for customers who would like to use Comulate as their third party solution; threatening customers who choose to work with Comulate or would like to continue their relationship with Comulate with termination or legal action; and entering into an agreement with an Applied competitor, Ascend, to exclude Comulate by designating Ascend as the only authorized provider for the existing Comulate customers.

331. Applied's anticompetitive conduct constitutes, *inter alia*, refusing to deal, tying, monopoly leveraging, and depriving competitors of facilities essential to compete.

332. There is a dangerous probability that Applied will achieve monopoly power in the market for enterprise-level automated insurance agency accounting software. That probability is measured not by Applied's current revenue share but by its demonstrated ability to foreclose every independent alternative through infrastructure it already controls. Applied has frozen SDK authorizations, blocked Eventual Treasury and SimplePin from obtaining SDK access, denied Data Lake access when the customer intended to use it with Comulate, and excluded Comulate from ACN. No independent provider can obtain the access necessary to serve a new Epic customer. The field is already closed. Comulate's annualized revenue growth was [redacted] before Applied's campaign started on November 21, 2025; within 90 days, Comulate [redacted], a swing equivalent to more than [redacted]. Existing customers continue to leave or plan to leave, and [redacted]

[redacted].

As of Applied's stated deadline, the only remaining accounting automation providers with SDK access will be Ascend, whose access Applied can revoke at will, and Recon. Applied told at least one customer that it "will likely cut off SDK for Ascend next because Applied Recon will work for agency bill as well." Both outcomes lead to Applied alone. The mechanism is already working. As of December 2025, Applied had generated approximately $600,000 in Recon revenue from a pre-launch product that was described by customers who evaluated it as "a really bad product." That Applied can claim revenue from a product it has not finished building is itself evidence of the power its infrastructure control confers.

333. This playbook has already succeeded: in premium payments, Applied used the same sequence to displace ePayPolicy without ever formally terminating its access. Applied Pay launched into an empty field. The remaining steps are ministerial. Applied controls the only three infrastructure gates through which any provider must pass to reach 81% of enterprise insurance agencies and brokerages. No new entrant can obtain access on a commercially meaningful timeline.

334. Applied's conduct has had a substantial effect on interstate commerce.

335. Applied's anticompetitive conduct has no efficiency justification, and its sole purpose and effect is to drive the most efficient and effective competitor from the relevant enterprise-level automated insurance agency accounting software market, leaving customers with no meaningful choice but to utilize Ascend's or Applied's lower-quality products. Applied's conduct has harmed and/or will harm competition overall in the relevant market for enterprise-level automated insurance agency accounting software.

336. As a direct and foreseeable result of Applied's anticompetitive conduct, Comulate has been and/or will be injured in its business and property and has suffered and/or will suffer substantial and calculable damages in the form of current and future lost profits, lost valuation, and artificially suppressed market share in amounts to be proven at trial.

**COUNT II**

**Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720**

337. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

338. Applied has a market share of approximately 81% in the market for enterprise-level insurance agency management systems.

339. Applied has monopoly power, *i.e.*, the ability to control prices, reduce output, and exclude competition, in the U.S. market for enterprise-level insurance agency management systems, which is a relevant antitrust market.

340. Applied willfully and intentionally conspired with Ascend to acquire monopoly power in the relevant market for enterprise-level automated insurance agency accounting software. This conspiracy consists of an agreement between Applied and Ascend to prevent Applied and Ascend's competitors and potential competitors, including Comulate, from interoperating with Epic such that the only viable options for enterprise-level automated insurance agency accounting software are Ascend, in the immediate term, and Recon, in the long run. The conspiracy enables Applied to exclude competition and acquire monopoly power in the relevant enterprise-level automated insurance agency accounting software market.

341. As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, competition in the relevant market for enterprise-level automated insurance agency

accounting software has been and/or will be unreasonably restrained in at least the following ways: (1) a lower-cost, higher-quality seller of enterprise-level automated insurance agency accounting software with the ability and incentive to drive competition is excluded from the market; and (2) other potential entry into the relevant market for enterprise-level automated insurance agency accounting software is thwarted.

342. Applied's anticompetitive conduct constitutes, *inter alia*, refusing to deal, tying, monopoly leveraging, and depriving competitors of facilities essential to compete.

343. Applied and Ascend's conspiracy has had a substantial effect on interstate commerce.

344. Applied and Ascend's conspiracy has no efficiency justification, and its sole purpose and effect is to drive the most efficient and effective competitor from the relevant enterprise-level automated insurance agency accounting software market, leaving customers with no meaningful choice but to utilize Ascend's or Applied's lower-quality products. Applied's conduct has harmed and/or will harm competition overall in the relevant market for enterprise-level automated insurance agency accounting software.

345. As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, Comulate has been and/or will be injured in its business and property and has suffered and/or will suffer substantial and calculable damages in the form of current and future lost profits, lost valuation, and artificially suppressed market share in amounts to be proven at trial.

## COUNT III

### Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720

346. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

347. In or around November 2025, Applied and Ascend entered into a contract, combination, and conspiracy in unreasonable restraint of trade to exclude their competitors and potential competitors, including Comulate, from the U.S. market for enterprise-level automated insurance agency accounting software, which is a relevant antitrust market.

348. Applied and Ascend's conspiracy consists of an agreement between horizontal competitors in the market for enterprise-level automated insurance agency accounting software to prevent Applied and Ascend's competitors and potential competitors, including Comulate, from interoperating with Epic such that the only viable options for enterprise-level automated insurance agency accounting software are Ascend or Recon. To the extent the conspiracy does not enable Applied to acquire monopoly power in the relevant market (which it will, for the reasons discussed above), the conspiracy establishes a duopoly consisting of Applied and Ascend that is fortified against any competitors or potential competitors.

349. As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, competition in the relevant market for enterprise-level automated insurance agency accounting software has been and/or will be unreasonably restrained in at least the following ways: (1) a lower-cost, higher-quality seller of enterprise-level automated insurance agency accounting software with the ability and incentive to drive competition is excluded from the market; and (2) other potential entry into the relevant market for enterprise-level automated insurance agency accounting software is thwarted.

350. Applied and Ascend's anticompetitive conduct constitutes, *inter alia*, a concerted refusal to deal, group boycott, and market allocation. More specifically, Applied and Ascend have agreed that they will not compete with each other with respect to the dozens of existing Comulate customers (who will be served by Ascend, unless and until Applied shuts off Ascend's SDK access leaving Applied Recon as the lone provider), and that they will disparage Comulate—and misrepresent the status of court proceedings—to coerce customers to stop using Comulate.

351. Applied and Ascend's conspiracy has had a substantial effect on interstate commerce.

352. Applied and Ascend's conspiracy has no efficiency justification, and its sole purpose and effect is to drive the most efficient and effective competitor from the relevant enterprise-level automated insurance agency accounting software market, leaving customers with no meaningful choice but to utilize Ascend's or Applied's lower-quality products. Applied's conduct has harmed and/or will harm competition overall in the relevant market for enterprise-level automated insurance agency accounting software.

353. As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, Comulate has been and/or will be injured in its business and property and has suffered and/or will suffer substantial and calculable damages in the form of current and future lost profits, lost valuation, and artificially suppressed market share in amounts to be proven at trial.

## COUNT IV

### Unlawful Business Practices in Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

354. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

355. Comulate is headquartered in California and has suffered and will continue to suffer the harm of Applied's unlawful conduct in California.

356. Comulate has standing to assert a claim under the California Unfair Competition Law because it has suffered an injury-in-fact and economic injury as a result of Applied's unlawful acts. Applied's unlawful acts have caused several of Comulate's customers to breach or terminate their contracts with Comulate, caused several other existing or onboarding customers to pause, rescale, or reconsider their Comulate deployments, caused other existing customers to switch to month-to-month rather than long-term contracts, and caused several prospective customers to place their evaluations of Comulate on hold.

357. Applied's conduct constitutes unlawful business practices within the meaning of California Business and Professions Code § 17200 because it violates the Sherman Act, the Cartwright Act, and related laws as alleged herein.

358. Applied's conduct further constitutes unlawful business practices within the meaning of California Business and Professions Code § 17200 because it constitutes tortious interference with prospective economic advantage, tortious interference with contract, and trade libel.

359. Applied's unfair business practices risk more than economic harm. Given Comulate's size, its status as a startup, and its customer overlap with Applied, Applied's actions threaten Comulate's viability as a business, as well as its goodwill and reputation within the

insurance industry. Unless Applied's actions are enjoined, Comulate will suffer irreparable harm through the destruction of business and goodwill.

360. Comulate thus has no adequate remedy at law absent injunctive relief.

361. Comulate has suffered injury in fact and lost money or property as a direct result of Applied's actions. Comulate is entitled to restitution, disgorgement, injunctive relief, and all other relief available under California law.

## COUNT V

### Unfair Business Practices in Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

362. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

363. Comulate is headquartered in California and has suffered and will continue to suffer the harm of Applied's unfair business practices in California.

364. Among other things, Applied engaged in unfair business practices by, in retaliation for Comulate declining to sell its business to Applied, launching a campaign to force Comulate out of the market for enterprise-level automated insurance agency accounting software and monopolize that market with its own product, Recon. Applied's anticompetitive conduct includes, but is not limited to, the following acts:

a. After maintaining a business relationship with Comulate for years, insisting that Comulate sign third-party consulting agreements with onerous and anticompetitive terms. These actions were intended to cause friction for Comulate customers and hinder customer uptake, thus harming Comulate's business relationships.

b. Exploiting its control over three critical infrastructure gates—the Epic SDK, IVANS, and ACN—to foreclose independent competition in the adjacent market for

enterprise-level automated insurance agency accounting software, including by imposing discriminatory SDK pricing on Comulate's customers, freezing all new SDK authorizations market-wide, refusing to sell Data Lake access when intended for use with Comulate, and directing ACN to exclude Comulate from its flagship conference in breach of an auto-renewed contract.

c. Unilaterally terminating a voluntary, mutually beneficial course of dealing with Comulate and its customers—which Applied had maintained for years, profiting from SDK and Data Lake access fees derived therefrom—in an escalating sequence across all three controlled infrastructure gates, sacrificing its own short-run profits for the purpose and effect of excluding Comulate from the market for enterprise-level automated insurance agency accounting software so Applied can establish a monopoly therein.

d. In addition to filing its false trade secrets claims, sending false and libelous communications to joint customers, accusing Comulate of misappropriating trade secrets, falsely claiming that the joint clients would breach their contract if they continued to use Comulate, and threatening these joint clients with legal action if they continued to use Comulate.

e. After sending such communications, continuing to have one-on-one conversations with joint clients, telling them that they must cease using Comulate.

f. Conspiring with Ascend, a horizontal competitor in the enterprise-level automated insurance agency accounting software market, to allocate approximately sixty Comulate customers that have been blocked from using all independent accounting automation alternatives, including by coordinating calls to Comulate's customers the day Applied filed its pretextual IP litigation and reading from scripts that promoted Ascend as a

replacement with pre-negotiated pricing already in place, all while Applied retains the right to terminate Ascend's integration to Epic (and the ability to provide accounting automation services to customers) at will.

365. Applied's anticompetitive conduct violates the spirit and policy of antitrust law as it constitutes an attempt to monopolize the market for enterprise-level automated insurance agency accounting software in violation of the spirit of the Sherman Act.

366. Applied used its monopolistic power in the market for enterprise-level insurance agency management systems to lure customers into using Epic. In doing so, it promised that Epic was an open platform that would allow customers to use third-party extension services, including Comulate.

367. Applied has now taken anticompetitive actions to try to oust Comulate from the market, taking away that option from its customers and forcing customers to use Applied's own inferior product, Recon, in the market for enterprise-level automated insurance agency accounting software.

368. Applied's propping up of Ascend as its newfound "Preferred Referral Partner" is nothing more than a false choice designed to stave off customer complaints and conceal the true nature of Applied's anticompetitive acts. Applied is certainly not partnering with Ascend—a company whose founder Blackwell removed from Applied Net and called a "snake"—to improve customer choice. Applied is no doubt planning to acquire Ascend once Recon is fully launched. And if Ascend refuses to be acquired, Applied will follow the same playbook it has used against Comulate—cut off Ascend's access to the Epic SDK, thereby ousting Ascend from the market.

369. Transitioning away from Epic to another AMS is not a viable option for Epic clients because (i) it would take Epic customers years and be prohibitively expensive to switch to an alternative AMS, and (ii) Applied's market dominance in the market for enterprise-level insurance agency management systems leaves customers with no reasonable alternative options for an AMS. Applied has thus "locked in" its clients to the Epic platform and, as a result, into Recon and out of Comulate.

370. Applied's unfair business practices have harmed competition in the market for enterprise-level automated insurance agency accounting software by eliminating a major competitor in the market, thus decreasing the quality of products and leaving the market open to a takeover by Recon.

371. As a result of Applied's unfair business practices, Comulate has suffered, and will continue to suffer, substantial irreparable harm. Applied's unlawful acts have caused several of Comulate's customers to breach or terminate their contracts with Comulate, caused several other existing or onboarding customers to pause, rescale, or reconsider their Comulate deployments, caused other existing customers to switch to month-to-month rather than long-term contracts, and caused several prospective customers to place their evaluations of Comulate on hold.

372. Applied's unfair business practices risk more than economic harm. Given Comulate's size, its status as a startup, and its customer overlap with Applied, Applied's actions threaten [redacted], as well as its goodwill and reputation within the insurance industry. Unless Applied's actions are enjoined, Comulate will suffer irreparable harm through the destruction of business and goodwill.

373. Comulate thus has no adequate remedy at law absent injunctive relief.

374. Comulate has suffered injury in fact and lost money or property as a direct result. Comulate is entitled to restitution, disgorgement, injunctive relief, and all other available relief.

**COUNT VI**

**Tortious Interference with Prospective Economic Advantage**

375. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

376. Comulate has (or, in some instances, had) valid prospective economic relationships with existing and prospective customers, including customers evaluating or onboarding Comulate who placed evaluations on hold and prospects told by Applied that new integrations would not be enabled. Because these relationships contemplated payments to Comulate, they stood to yield future economic advantage for Comulate.

377. Applied was aware of Comulate's economic relationships with its existing and prospective customers, as many of Comulate's clients are joint clients with Applied.

378. Applied intentionally interfered through independently wrongful acts: (a) the 22-month pre-litigation exclusionary campaign (January 2024 through November 2025), comprising discriminatory SDK pricing, the [redacted] Data Lake refusal, the ACN exclusion, the market-wide SDK freeze, and the coercive conditioning documented in Section IX; (b) Applied's post-filing communications with customers, including false, libelous, and defamatory claims about Comulate misappropriating and reverse engineering Applied's trade secrets, and a directive to customers to terminate Comulate, asserting without contractual basis that using Comulate was a "violation of your Agreement with Applied Systems" and deactivating at least one customer's functionality without consent (Section XII.B); (c) Applied's knowing mischaracterization of the Delaware TRO in three audience-calibrated versions—internal ("the TRO"), customer-facing (court "did not support"), published (court "accepted

Applied's proposal")—which were affirmative factual misrepresentations about court orders (Section XII.E); and (d) the coordination with Ascend to allocate displaced customers (Section XI). Applied reinforced the coercion through operational directives: on or about December 10, 2025, Applied required all customers to "register or re-register their Comulate SDK integration," imposing a Q2 2026 expiration that functioned as a built-in termination date and forced customers to begin transition planning immediately, before the merits of Applied's accusations had been tested (Section XII.C).

379. As a direct and proximate result, Comulate lost customer opportunities, existing relationships, and future business expectancy, as detailed in Section XII.G and Section XIV.E.

380. Comulate has suffered substantial economic and reputational harm. Given Comulate's status as a startup, further terminations risk irreparable harm. Comulate has no adequate remedy at law absent injunctive relief.

381. Because Applied's conduct was malicious and in bad faith, Comulate is entitled to punitive damages.

**COUNT VII**

**Tortious Interference with Contract**

382. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

383. Comulate had valid and enforceable contracts with customers including [redacted] (total contract value [redacted]), [redacted], [redacted], and other identified accounts. Applied was aware of these contracts—specifically, Applied knew of the [redacted] contract because Blackwell personally delayed the statement of work [redacted] needed to implement it.

384. Applied intentionally induced disruption or termination of such contractual relationships through: (a) Blackwell's personal obstruction of [redacted] statement of work, culminating in Applied's failure to deliver the document on the committed date of November 21, 2025 (Section XII.A); (b) Applied's post-filing communications with customers, including false, libelous and defamatory claims about Comulate misappropriating and reverse engineering Applied's trade secrets, and a directive to customers to terminate Comulate, asserting without contractual basis that using Comulate was a "violation of your Agreement with Applied Systems" and deactivating at least one customer's functionality without consent (Section XII.B); (c) knowing mischaracterization of the Delaware TRO as alleged in Count VI (Section XII.E); and (d) the statement that "even if Comulate wins, we still won't be allowing them to integrate with Epic," *see* Section X.C, which caused customers to conclude that maintaining Comulate contracts was commercially futile (Section XII.F).

385. As a direct and proximate result, [redacted] terminated its contract with Comulate on November 25, 2025. [redacted] termination was not justified under the Master Services Agreement between Comulate and [redacted]; Applied caused [redacted] to breach its contract with Comulate. [redacted] also terminated without justification. Applied reinforced these terminations through its December 10, 2025 re-registration directive, which required customers to take affirmative steps with a built-in Q2 2026 expiration, effectively converting a purported accommodation into a forced transition timeline (Section XII.C). Other customers transitioned to month-to-month agreements, as detailed in Section XII.G. On March 12, 2026, [redacted] likewise terminated its contract with Comulate.

386. Comulate has suffered substantial economic and reputational harm. Given Comulate's status as a startup, further terminations risk irreparable harm. Comulate has no adequate remedy at law absent injunctive relief.

387. Because Applied's conduct was malicious and in bad faith, Comulate is entitled to punitive damages.

**COUNT VIII**

**Trade Libel**

388. Comulate incorporates by reference all preceding allegations as if fully set forth herein.

389. Applied made false and libelous statements concerning Comulate and its product: (a) Applied published a press release entitled "Applied Systems Sets the Record Straight on Comulate's Fraud and Applied's Commitments to Competition and Customer Access" that accused Comulate of "cheating and lying," perpetrating an "elaborate fraud scheme," and "theft," which it distributed to customers and the market before amending its own complaint to remove the core trade-secret allegations on which these accusations rested; (b) Applied sent false and libelous communications to mutual customers following its lawsuit, falsely accusing Comulate of trade secret misappropriation and reverse engineering, (c) Applied made pre-litigation false statements to [redacted], including that Comulate "doesn't work with any of the big five brokers" and lacked the scalability [redacted] required; (d) in August 2025, Applied lied to [redacted] that Comulate would soon be "out of business."

390. These statements were false and Applied knew they were false. For example, Applied knew the "theft" characterization was false because it had authorized, facilitated, and profited from the same SDK access for years, and Applied's own in-house counsel had assessed Comulate's integration and raised no issues. Applied made these

statements intentionally and in bad faith to destroy Comulate's business. The statements caused grave pecuniary and reputational harm, including the termination of the [redacted] and [redacted] contracts and additional damages in the form of reputational harm and loss of goodwill, as detailed in Section XIV.E.

391. Because Applied's dissemination of false statements was malicious and in bad faith, Comulate is entitled to punitive damages.

## XVI. PRAYER FOR RELIEF

**WHEREFORE**, Comulate respectfully requests that the Court enter judgment in its favor and grant the following relief:

a. Adjudging and decreeing that Applied attempted to monopolize the relevant market for enterprise-level automated insurance agency accounting software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b. Adjudging and decreeing that Applied conspired with Ascend to monopolize the relevant market for enterprise-level automated insurance agency accounting software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720;

c. Adjudging and decreeing that Applied conspired with Ascend to unreasonably restrain trade in the relevant market for enterprise-level automated insurance agency accounting software in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720;

d. Issuing preliminary and permanent injunctive relief to enjoin Applied from continuing the unlawful anticompetitive behavior described above, disseminating false information about Comulate, engaging in unfair trade practices, and further interfering with Comulate's relations with its clients and prospective clients;

e. Declaring that Applied violated the California Unfair Competition Law through both unlawful and unfair business practices;

f. Awarding Comulate treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, or, alternatively, restitution, caused by Applied's violations of the antitrust laws;

g. Awarding Comulate compensatory damages for lost profits, lost enterprise value, and lost market share caused by Applied's tortious and defamatory conduct;

h. Awarding Comulate punitive damages based on Applied's bad-faith and malicious tortious conduct;

i. Awarding Comulate pre- and post-judgment interest, as well as Comulate's reasonable attorneys' fees, expert fees, and other expenses and litigation costs; and

j. Awarding Comulate such other relief as this Court deems just, equitable, and proper.

Respectfully submitted,

Dated: October 23, 2026

/s/ *Michael N. Nemelka*

Michael N. Nemelka (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
Derek T. Ho (Bar No. 488609)
Daniel S. Severson (*pro hac vice*)
Michael C. McCue (*pro hac vice*)
Justin D. Cole[*] (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, PLLC
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
mnemelka@kellogghansen.com
apanner@kellogghansen.com
dho@kellogghansen.com
dseverson@kellogghansen.com
mmccue@kellogghansen.com
jcole@kellogghansen.com

*Attorneys for Defendant Ardent Labs, Inc., d/b/a Comulate*

[*] Not admitted in the District of Columbia; practicing under the supervision of members of the Firm.